Mark H. Meyerhoff, Bar No. 180414
mmeyerhoff@lcwlegal.com
Joung H. Yim, Bar No. 216136
jyim@lcwlegal.com
LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

Telephone:  (310) 981-2000
Facsimile:   (310) 337-0837

Attorneys for Defendants
CITY OF TORRANCE and
JOHN J. NEU

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| REHAN NAZIR,<br><br>          Plaintiff,<br><br>v.<br><br>COUNTY OF LOS ANGELES [an entity of unknown form]; COUNTY OF LOS ANGELES DISTRICT ATTORNEY'S OFFICE [an entity of unknown form]; LAWRENCE E. MASON, in his capacity as Senior Special Assistant for the COUNTY OF LOS ANGELES DISTRICT ATTORNEY'S OFFICE; CITY OF TORRANCE, a municipal corporation; JOHN J. NEU, individually and as Chief of Police of the City of Torrance Police Department; DOES 1 THROUGH 10,<br><br>          Defendants. | Case No.  CV 10-6546 SVW (AGRx)<br><br>Assigned to Hon. Stephen V. Wilson<br>Courtroom: 6<br>Complaint Filed: September 1, 2010<br><br>**DEFENDANTS CITY OF TORRANCE AND JOHN J. NEU'S APPENDIX OF EVIDENCE IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF**<br><br>Date:        May 16, 2011<br>Time:       1:30 p.m.<br>Courtroom:   6<br><br>[Filed concurrently with Defendant's Notice and Motion for Summary Judgment; Statement of Uncontroverted Facts and Conclusions of Law; [Proposed] Order and Judgment] |

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

DEFENDANT'S APPENDIX OF EVIDENCE IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

**1**

1    TO THE COURT, PLAINTIFF AND TO HIS ATTORNEYS OF RECORD:

2    PLEASE TAKE NOTICE that Defendants City of Torrance and John J. Neu

3    hereby submit this Appendix of Evidence in Support of their Motion for Summary

4    Judgment.  Defendants respectfully request that the Court consider the following

5    evidence referenced in Defendants' Statement of Uncontroverted Facts and

6    Conclusions of Law, filed concurrently herewith:

7       Declaration of Joung H. Yim;

8       Declaration of John J. Neu;

9       Declaration of Mary Giordano;

10      Declaration of Kevin Kreager;

11      Declaration of Lael R. Rubin;

12      Declaration of Diane Vezzani;

13      Exhibit A:   April 14, 2007, Arrest Report 070024540 re Michael Baker;

14      Exhibit B:   Second Amended Complaint, filed on or about November 15,
                     2010;

15      Exhibit C:   Excerpts from Plaintiff's Deposition taken March 12, 2011;

16      Exhibit D:   Superior Court of Los Angeles Crime Summary Information
                     Probable Cause Declaration 070024540 of Arrestee Baker,
                     executed April 14, 2007;

17      Exhibit E:   February 2, 2009, Brady Letter from the D.A.'s Office to
                     Plaintiff;

18      Exhibit F:   April 23, 2010, Brady Appeal Letter from Plaintiff's Attorney;

19      Exhibit G:   June 3, 2010 Letter from the D.A.'s Office to Plaintiff's
                     Counsel;

20      Exhibit H:   D.A.'s Special Directive 02-08, Subject: Brady Protocol, dated
                     December 7, 2002;

/ / /

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

1     Exhibit I:    June 10, 2010 Letter from the D.A.'s Office to Chief Neu re

2               Brady Notice for Plaintiff;

3     Exhibit J:    August 16, 2010 Notice of Intent to Terminate Plaintiff;

4     Exhibit K:    September 9, 2010 letter from Ms. Giordano to Plaintiff.

5

6   Dated: April 15, 2011              LIEBERT CASSIDY WHITMORE

7

8                                 By: _____

9                                 Mark H. Meyerhoff

                                  Joung H. Yim

10                                 Attorneys for Defendants

                                CITY OF TORRANCE and

11                                 JOHN J. NEU

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

DEFENDANT'S APPENDIX OF EVIDENCE IN
SUPPORT OF THEIR MOTION FOR SUMMARY
JUDGMENT

**3**

# Declaration of Yim

**4**

# DECLARATION OF JOUNG H. YIM

I, Joung H. Yim, declare as follows:

1.   I am an attorney licensed to practice in California and an associate at Liebert Cassidy Whitmore, attorneys of record for Defendants CITY OF TORRANCE and JOHN J. NEU in the above-entitled matter. I make this declaration in support of Defendants CITY OF TORRANCE and JOHN J. NEU'S Motion for Summary Judgment, based on my own personal knowledge. If called upon to do so, I could and would competently testify thereto.

2.   On or about September 1, 2010, Plaintiff filed this lawsuit.

3.   He filed his Second Amended Complaint on or about November 15, 2010. Attached as Exhibit "B" to Defendants' Appendix of Evidentiary Support ("Appendix") is a true and correct copy of Plaintiff's Second Amended Complaint.

4.   On or about March 14, 2011, Mark H. Meyerhoff, an attorney from my firm deposed Plaintiff in this action. I was present during the entirety of Plaintiff's deposition. Attached as Exhibit "C" to the Appendix are relevant excerpts from Plaintiff's deposition.

5.   Included as Exhibit "A" to the Appendix is a true and correct copy of an Arrest Report 070024540 which Plaintiff authenticated during his deposition on or about March 14, 2011.

6.   Included as Exhibit "D" to the Appendix is a true and correct copy of a Probable Cause Declaration 070024540 which Plaintiff authenticated during his deposition on or about March 14, 2011.

7.   Included as Exhibit "E" to the Appendix is a true and correct copy of a February 2, 2009 letter from Lael R. Rubin, Head Deputy District Attorney to Plaintiff, which Plaintiff produced in his February 14, 2011 Responses to Request for Production of Documents, Set One.

8.   Included as Exhibit "F" to the Appendix is a true and correct copy of

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

5

an April 23, 2010 letter from Plaintiff's counsel to Lawrence Mason, Senior Special Assistant, which Plaintiff produced in his February 14, 2011 Responses to Request for Production of Documents, Set One.

9. Included as Exhibit "G" to the Appendix is a true and correct copy of a June 3, 2010 letter from Lawrence E. Mason, Senior Special Assistant to Plaintiff's counsel, which Plaintiff produced in his February 14, 2011 Responses to Request for Production of Documents, Set One.

10. On April 6 and 13, 2011, pursuant to Central District Local Rule 7-3 conferences were held with Plaintiff's counsel, Michael Morguess regarding Defendants' contemplated Motion for Summary Judgment.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed this 15th day of April 2011, Los Angeles, California.

Joung H. Yim, Declarant

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

**7**

# Declaration of Neu

**DECLARATION OF JOHN J. NEU**

I, John J. Neu, declare as follows:

1.     I am the Chief of Police for the Torrance Police Department ("Department").  I declare that I have personal knowledge of the following facts and if called upon to testify as a witness, I could and would competently testify thereto.

2.     I have served as Chief of Police for the Department since October 2006.  I started at the Department in August 1985 as a Police Officer.  I became Captain in June 2002 and served in that capacity until I became Chief.

3.     As Chief of Police, my duties include overseeing and managing over 300 sworn police officers and other non-sworn employees.  The Department is charged by law with ensuring the safety of a diverse community of 143,000 people, covering 20.5 square miles.  As part of my duties, I oversee hiring and promotion of employees.  Specifically, I am responsible for interviewing and selecting sworn public safety employees for promotion pursuant to the Torrance Munipal Code ("TMC").  I am also responsible for recommending to the City Manager the dismissal of any member of the Department as it becomes necessary.

4.     Plaintiff Rehan Nazir ("Plaintiff") was formerly employed by the City as a Police Officer until his termination on September 9, 2010.

5.     On or about June 10, 2010, I received a letter from Irene Wakabayashi, the Head Deputy, Appellate Division for the Los Angeles County District Attorney's Office ("D.A.'s Office").  In the letter, Ms. Wakabayashi informed me that the D.A.'s Office had reviewed information regarding Officer Nazir and had determined that *Brady* impeachment material relating to Officer Nazir existed.  Specifically, the letter advised me that the D.A. Office's "Brady Compliance Unit" had reviewed allegations that Officer Nazir made false statements in two probable cause declarations and a police report that he prepared in connection with the arrests of Michael Baker and Latera Odom.  According to Ms. Wakabayashi, the D.A.'s Office had determined that Officer Nazir's conduct involved moral turpitude and considered his conduct to constitute *Brady* material that required his placement in the "Brady Alert System."  A true and correct copy of the June 10, 2010 letter from Ms. Wakabayashi is attached to Defendants'

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

DECLARATION OF JOHN J. NEU

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

Appendix of Evidentiary Support ("Appendix") as Exhibit "I."

6.    The June 10, 2010 letter from Ms. Wakabayashi also informed me that the D.A.'s Office reached its determination to place Officer Nazir in the "Brady Alert System" in accordance with its "District Attorney's Brady Protocol," set forth in Special Directive 02-08.  Ms. Wakabayashi notified me that, prior to June 10, 2010, Officer Nazir had submitted an appeal to the District Attorney's Office's Special Designee, a neutral third party, in an attempt to reverse his placement in the "Brady Alert System."  However, Ms. Wakabayashi informed me that the Special Designee rejected Officer Nazir's appeal and found that substantial evidence existed to support the Brady Compliance Unit's determination that *Brady* material existed and that Officer Nazir's name and a brief description of his misconduct would be placed in the "Brady Alert System."  I had no knowledge of the substance or content of Officer Nazir's appeal to the D.A.'s Office prior to his termination on September 9, 2010.

7.    Upon receipt of Ms. Wakabayashi's June 10 letter, I took steps to determine the impact on the Torrance Police Department of Officer Nazir's placement in the "Brady Alert System."  Accordingly, on or about June 21, 2010, Torrance Police Department Deputy Police Chief Mike Browne and I met with Head Deputy District Attorney Diane Vezzani (since retired) and the Assistant Head Deputy District Attorney Shawn Randolph.  Ms. Vezzani advised me that she read Ms. Wakabayashi's letter pertaining to Officer Nazir's placement in the "Brady Alert System."  Based on this, Ms. Vezzani concluded that she would never approve a criminal filing of any case in which Officer Nazir was a material witness, nor allow Plaintiff to testify in any such matter.  Ms. Vezzani told me that "on a scale of 1 to 10," with 10 being the most serious, Officer Nazir's actions as described in Ms. Wakabayashi's letter was "at the top of the scale" because Officer Nazir's conduct impacted his credibility as a witness.

8.    Prior to making a determination regarding Officer Nezir's employment with the City, I also reviewed the *Brady v. State of Maryland* (1963) 373 U.S. 83 decision and Brady Protocol Special Directive 02-08 cited in Ms. Wakabayashi's June 10, 2010 letter.  After reviewing these sources, I concluded that the D.A.'s Office had independently determined that it

494152.2 TO020-062

- 2 -

**DECLARATION OF JOHN J. NEU**

9

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

must, under *Brady*, disclose to the defense its finding that Officer Nazir included false information in police reports in connection with the Michael Baker arrest.

9.      Based on Officer Nazir's placement in the "Brady Alert System," I also concluded that Officer Nazir's continued employment with the Torrance Police Department would harm the public service in at least two significant ways: 1) cases in which Officer Nazir was the arresting officer, or a material witness, may not be filed by the District Attorney, and 2) even if such a case were filed, Officer Nazir's credibility would be subject to challenge and the prosecution of such a case would likely to be undermined.  Accordingly, I determined that Officer Nazir's  placement in the "Brady Alert System" would prohibit him from performing the essential and fundamental functions as a law enforcement officer for the City.

10.      On or about August 16, 2010, I issued to Officer Nazir a Notice of Intent to terminate him from his position as police officer with the City of Torrance.  My determination was based upon the conclusion that Officer Nazir could no longer perform his job duties.  I also concluded that I could not reasonably ask the taxpayers of the City of Torrance to pay full salary and benefits to a police officer whose cases may or may not get filed because of the D.A. Office's formal determination that Officer Nazir was not credible.  I could not justify Officer Nazir's continued employment as a police officer in light of the fact that he could not effectively and without question perform the essential functions of his job.  A true and correct copy of the Notice of Intent to terminate Officer Nazir is attached to Defendants' Appendix as Exhibit "J."

11.      My decision to recommend Officer Nazir's termination was not based in any way upon any grievances, lawsuits or complaints Officer Nazir submitted to, or filed against, the City during his employment with the City.  Rather, my recommendation was based entirely upon Officer Nazir's placement in the "Brady Alert System" and the subsequent consequence of that placement.

12.      Prior to making my decision to recommend Officer Nazir's termination, I did not have any involvement with the investigation or review by the D.A.'s Office into Officer Nazir's misconduct related to his arrest of Michael Baker in April 2007.  Specifically, I had no contact or

**DECLARATION OF JOHN J. NEU**

**10**

1    discussions, either verbally or in writing with anyone from the Brady Compliance Unit of the

2    D.A.'s Office related to Officer Nazir's placement in the "Brady Alert System."  I also had no

3    contact or discussions, either verbally or in writing with Lael R. Rubin, the Head Deputy of the

4    D.A. Officer's Appellate Division of the Brady Compliance Unit regarding Officer Nazir's

5    placement in the Brady Alert System.

6          13.    I have never had any contact or discussion, verbally or in writing with Lawrence

7    E. Mason, the D.A. Office's Special Designee, regarding Mr. Mason's final determination to

8    place Officer Nazir in the "Brady Alert System."

9          14.    I had no knowledge regarding Plaintiff's disclosure, if any, to the D.A.'s Office or

10   the County of Los Angeles describing the City's policy relating to the disclosure of informants on

11   arrest reports or probable cause declarations.  Specifically, I had no knowledge or notice about

12   what, if any,  information Officer Nazir set forth in his April 23, 2010 appeal letter to Lawrence

13   E. Mason prior to Officer Nazir's termination on September 9, 2010.

14         15.    Since I have been Chief of Police, no police officer or sworn employee has

15   remained employed by the Department who was also placed in the Brady Alert System.

16         I declare under the penalty of perjury under the laws of the United State and the State of

17   California that the foregoing is true and correct.

18         Executed this 14th day of April 2011, at Los Angeles California.

19

20

21                                              _____

22                                              John J. Neu, Declarant

23

24

25

26

27

28

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA  90045

494152.2 TO020-062                          - 4 -

**DECLARATION OF JOHN J. NEU**

11

Declaration of Giordano

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

**DECLARATION OF MARY K. GIORDANO**

I, Mary K. Giordano, declare as follows:

1.      I am employed as the Assistant City Manager for the City of Torrance ("City") and have held such position for 16 years.  I declare that I have personal knowledge of the following facts and if called upon to testify as a witness, I could and would competently testify thereto.

2.      As Assistant City Manager, I am familiar with the City's Policy, Procedures and Protocol Manual Chapter 139, "Disciplinary Action Procedure."  Pursuant to this procedure, I was designated as the *Skelly* hearing officer for a *Skelly* conference with Officer Rahin Nazir on or about September 7, 2010 after Police Chief John J. Neu recommended Officer Nazir's termination.

3.      Despite receiving notice of the *Skelly* meeting, neither Officer Nazir nor his representative appeared at the scheduled *Skelly* conference.  Prior to the *Skelly* conference I had reviewed the Notice of Intent to terminate Officer Nazir, including all supporting documents, which was prepared by Chief Neu and served on Officer Nazir on August 16, 2010.  A true and correct copy of the Notice of Intent that I reviewed is attached to Defendants' Appendix of Evidentiary Support ("Appendix") as Exhibit "J."

4.      Based on my review of the facts and evidence, I found that the preponderance of evidence supported Chief Neu's recommendation to terminate Officer Nazir's employment.  Accordingly, Officer Nazir's termination was upheld effective September 9, 2010.  A true and correct copy of my September 9, 2010 letter upholding the recommended termination is attached to the Appendix as Exhibit "K."

I declare under the penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed this 14th day of April 2011, at Los Angeles California.

*Mary K. Giordano*
Mary K. Giordano, Declarant

**DECLARATION OF MARY K. GIORDANO**

**13**

**14**

Declaration of Kreager

**DECLARATION OF KEVIN KREAGER**

I, Kevin Kreager, declare as follows:

1.      I am a Captain with the Torrance Police Department ("Department"). I declare that I have personal knowledge of the following facts and if called upon to testify as a witness, I could and would competently testify thereto.

2.      I am currently Captain Services Bureau. I was a Captain of the Administrative Bureau from November 27, 2005 to April 9, 2011. The Administrative Bureau is involved in the following operations: Recruiting and Hiring; Internal Affairs Investigations; Training Plans and Activities; Budget, Payroll and Purchasing; Research Projects; and Policy and Development. As part of my duties, I also review all grievances filed by Police Officers.

3.      In my position, I am familiar with former Police Officer Rehan Nazir. The City terminated Officer Nazir on or about September 9, 2010.

4.      Prior to Officer Nazir's termination, I had no involvement with the Los Angeles County District Attorney's Office's ("D.A.'s Office") investigation or review related to Officer Nazir's arrest of Michael Baker in April 2007. Specifically, I had no contact or discussions, either verbally or in writing with anyone from the D.A. Office's Brady Compliance Unit regarding their investigation of Officer Nazir. I also had no contact or discussions, either verbally or in writing, with Lael R. Rubin regarding Officer Nazir's placement in the Brady Alert System.

5.      I have never had any contact or discussion, verbally or in writing, with Lawrence E. Mason regarding Mr. Mason's final determination to include Officer Nazir in the Brady Alert System.

6.      I had no knowledge regarding Plaintiff's disclosure, if any, to the D.A.'s Office or the County of Los Angeles describing the City's policy relating to the disclosure of informants on arrest reports or probable cause declarations. Specifically, I had no knowledge or notice about what, if any, information Officer Nazir set forth in his April 23, 2010 appeal letter to Lawrence E. Mason prior to Officer Nazir's termination from the City in September 2010.

7.      As the former Captain assigned to Administrative Bureau, I am familiar with and have reviewed grievances filed by Officer Nazir during his employment with the City.

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

494117.2 TO020-062

Specifically, Officer Nazir filed a grievance in late December 2007 or early January 2008 seeking promotion to the position of Sergeant.  Officer Nazir also filed a grievance on or about July 30, 2008 in regards to his reassignment to the Department's Communications division.

I declare under the penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed this 14th day of April 2011, at Los Angeles California.

_____

Kevin Kreager, Declarant

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA  90045

DECLARATION OF KEVIN KREAGER

**17**

Declaration of Rubin

## DECLARATION OF LAEL R. RUBIN

I, Lael R. Rubin, declare as follows:

1.     I am Director of the Los Angeles County District Attorney's Office Bureau of Prosecution Support Operations and have management responsibility over the Brady Compliance Unit.  I declare that I have personal knowledge of the following facts and if called upon to testify as a witness, I could and would competently testify thereto.

2.     I have been Director of the Bureau of Prosecution Support Operations since April 6, 2009.  Prior to being appointed Director, I was Head Deputy of the Los Angeles County District Attorney's Office Appellate Division.  The Brady Compliance Unit is part of the Appellate Division.   I was responsible for ensuring that the Brady Compliance Unit adhered to the Brady Protocols set forth in Special Directive 02-08.  A true and correct copy of the Special Directive 02-08 is attached and incorporated herein as Exhibit "H."

3.     I am familiar with the facts and circumstances surrounding the decision to place Rehan Nazir's name in the Brady Alert System.  Mr. Nazir's name was placed in the Brady Alert System in February 2009 while I was Head Deputy of the Appellate Division and the direct supervisor of personnel assigned to the Brady Compliance Unit.  Los Angeles County District Attorney's Office policy, including Special Directive 02-08, was followed in making the decision to place Mr. Nazir's name into the Brady Alert System.

I declare under the penalty of perjury under the laws of the United States and of the State of California that the foregoing is true and correct.

Executed this 13th day of April 2011, at Los Angeles, California.

Lael R. Rubin, Declarant

**DECLARATION OF LAEL R. RUBIN**

19

# Declaration of Vezzani

**DECLARATION OF DIANE VEZZANI**

I, Diane Vezzani, declare as follows:

1.     I was formerly employed as the Head Deputy District Attorney for the Los Angeles County District Attorney's Office ("D.A.'s Office").  I declare that I have personal knowledge of the following facts and if called upon to testify as a witness, I could and would competently testify thereto.

2.     I am currently retired.  I was the Head Deputy District Attorney assigned to the Torrance Branch from September 3, 2001 to January 14, 2011.  I started as a Deputy District Attorney on December 29, 1980.  As Head Deputy District Attorney I reviewed all criminal cases involving police officers acting as material witnesses whose credibility may be at issue.

3.     On or about June 21, 2010 I had a meeting with the City of Torrance Police Chief John Neu and the City's Deputy Chief Mike Browne of the Torrance Police Department.  Chief Neu asked to meet with me to get my perspective on the challenges of prosecuting cases if the filing officer was in the District Attorney's Brady Alert System.  During this meeting, I read the June 10, 2010 letter from Irene Wakabayashi, the Head Deputy, Appellate Division informing Chief Neu that Officer Rehan Nazir was placed in the Brady Alert System based on conduct involving moral turpitude.  Specifically, the letter stated that the D.A. Office's "Brady Compliance Unit" had reviewed allegations that Officer Nazir made false statements in probable cause declarations and a police report that he prepared.

4.     Given that Officer Nazir was placed in the Brady Alert System for conduct involving moral turpitude and falsifying an arrest report, I advised Chief Neu and Deputy Chief Browne that I would never approve a criminal filing of any case in which Officer Nazir was a material witness nor allow Officer Nazir to testify in any such matter.  Based on my 30 years experience prosecuting felony cases, I would not proceed with any case where Officer Nazir was a material witness.  This was especially so because Officer Nazir's credibility as a witness could be easily undermined given the basis for his placement in the Brady Alert System.

///

///

494152.1 TO020-062

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

**20**

**DECLARATION OF DIANE VEZZANI**

5.      I also told Chief Neu that on a scale of 1 to 10, with 10 being the most serious, Officer Nazir's actions, as described in Ms. Wakabayashi's June 10, 2010 letter, was at the top of the scale because Officer Nazir's credibility as a witness was significantly undermined.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 15th day of April 2011, at Los Angeles California.

_____
Diane Vezzani, Declarant

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA  90045

494152.1 TO020-062

**DECLARATION OF DIANE VEZZANI**

Exhibit A

**22**



# Torrance Police Department

General Case Report for Incident 070024540

---

| Occurred Between: 22:35:56 04/14/2007 and 22:35:56 04/14/2007 | Case Status: CAA (Cleared Adult Arrest ) |
|---|---|

When Reported: 22:35:56 04/14/2007            Status Date: 04/15/2007

Area: W15L                    Report Type: SPCV (Suspicious Person/Circ/Vehicle)

Location: 16520 CRENSHAW BLVD; 7-11 Torrance, CA 90504

Responsible Officer: Nazir R

---

Status: Arrestee :

Name: Odom, Latera L.

Home Address: 3647 W 104TH ST. Inglewood, CA 90303          Home Phone: (323)381-3507

DOB: 10/14/1982  AGE: 24        SEX: F        RACE: B        HEIGHT: 5'07"    WEIGHT: 180

Business Addr: LOS ANGELES / MARTIN LUTHER KING          Bus. Phone: ( ) -

---

Status: Arrestee :

Name: Baker, Michael E.

Home Address: 710 E. IMPERIAL HWY Los Angeles, CA 90059          Home Phone: (323)754-0934

DOB: 12/16/1974  AGE: 32        SEX: M        RACE: B        HEIGHT: 5'07"    WEIGHT: 188

Business Addr:          Bus. Phone: ( ) -

---

Arrested: Baker, Michael E.

Booking #: P07001416            Date: 22:50:00 04/14/07            Age: 0

| OFFENSE CLASS: | STATUTE: | LOCATION: |
|---|---|---|
| Felony | HS 11359 - Marijuana, Poss for Sales | 16520 CRENSHAW |
| Felony | HS 11360(a) - Marijuana, Sales/Furnish/Give | 16520 CRENSHAW |
| Felony | HS 11378 - Poss of Cont Subst for Sales | 16520 CRENSHAW |
| Felony | HS 11379(a) - Trans/Sell/etc Cont Substance | 16520 CRENSHAW |
| Felony | PC 3056F - Parole Violation (Fel & Misd) | 16520 CRENSHAW |

---

Arrested: Odom, Latera L.

Booking #: P07001417            Date: 23:50:00 04/14/07            Age: 0

| OFFENSE CLASS: | STATUTE: | LOCATION: |
|---|---|---|
| Felony | HS 11378.5 - Poss of PCP for Sales | 16520 CRENSHAW |
| Felony | HS 11379.5(a) - Trans/Sell/etc PCP | 16520 CRENSHAW |

---

**Exhibit A - 1**

General Case Report for Incident 070024540

*Page 2 of 7*

| Prop. # | Item Description | Value |
|---------|------------------|-------|
| 16625 | US Currency | 1231 |
| 16626 | US Currency | 3.82 |
| 16627 | Drivers License | 0 |
| 16628 | BLK Belt 501 | 0 |
| 16629 | WHI Jewelry | 0 |
| 16630 | WHI Clothing t-shirts | 0 |
| 16631 | Narc-Marijuana | 0 |
| 16632 | BRO Wallet | 0 |
| 16633 | BLU Clothing knit cap | 0 |
| 16634 | BLU Keys | 0 |
| 16637 | SIL Cellular Phone Motorola i450 | 0 |
| 16638 | SIL Cellular Phone Motorola i265 | 0 |
| 16641 | Cassette, Audio Maxell C-90 | 0 |
| 16642 | Cassette, Audio Maxell MC-60UR | 0 |
| 16643 | Paperwork | 0 |

## VEHICLE INFORMATION

Owner ID Number: 33621    Vehicle Number: 14907    License Plate: 5HTV068

VIN:    State: CA    Expires: **/**/**

Year: 1996    /Make: BUIC    Model: LES-ABRE    Type:    Color: BLU/    Doors: 4

Value: 0    Related: Vehicle

(c) 2005 Spillman Technologies
All Rights Reserved

04/16/07    **24**

**Exhibit A - 2**

General Case Report for Incident 070024540

*Page 3 of 7*

## Narrative

TORRANCE POLICE DEPARTMENT
ARREST REPORT

ARRESTEE: BAKER, MICHAEL
ARRESTEE #2: ODOM, LATERA

REPORTING
OFFICER(S): NAZIR #16279
            OKAZAKI #17616

ASSISTIG
OFFICER(S): SGT. PAT SUCH
            DET. FREDDY AHMAD
            LA IMPACT GROUP 12

TIME OF
ARREST:       2250 HOURS

PENAL CODE
SECTION(S): 11378.5 H&S-SALE OF PCP
            11379.5 H&S-TRANSPORTATION
            11359 H&S-SALES OF MARIJUANA
            11360 H&S-TRANSPORTATION
            3056 PC-VIOLATION OG PAROLS

DETAILS:

ARRESTEE BAKER IS ON PAROLE FOR SALE OF PCP

On 14 Apr 07 at approximately 2235 hours, Officer Okazaki and I (Nazir)
were working in a marked black and white police vehicle as Unit 502. Earlier
in this day, a robbery had occurred at approximately 1742 hours at the 7-11
convenience store located at 16520 Crenshaw Boulevard (DR 070024491). The
suspect of the robbery was described as a BMA, approximately 35 years old and
stocky build. The weapon used in the robbery was a chrome revolver.

We were conducting surveillance of the 7-11 convenience store when we observed
a light blue Buick LeSabre (California license plate 5HTV068) pull into the
7-11 parking lot. We noticed that the blue Buick backed into the parking stall
facing southbound on the north side of the 7-11 store. We continued to monitor
the vehicle and we noticed that the subjects were sitting inside the vehicle
for a few minutes. Based on our training and experience, we formed the opinion
that the suspects were possibly casing the 7-11 store for a robbery. It should
be noted that there was only two vehicles in the whole parking lot of 7-11
store. It appeared to us that Arrestee Baker and Arrestee Odom didn't park the
blue Buick in front of the store, so the vehicle couldn't be seen from the
inside of the store. We noticed that all of the parking spots in front of the
business were empty.

We drove eastbound on Cherry Avenue towards Crenshaw Boulevard and noticed a
black male adult wearing a grey long sleeve shirt, dark beanie, dark pants,
later identified as Arrestee Baker exit the driver seat of the blue Buick. This
subject matched the description of the robbery suspect who had committed the
robbery earlier at the 7-11 store. We noticed a black female adult (later
identified as Arrestee Odom) exit the right front passenger seat of the blue
Buick. While we were waiting at the red light at Crenshaw and Cherry, we

(c) 2005 Spillman Technologies
All Rights Reserved

**Exhibit A - 3**

noticed Arrestee Baker look in our direction and suddenly have a surprise look on his face. We noticed that Arrestee Odom stopped in front of the blue Buick for a few seconds and then continue to walk towards the 7-11 sore. Arrestee Baker walked back to his vehicle on the driver side and stood behind the driver's door looking in our direction.

Based on the facts that the robbery had occurred earlier at the 7-11 store and that these suspects were possibly casing the 7-11 store for robbery, we drove into the 7-11 parking lot via the southern driveway. It should be noted that we never turned on our emergency lights or siren and parked the police unit approximately 50 feet away from the suspect's vehicle. As we pulled our police unit into the parking lot, Arrestee Baker and Arrestee Odom started to walk at a faster pace towards the 7-11 store in an effort to avoid contact with law enforcement.

We contacted Arrestee Baker and Arrestee Odom in the parking lot. I spoke to Arrestee Baker and he (Baker) immediately told me that he was on parole for narcotics. Officer Okazaki contacted Arrestee Odom and she acted surprised. I asked Arrestee Baker if the blue Buick belonged to him and he stated yes. Due to the fact that Arrestee Baker related to me that he (Baker) was on parole, I conducted a search and found multiple baggies (one inch by one inch) in his right front jeans pocket containing a green leafy substance resembling marijuana in violation of 11359 H&S (sales of marijuana) and 11360 H&S (transportation of marijuana). I asked Arrestee Baker what they were doing in the area and he (Baker) didn't have an answer. Arrestee Baker admitted to me that he was a member of a "Grape Street Crips" gang member and his nickname was "Butter." Due to the fact that Arrestee Baker was in possession of a large amount of marijuana, we detained him (Baker) pending further investigation.

Officer Okazaki detained Arrestee Odom pending further investigation.

We conducted a wants and warrants check on the blue Buick and TPD communications advised the vehicle was registered to Arrestee Baker.

I conducted a wants and warrant check on Arrestee Baker through TPD communications. TPD communications advised us that Arrestee Baker was on parole for narcotic sales.

We asked Arrestee Baker and Arrestee Odom if there was anything illegal inside the vehicle and they both said no. I walked up to the blue Buick and immediately smelled a chemical odor emitting from inside the vehicle. Upon closer inspection, I noticed that there was a plastic bottle filled with a clear liquid sitting on the front passenger floor board of the vehicle. I noticed that the plastic bottle was inside a black plastic bag. We asked Arrestee Baker what was inside the plastic bottle and Arrestee Baker related it was apple juice. We asked Arrestee Odom what was inside the plastic bottle and she (Odom) also related that it was apple juice. I asked Arrestee Odom if she would have a problem drinking the apple juice. I noticed Arrestee Odom's head drop down and I noticed that she wasn't sure about her answer. We asked Arrestee Baker if he would have any problems drinking the apple juice. Arrestee Baker then told us that the liquid inside the plastic bottle was approximately a half gallon of PCP (Phencyclidine), in violation of 11378.5 H&S (sale of PCP) and 11379.5 H&S (transportation of PCP).

Arrestee Baker immediately started to tell me that it was his PCP. Arrestee Baker related that Arrestee Odom didn't have anything to do with possessing the

(c) 2005 Spillman Technologies
All Rights Reserved

**Exhibit A - 4**

PCP and to "just let her (Odom) go." Arrestee Baker continued to make spontaneous statements and related that he was at the 7-11 store to sell the PCP to another individual. Arrestee Baker then told me to dump and get rid of the PCP on the ground and just arrest him on a parole violation. Arrestee Baker related that he will take the "rap" for the whole thing but let her (Odom) go. Arrestee Baker related that he was going to go away for a long time. Arrestee Baker became emotional and told me to dump the PCP on the ground.

Based on our training and experience in regards to PCP knowing it contains very dangerous chemicals, the fact that it was approximately one-half gallon, we immediately notified TPD communications.

Sgt. Such responded to our location to assist us. We blocked off the area where the blue Buick was parked and waited for the LA IMPACT lab team to arrive.

TPD Detective Ahmad #16884 was contacted and he responded to our location to assist us.

Detective Ahmad contacted LA IMPACT team #12 (lab team) to respond to our location to properly handle and take custody of the PCP. Detective Frank Lyga was in charge of LA IMPACT investigation and he responded to our location and took custody of the PCP. For further on LA IMPACT involvement refer to Detective Lyga's report. LA IMPACT team 12 properly packaged the PCP and it was released to their custody.

Officer Bazilius (CSI) responded to our location and took photographs.
We transported Arrestee Baker and Arrestee Odom to TPD jail for booking and processing.

Based on the following facts below, we based the opinion that Arrestee Baker and Arrestee Odom conspired to sell and transport PCP and they were placed under arrested for the above listed charges.

1. Arrestee Baker is on parole for the sale of PCP (CDC #T80357).
2. Arrestee Baker admitted to possessing and transporting PCP in his vehicle.
3. Arrestee Baker related that he (Baker) came to the city of Torrance with half gallon of PCP with the intention of selling the PCP.
4. Arrestee Baker was in possession of multiple baggies of individually wrapped green leafy substance resembling marijuana.
5. Arrestee Odom was sitting in the vehicle as a front passenger and the PCP was on the floor board in a black plastic bag.
6. Arrestee Odom admitted to the knowledge of PCP and prepared a written confession.
7. Arrestee Baker has prior felony convictions for sales of PCP and on parole for the same.
8. Arrestee Baker and Arrestee Odom reside outside the city of Torrance and they took a journey together to Torrance with the intention of selling and transporting PCP.
9. Arrestee Odom was in possession of large amount of US currency.
10. The blue Buick was registered to Arrestee Baker.
11. Possession of cellular telephone. Communication device used by narcotic traffickers to communicate with their would be suppliers, buyers and or co-conspirators.

**Exhibit  A - 5**

General Case Report for Incident 070024540                          Page 6 of 7

Prior to the vehicles impound, LA IMPACT, Detective Lyga took custody of the PCP.

The vehicle was towed by Van Lingen, per section 22655.5 CVC.

While at the TPD jail, Arrestee Odom wrote a confession note in regards to her involvement.  Arrestee Odom wrote she (Odom) knew it was PCP in the plastic container.  For further refer to the confession note.

Arrestee Odom was in possession of over $1200 in US currency.  The US currency was booked into evidence for asset forfeiture proceedings.

While at the TPD jail, Officer Okazaki obtained a parole hold on Arrestee Baker.  Arrestee Odom signed the Currency disclaimer for the $1231.00.

Through department resources, we learned that Arrestee Baker is a documented gang member with "Grape Street Crips."  Based on the fact that Arrestee Baker admitted being an active gang member for Grape Street Crips (moniker Butter), which was confirmed through department resources, an additional charge of 186.22 (a) PC- Participation in a criminal street gangs should apply.  Based on our training and experience, we have learned that "Crips," gang members are heavily involved in manufacturing and selling PCP.

While at TPD jail, Detective Ahmad monitored one of Baker's telephone call.  "Arrestee Baker was heard telling his mother that the Torrance police arrested him for one-half gallon of PCP."  Arrestee Baker related that Torrance police got him "riding dirty and he will be going away for a while.

TPD Detective Ahmad advised Arrestee Baker of his Miranda advisement.  Arrestee Baker waived his rights.  Arrestee Baker told Detective Ahmad that he brought the one-half gallon of PCP to sell it to a subject by the name of "Tank."  Arrestee Baker related that he was going to charge "Tank," approximately $5000.  Arrestee Baker told Detective Ahmad that Arrestee Odom didn't have anything to do with it.  For further refer the tape.

TPD Detective Ahmad advised Arrestee Odom of her Miranda advisement.  Arrestee Odom waived her rights.  Arrestee Odom admitted to the knowledge of PCP in the vehicle.  Arrestee Odom admitted that the PCP was on the front passenger floorboard. For further refer to the tape.


SEE BOOKING
SEE PCD
SEE LA IMPACT REPORT
SEE WRITTEN CONFESSION NOTE BY ARRESTEE ODOM
SEE CSI REPORT
SEE CURRENCY CONTROL DOCUMENT


R. NAZIR #16279


Lt. L. DeGonia

**Exhibit A - 6**

Case 2:10-cv-06546-JAK-AGR   Document 43-2   Filed 04/15/11   Page 29 of 120   Page ID #:440

| Prepared By: | Date: | Records Status: | Date: |
|---|---|---|---|
| Approved By: | Date: | | |

**Exhibit A - 7**

**30**

Exhibit B

DIETER C. DAMMEIER, SBN 188789
dieter@policeattorney.com
MICHAEL A. MCGILL, SBN 231613
mcgill@policeattorney.com
MICHAEL A. MORGUESS, SBN 192838
morguess@policeattorney.com
**LACKIE, DAMMEIER & MCGILL APC**
367 North Second Avenue
Upland, CA  91786
Telephone: (909) 985-4003
Facsimile:  (909) 985-3299

Attorneys for Plaintiff
REHAN NAZIR

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| REHAN NAZIR,<br><br>              Plaintiff.<br><br>    vs.<br><br>COUNTY OF LOS ANGELES [an entity of unknown form]; COUNTY OF LOS ANGELES DISTRICT ATTORNEY'S OFFICE [an entity of unknown form]; LAWRENCE E, MASON, in his capacity as Senior Special Assistant for the COUNTY OF LOS ANGELES DISTRICT ATTORNEY'S OFFICE; CITY OF TORRANCE, a municipal corporation; JOHN J. NEU, individually and as Chief of Police of the City of Torrance Police Department; DOES 1 THROUGH 30,<br><br>              Defendants. | Case No.: CV 10-6546 SVW<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR VIOLATION OF INDIVIDUAL CIVIL RIGHTS AND LIBERTIES WITH SUPPLEMENTAL STATE LAW CLAIMS**<br><br>**DEMAND FOR JURY TRIAL** |

1

# I

## JURISDICTION AND VENUE

1.  Plaintiff's action is authorized by 42 U.S.C. §1983, which provides for redress for the deprivation under color of state law of rights secured by the Constitution and the laws of the United States.  Jurisdiction is conferred on this Court by 28 U.S.C. §1343(3), providing for jurisdiction in this Court of suits authorized by 42 U.S.C. §1983 to redress the deprivation under color of state law of any right, privilege, or immunity secured by the Constitution of the United States, and by 28 U.S.C. §1343(4), providing for the protection of civil rights.  Federal supplemental jurisdiction over the state law claims is conferred by 28 U.S.C. §1367.  This Court has authority to provide declaratory and injunctive relief in this case pursuant to 28 U.S.C. §§2201 and 2202.  Venue is proper in the Central District of California in that the wrongs alleged herein occurred within the County of Los Angeles, and the cities of Los Angeles and Torrance, within the Central District.

# II

## PARTIES

2.  Plaintiff REHAN NAZIR (hereinafter "PLAINTIFF" or "NAZIR") is an individual and resident of Los Angeles County.  At all relevant times unless otherwise mentioned herein, Nazir was employed by Defendant City of Torrance in the capacity of police officer with the Torrance Police Department.  NAZIR is a permanent police officer for the CITY OF TORRANCE and as such has a constitutionally cognizable property interest in his position.  At all relevant times unless otherwise mentioned herein, NAZIR was a peace officer as defined by California Penal Code Section 830.1, and therefore is and was entitled to the protections of the Public Safety Officers Procedural Bill of Rights Act (Cal. Govt. Code Section 3300 et seq.), and further he completed the probationary period

2

Exhibit  B - 2

32

1   required by his employing agency, and thus could only be terminated for cause and

2   therefore has a constitutionally cognizable property interest in his employment.

3       3.    Defendant COUNTY OF LOS ANGELES ("COUNTY") is, and at all

4   times mentioned herein was, a public entity existing and organized under the laws

5   of the State of California.  COUNTY is also a public agency for purposes of the

6   Public Safety Officers Procedural Bill of Rights Act (Cal. Govt. Code Section

7   3300 et seq.).

8       4.    Defendant COUNTY OF LOS ANGELES DISTRICT

9   ATTORNEY'S OFFICE ("DISTRICT ATTORNEY'S OFFICE") is, and at all

10   times herein mentioned was, a department of, an entity doing business on behalf

11   of, COUNTY.  DISTRICT ATTORNEY'S OFFICE is also a public agency for

12   purposes of the Public Safety Officers Procedural Bill of Rights Act (Cal. Govt.

13   Code Section 3300 et seq.).

14       5.    Plaintiff is informed and believes, and upon such information and

15   belief, alleges that Defendant LAWRENCE E. MASON ("MASON") is, and at all

16   times herein mentioned herein was, an individual employed by the DISTRICT

17   ATTORNEY'S OFFICE in the non-prosecutorial capacity of Senior Special

18   Assistant and as such is and was a third party neutral and final decisionmaker

19   pursuant to the COUNTY and DISTRICT ATTORNEY'S OFFICE's purported

20   Brady appeal procedure on whether police officers, including NAZIR, are placed

21   on the COUNTY Brady Alert System pursuant to which COUNTY and DISTRICT

22   ATTORNEY'S OFFICE notify the police officer's employer.  He is sued in his

23   individual capacity as Senior Special Assistant for the DISTRICT ATTORNEY'S

24   OFFICE.  He is not a deputy district attorney.

25       6.    Defendant CITY OF TORRANCE ("CITY") is a duly constituted

26   municipal corporation operating under the laws of the State of California, wholly

27   situated in the County of Los Angeles.  Torrance Police Department (hereinafter

28   "Department") is an operating department of CITY.  CITY is a public agency

3

**Exhibit  B - 3**

**33**

1  employer for purposes of the Public Safety Officers Procedural Bill of Rights Act

2  (Cal. Govt. Code Section 3300 et seq.).

3        7.     Defendant JOHN J. NEU ("NEU") is, and at all times herein

4  mentioned was, the Chief of Police of the CITY Police Department.  NEU is sued

5  individually in his capacity as the Chief of Police.  In doing the things alleged

6  herein, NEU acted under color of state law, within the course and scope of his

7  employment, and as an official policy-maker for the City.  As a head of the Police

8  Department, NEU is, and at all times herein mentioned was, vested with policy-

9  making authority over actions such as the ones at issue in this complaint.

10        8.     Plaintiff is ignorant of the true names and capacities of Defendants

11  and DOES 1 through 30 sued herein, and therefore sues these Defendants by

12  fictitious names.  Plaintiff is informed and believes, and thereupon alleges, that

13  each of these fictitiously named Defendants is legally responsible, intentionally,

14  negligently, or in some other actionable manner, for the events and occurrences

15  described herein and thereby legally caused the injuries, damages, violations and

16  deprivation of rights alleged herein.  Plaintiff will amend this complaint and seek

17  the true names and capacities of said fictitiously named Defendants when they

18  have been ascertained.

19        9.     At all times relevant herein, Defendants and DOES 1 through 30, and

20  each of them, were acting under color of law, to wit, under the color of statutes,

21  ordinances, regulations, policies, customs, practices, and usages of Defendants

22  COUNTY, DISTRICT ATTORNEY'S OFFICE or CITY as appropriate and the

23  State of California.  Defendants and said DOE Defendants were acting within the

24  course and scope of their employment with COUNTY, DISTRICT ATTORNEY'S

25  OFFICE, or CITY, and the wrongful acts hereinafter described flow from their

26  exercise of said authority.  In some circumstances, each Defendant was also acting

27  as an employee, agent and representative of each and every Defendant herein, and

28

4

**Exhibit B - 4**

**34**

1   in doing the acts herein alleged, was acting within the permission, consent,

2   ratification, and authority of their co-Defendants.

3

### III

### FACTS COMMON TO ALL COUNTS

6       10.     On or about April 14, 2007, NAZIR and another CITY police officer

7   were working a patrol shift for CITY.  During that shift, NAZIR and the other

8   police officer learned that a robbery had occurred at a local convenience store, and

9   learned the suspect's description.

10      11.     Subsequent to learning of the robbery and suspect's description, and

11  during the same patrol shift, NAZIR and the other police officer used a

12  confidential informant to arrange a narcotics purchase from a suspected narcotics

13  dealer.

14

15      12.     Subsequent to arranging the narcotics transaction, and during the same

16  patrol shift, NAZIR and the other police officer observed someone matching the

17  description of the aforementioned robbery suspect in the vicinity of the same local

18  convenience store that had been robbed, and who acted suspiciously.

19      13.     The person NAZIR and the other police officer observed also

20  generally matched the description of the person from whom the confidential

21  informant arranged to purchase narcotics; however, NAZIR and the other police

22  officer had not previously worked with this particular confidential informant and

23  given the tenuous nature of developing and using such contacts, did not know if the

24  confidential informant or the information provided by the informant were

25  trustworthy, reliable or accurate, and therefore could not ascertain whether the

26  person then and there observed was the suspect from the earlier reported robbery or

27  the person from whom the confidential informant had arranged to purchase

28  narcotics, or neither.

SECOND AMENDED COMPLAINT FOR DAMAGES

**Exhibit B - 5**

14.     NAZIR and the other police officer decided to make contact with the observed person to ascertain whether he was the robbery suspect or the narcotics dealer.

15.     Upon initiating a consensual encounter with the observed person, NAZIR and the other police officer determined he was the narcotics dealer from whom the confidential informant had arranged to purchase narcotics and placed him under arrest.

16.     NAZIR and the other police officer reported the arrest, and a Sergeant from the CITY police department arrived to provide assistance at the scene of the arrest. NAZIR and the other police officer briefed the Sergeant on the details of the arrest, including the use of the confidential informant.

17.     NAZIR prepared two Probable Cause Declarations ("PCD") detailing the probable cause supporting the contact and arrest, and an Arrest Report. Pursuant to training he received by CITY, and consistent with law enforcement professional standards and customs, and case law, he omitted information concerning use of the confidential informant because he had independent probable cause to make contact with, detain, and arrest the observed person. The PCD and Arrest Report were reviewed with approval by the other police officer partnered with NAZIR and the Watch Commander, who is a lieutenant. At no time has any person or entity disputed whether probable cause existed to make the contact or arrest.

18.     Shortly thereafter, in or about the middle of April 2007, the DISTRICT ATTORNEY'S OFFICE filed criminal charges against the person arrested (the "Arrestee") by NAZIR and his partner; contemporaneous with the filing of said criminal charges, the DISTRICT ATTORNEY'S OFFICE was informed of the use of the confidential informant; nevertheless, the DISTRICT ATTORNEY'S OFFICE proceeded with the prosecution of the Arrestee.

6

**Exhibit B - 6**

**36**

19.    In or about October 2008, in the course of a federal prosecution against the Arrestee, his attorney learned of the use of a confidential informant and moved to dismiss the case filed in state court against him by the DISTRICT ATTORNEY'S OFFICE.

20.    In or about October 2008, the DISTRICT ATTORNEY'S OFFICE dismissed the state case against Arrestee.

21.    On or about December 2008, CITY police department initiated investigations of several of CITY's police officers who were involved in the arrest of Arrestee and concerning the arrest; however, although fully aware of the omission of the use of the confidential informant from the PCD and Arrest Report, Plaintiff is informed and believes the CITY also investigated NAZIR or sought to discipline him at that time; and none of the other investigated police officers were disciplined.

22.    On February 2, 2009, the DISTRICT ATTORNEY'S OFFICE, through its Bureau of Prosecution Support Operations, Brady Compliance Unit, notified NAZIR that the Brady Compliance Unit had conducted an investigation and determined that the PCD and Arrest report concerning Arrestee contained false information because it failed to contain information concerning use of the confidential informant; that it considered its findings to constitute "Brady material," and the notice indicated that as a result thereof, NAZIR was being placed in the DISTRICT ATTORNEY'S OFFICE's "Brady Alert System."

23.    Plaintiff is informed and believes, and upon such information and belief alleges that "Brady material" refers to a prosecuting authority's discovery obligations pursuant to the United States Supreme Court case of *Brady v. Maryland* (1963) 373 U.S. 83 ("*Brady*"). Generally, *Brady* requires prosecutors to disclose to the defense evidence favorable to a defendant which is either exculpatory or impeaching and is material to either guilt or punishment;

7

Exhibit  B - 7

37

1   suppression by the prosecution of evidence favorable to an accused upon request

2   violates due process where the evidence is material either to guilt or punishment.

3         24.     Plaintiff is informed and believes, and upon such information and

4   belief, alleges that pursuant to Special Directive 02-08 promulgated by COUNTY

5   and DISTRICT ATTORNEY'S OFFICEthe COUNTY and DISTRICT

6   ATTORNEY'S OFFICE have created a "Brady Alert System" which is operated

7   and maintained by the Brady Compliance Division and/or Brady Compliance Unit,

8   which serves as a central repository for Brady material and coordinates and makes

9   available to deputy district attorneys Brady material on peace officers, including

10  police officers such as NAZIR, and governmentally employed expert witnesses.

11        25.     Plaintiff is informed and believes, and upon such information and

12

13  belief, alleges that every deputy district attorney of the DISTRICT ATTORNEY'S

14  OFFICE can access the Brady Alert System to determine whether information

15  about a particular witness exists.

16        26.     There is no obligation of law which requires the DISTRICT

17  ATTORNEY'S OFFICE to maintain the Brady Alert System; its creation is a

18  matter of convenience.

19        27.     In its February 2, 2009, notice to NAZIR, the Brady Compliance Unit

20  informed NAZIR that he was permitted to file written objections and submit

21  additional written information to Senior Special Assistant MASON of the

22  DISTRICT ATTORNEY'S OFFICE who would make the final decision as to

23  whether NAZIR was to be placed in the Brady Alert System.  The notice

24  concluded that if placed in the Brady Alert System, NAZIR's employer would be

25  so notified.  The procedures described in this paragraph were taken pursuant to

26  Special Directive 02-08.

27

28        28.     On or about April 23, 2010, NAZIR submitted his written objections

and further information in an attempt to have his name removed from the Brady

8

Alert System and to dispute the initial findings by COUNTY and DISTRICT ATTORNEY'S OFFICE of dishonesty and conduct involving moral turpitude. NAZIR was not permitted to appear before MASON, present live testimony, or cross-examine witnesses, or able to review all of the materials and information upon which the DISTRICT ATTORNEY'S OFFICE relied; nor was the DISTRICT ATTORNEY'S OFFICE required to carry any burden or present a case-in-chief in support of placement into the Brady Alert System.

29. On June 3, 2010, Senior Special Assistant MASON rendered the final administrative decision on behalf of the DISTRICT ATTORNEY'S OFFICE and determined that there is substantial evidence that Brady material exists and that such information be placed into the District Attorney's Brady Alert system. More specifically, MASON determined that NAZIR was the primary subject of the internal investigation by CITY concerning Arrest of Arrestee; that NAZIR falsified the Arrest Report and PCDs; that his conduct involved moral turpitude; and that Brady material exists and that such information should be placed into the COUNTY and DISTRICT ATTORNEY's OFFICE's Brady Alert System.

30. On or about June 10, 2010, the Brady Compliance Unit of the DISTRICT ATTORNEY'S OFFICE notified Defendants CITY (NAZIR's employer) and Chief of Police NEU of the final administrative decision by MASON, who the DISTRICT ATTORNEY'S OFFICE identified as a neutral third party, of placing NAZIR in the Brady Alert System.

31. On or about August 16, 2010, CITY, through Defendant NEU, issued a notice to NAZIR of CITY's intent to terminate NAZIR based on a finding that NAZIR made false statements in two PCDs and the Arrest Report prepared in connection with arrest of the Arrestee, and additionally the determination to place NAZIR's name in the Brady Alert System, and additionally the prospect that the DISTRICT ATTORNEY'S OFFICE may not file cases in which NAZIR is

9

1  involved.  On September 9, 2010, CITY terminated NAZIR purportedly based on

2  these same reasons.

3       32.    Plaintiff is informed and believes, and upon such information and

4  belief, alleges that placement in the Brady Alert System effectively blacklists

5  NAZIR from further employment as a peace officer in that no law enforcement

6  agency will hire him so long as he remains on the DISTRICT ATTORNEY'S

7  OFFICE's Brady Alert System list.  Pursuant to Special Directive 02-08, and

8  policies and procedures of COUNTY and DISTRICT ATTORNEY'S OFFICE,

9  inclusion in the Brady Alert System indicates that the COUNTY and DISTRICT

10  ATTORNEY'S OFFICE, and MASON, have determined that clear and convincing

11  evidence exists to support a finding that the officer engaged in improper conduct

12  involving moral turpitude.

13

14

15  **FIRST CAUSE OF ACTION**

16  *42 U.S.C. § 1983 – As Against COUNTY and*

17  *DISTRICT ATTORNEY'S OFFICE*

18       33.    Plaintiff hereby incorporates each and every preceding paragraph

19  as though fully set forth herein.

20       34.    NAZIR has a constitutionally cognizable property interest in his

21  position as a police officer for CITY; the actions of Defendants COUNTY,

22  DISTRICT ATTORNEY'S OFFICE as alleged herein, including the findings they,

23  independently and through MASON, made of dishonesty and conduct involving

24  moral turpitude, have deprived NAZIR of his property interest.  Before it may do

25  so, due process under the 5th and 14th amendments to the United States Constitution

26  require that NAZIR be afforded a full and fair evidentiary hearing before a neutral

27  third party, where Defendants COUNTY and DISTRICT ATTORNEY'S OFFICE

28  are required to carry the burden to prove that NAZIR committed the conduct with

Exhibit  B - 10

1  which he is charged and that such conduct amounts, if at all, to Brady material; and

2  where NAZIR may test such evidence and call and cross-examine witnesses and

3  otherwise present testimony and argument in his behalf. This is also required by

4  California Government Code Section 3304(b), and failure to comport with this

5  procedure is additional grounds for violation of due process.

6      35.   Defendants COUNTY, DISTRICT ATTORNEY'S OFFICE failed to

7  afford NAZIR due process in accordance with the above prior to placing and

8  maintaining his name in the Brady Alert System; and by maintaining NAZIR's

9  name in the Brady Alert System and communicating the placement of his name to

10  other agencies, including Defendant CITY, Defendants have blacklisted NAZIR

11  and deprived him of his current employment and have made it impossible for him

12  to find new employment, and have infringed upon his constitutionally cognizable

13  property and liberty interests.

14      36.   As a direct and proximate result of Defendants' actions, NAZIR was

15  deprived of his rights, privileges, and immunities under the Fifth and Fourteenth

16  Amendments to the United States Constitution, which states that "No State shall

17  deprive any person of life, liberty, or property without due process of law." Article

18  I, Section 7 of the California Constitution states that a person may not be deprived

19  of life, liberty or property without due process of law, or denied equal protection of

20  the laws. As a result of Defendants' action described herein, Defendants have

21  deprived NAZIR of his Fourteenth Amendment due process rights.

22      37.   The acts and omissions of Defendants, and each of them, were done

23  under color of state law in their capacity as a municipality or other entity chartered

24  under state law, and as policy making authorities to which Defendants, and each of

25  them, delegated its governing powers in the subject matter areas in which these

26  policies were promulgated or decisions taken or customs and practices followed.

11

Exhibit B - 11

41

38.     Plaintiff is informed and believes, and upon such information and belief, alleges that the COUNTY has ratified and/or approved and adopted the DISTRICT ATTORNEY'S OFFICE'S conduct as complained of herein and the COUNTY is liable for the acts of its DISTRICT ATTORNEY'S OFFICE because it has delegated to and allowed the DISTRICT ATTORNEY'S OFFICE to engage in the acts complained of herein.

39.     The acts and omissions described above were taken by Defendant COUNTY's, DISTRICT ATTORNEY's OFFICE'S official policy makers as members charged with such responsibility, and the acts and omissions described above were further taken pursuant to official policy and custom, to wit: DISTRICT ATTORNEY'S OFFICE's Special Directive 02-08 adopted December 7, 2002.  It was or should have been plainly obvious to any reasonable policy making official of Defendants COUNTY and DISTRICT ATTORNEY'S OFFICE that their acts and omissions as alleged herein, taken singly or in conjunction, directly violated and continued to violate Plaintiff's clearly established constitutional and statutory rights.  In doing the things alleged herein, Defendants acted with malicious intent to violate Plaintiff's rights, or at least in conscious, reckless, and callous disregard of Plaintiff's rights and to the injurious consequences likely to result from a violation of said rights.  General, special, and exemplary damages are sought according to proof.  Punitive damages are sought against the individual defendants, according to proof.

40.     As a result of the conduct described herein by Defendants, Plaintiff has sustained and will continue to sustain severe physical, mental, and emotional injuries, pain, distress, suffering, anguish, fright, nervousness, grief, anxiety, worry, shame, mortification, injured feelings, mental suffering, shock, humiliation and indignity, as well as other unpleasant physical, mental, and emotional

12

Exhibit  B - 12

42

1   reactions, damages to good name, reputation, standing in the community, and other

2   non-economic damages.

3        41.    Plaintiff has no plain, speedy nor adequate remedy at law to prevent

4   future violations of his civil rights, and therefore seeks extraordinary relief in the

5   form of permanent injunctions, as hereafter described.  Damages alone are

6   inadequate and injunctive relief is sought to command Defendants to remove

7   NAZIR from the Brady Alert System until such time as he may be accorded a

8   hearing pursuant to due process.

9   **SECOND CAUSE OF ACTION**

10
11  *Cal. Government Code Sections 3304(b), 3309.5, as against Defendants*

12  *COUNTY and DISTRICT ATTORNEY'S OFFICE*

13       42.    Plaintiff hereby incorporates each and every preceding paragraph as

14  though fully set forth herein.

15       43.    Plaintiff is a peace officer pursuant to California Penal Code Section

16  830.1(a); as such he is entitled to the protections of the Public Safety Officers

17  Procedural Bill of Rights Act (Govt. Code Section 3300 et seq.).

18       44.    COUNTY and DISTRICT ATTORNEY'S OFFICE are public safety

19  employers obligated to afford peace officers the protections of the Public Safety

20  Officers Procedural Bill of Rights Act because each employs peace officers as

21  defined in California Penal Code Section 830.1(a).

22       45.    The Public Safety Officers Procedural Bill of Rights Act also applies

23  to public agencies who render findings adverse to peace officers and otherwise

24  take action where the adverse findings and actions may negatively impact the

25  peace officer's career as a peace officer.  Under such circumstances, the adverse

26  findings and actions constitute "punitive action" for purposes of Government Code

27  Section 3303 of the Public Safety Officers Procedural Bill of Rights Act because

28

13

SECOND AMENDED COMPLAINT FOR DAMAGES

**Exhibit  B - 13**

**43**

1  the findings and actions "may lead to dismissal, demotion, suspension, reduction in

2  salary, written reprimand," and punitive transfers. (Cal. Govt. Code Section 3303.)

3      46.    The COUNTY and DISTRICT ATTORNEY'S OFFICE are a public

4  agency(ies) that rendered adverse findings and took action constituting punitive

5  action within the meaning of California Government Code Section 3303, against

6  NAZIR, a peace officer, which has negatively impacted his career as a peace

7  officer because the findings and action did actually lead to, and were used as a

8  basis for, NAZIR's termination; moreover, given Special Directive 02-08's

9  command, such findings have led to placement into the Brady Alert System and in

10  turn the findings and placement will be automatically communicated to criminal

11  defense attorneys, criminal defendants, juries and the bench of the Los Angeles

12  County Superior Court; and to prospective employers who by state law are

13  required to conduct exhaustive background investigations into peace officer

14  applicants.

15

16      47.    California Government Code Section 3304(b) of the Public Safety

17  Officers Procedural Bill of Rights Act applies to public agencies who render such

18  adverse findings and/or take action which constitute "punitive action," even though

19  such public agencies are not the employer of the peace officer and have no

20  disciplinary authority over the peace officer.

21      48.    As a public agency that has rendered adverse findings and/or taken

22  action constituting "punitive action" against NAZIR, a peace officer, COUNTY

23  and DISTRICT ATTORNEY'S OFFICE are required to afford to NAZIR the

24  rights provided in Government Code Section 3304(b) of the Public Safety Officers

25  Procedural Bill of Right Act.

26

27      49.    Government Code Section 3304(b) states that "No punitive action, nor

28  denial of promotion on grounds other than merit, shall be undertaken by any public

agency against any public safety officer who has successfully completed the

14

Exhibit  B - 14

1   probationary period that may be required by his or her employing agency without

2   providing the public safety officer with an opportunity for administrative appeal."

3       50.    While each public agency may establish the details of the

4   administrative appeal, the administrative appeal of California Government Code

5   Section 3304(b) requires at a minimum that the peace officer be afforded an

6   administrative appeal before an independent decision maker, at a de novo

7   proceeding at which no facts are taken as established and the proponent of any

8   given fact bears the burden of establishing it, and thus carries the burdens of

9   production and proof; the public safety officer has the right to call and examine

10  and cross-examine witnesses, is entitled to all of the evidence relied upon by the

11  decision maker; the decisionmaker must set forth findings to bridge the analytical

12  gap between the raw evidence and ultimate decision or order; and finally, the result

13  of any hearing required by California Government Code Section 3304(b) is subject

14  to review by way of a writ of administrative mandate under California Code of

15  Civil Procedure Section 1094.5.

16      51.    Although NAZIR exhausted all available administrative remedies,

17  COUNTY and DISTRICT ATTORNEY'S OFFICE failed to comply with

18  California Government Code Section 3304(b) in that the administrative appeal was

19  not a de novo proceeding at which no facts were taken as established; rather the

20  appeal only reviewed the initial determination for substantive evidence; nor was

21  the decisionmaker independent; nor were the proponents of any given fact,

22  COUNTY and DISTRICT ATTORNEY'S OFFICE, required to bear the burden of

23  establishing it, nor were they required to meet their burden of production of

24  evidence, nor were they required to meet the clear and convincing burden of proof

25  established by Special Directive 02-08; nor was NAZIR permitted to call and

26  examine and cross-examine witnesses.

27      52.    Pursuant to California Government Code Section 3309.5(d)(1), this

15

Exhibit  B - 15

1    Court may remedy this violation by ordering COUNTY and DISTRICT

2  ATTORNEY'S OFFICE to afford NAZIR an administrative appeal that comports

3  with the minimum requirements of California Government Code Section 3304(b).

4      53.    California Government Code Section 3309.5(c) authorizes this court

5  to have initial jurisdiction over this action without requiring Plaintiff to first

6  exhaust any administrative remedies, and there are no administrative remedies to

7  exhaust.

8      54.    Defendants COUNTY and DISTRICT ATTORNEY'S OFFICE acted

9  maliciously to violate Plaintiff's rights herein by failing to afford him the hearing

10  required by California Government Code Section 3304(b), and did so with intent to

11  injure Plaintiff and his career, and therefore pursuant to California Government

12  Code Section 3309.5(e), Plaintiff seeks actual damages according to proof and a

13  civil penalty of up to $25,000.

14

15

16

17                        **THIRD CAUSE OF ACTION**

18  *Petition for Writ of Administrative Mandate (Cal. Civ. Proc. §1094.5) – Against*

19    *Defendants MASON, COUNTY and DISTRICT ATTORNEY'S OFFICE*

20      55.    Plaintiff hereby incorporates each and every preceding paragraph as

21  though fully set forth herein.

22      56.    MASON's decision is invalid under California Code of Civil

23  Procedure Section 1094.5 because he committed a prejudicial abuse of discretion

24  in that the findings are contrary to the weight of the evidence, and the decision to

25  include NAZIR in the Brady Alert System is not supported by the findings and

26  constitutes a manifest abuse of discretion; MASON also failed to proceed in a

27  manner authorized by law by failing to conduct the hearing in accordance with

28  California Government Code Section 3304(b) and COUNTY and DISTRICT

**Exhibit  B - 16**

**46**

1  ATTORNEY'S OFFICE's Special Directive 02-08 concerning the clear and
2  convincing standard of proof.

3       57.    The decision is further invalid because conduct in which Plaintiff was
4  found to have engaged is consistent with police department policy, his training,
5  standard law enforcement procedure, and case law.

6       58.    Plaintiff has a fundamental vested right in his employment; by
7  communicating to CITY the findings of dishonesty and conduct involving moral
8  turpitude and the decision to place NAZIR in the Brady Alert System, COUNTY
9  and DISTRICT ATTORNEY'S OFFICE placement as such is designed to, and
10  COUNTY and DISTRICT ATTORNEY'S OFFICE desired to, affect, and did so
11  affect, Plaintiff's employment.  Therefore, the scope of review is under the
12  independent judgment test.
13

14       59.    Review is authorized pursuant to California Code of Civil Procedure
15  Section 1094.5(a) because the writ sought inquires into the validity of a final
16  administrative decision made as the result of a proceeding in which by law a
17  hearing is required to be given pursuant to due process and California Government
18  Code Section 3304(b), evidence is required to be taken, and discretion in the
19  determination of facts was vested in the MASON, the decisionmaker.

20       60.    Plaintiff has exhausted all available administrative remedies of
21  COUNTY and DISTRICT ATTORNEY'S OFFICE and has received a final
22  administrative decision therefrom.

23       61.    Plaintiff is beneficially interested in the issuance of this Court's writ
24  and has no plain, speedy, and adequate remedy, in the ordinary course of law.
25  / / /
26
27
28

17

**Exhibit  B - 17**

### FOURTH CAUSE OF ACTION

*Petition for Writ of Mandate (Cal. Civ. Proc. §1085) – As Against*
*COUNTY, DISTRICT ATTORNEY'S OFFICE and MASON*

62.     Plaintiff hereby incorporates each and every preceding paragraph as though fully set forth herein.

63.     MASON rendered a quasi-adjudicatory decision.  It must be set aside because it is arbitrary, capricious, and entirely lacking in evidentiary support and must therefore be set aside.

64.     Plaintiff has exhausted all available administrative remedies of COUNTY and DISTRICT ATTORNEY'S OFFICE and has received a final administrative decision therefrom.

65.     Plaintiff is beneficially interested in the issuance of this Court's writ and has no plain, speedy, and adequate remedy, in the ordinary course of law.

### FIFTH CAUSE OF ACTION

*42 U.S.C. § 1983-As Against Defendants CITY and NEU*

66.     Plaintiff realleges and incorporates each and every preceding paragraph as though fully set forth herein.

67.     On January 3, 2008, NAZIR and the Torrance Police Officers Association filed a grievance against NEU and CITY alleging that NEU refused to fill a vacancy in the sergeant classification in violation of CITY police department policy and procedure, and that he, NAZIR, was entitled to a promotion to fill the vacancy. NEU then began efforts to remove NAZIR's name from the eligibility list for that position; NAZIR exhausted administrative remedies to oppose NEU's actions.

68.     On or about March 10, 2008, the Torrance Police Officers Association filed a petition for writ of mandate in state court to compel the CITY and NEU to

18

**48**

**Exhibit  B - 18**

fill the sergeant's vacancy.  CITY and NEU then filled the sergeant's vacancy, effectively mooting the petition, but only after NAZIR's decertification from the list was final.

69.    On August 22, 2008, NAZIR filed a petition for writ of mandate and complaint for damages against the CITY based on NEU's conduct in failing to comply with CITY's municipal code, the CITY's memorandum of understanding with the police officers association, and for retaliation California Government Code Section 3304, the last cause of action being dismissed without prejudice without ever reaching the merits.

70.    NAZIR has appealed the decision denying his petition.

71.    In or about October 2008, NAZIR filed a hostile work environment complaint with the director of human resources of CITY against a sergeant.  The CITY and police department investigated the complaint, including interviewing in excess of 30 members of the police department; ultimately, and in 2009, the human resources director determined the allegations of the complaint were unfounded or did not constitute hostile work environment.

72.    In or about December 2008 NAZIR filed an internal affairs complaint of misconduct against a lieutenant for comments made to co-workers about NAZIR; an investigation was conducted and in or about December 2009, NAZIR was informed that the allegations were unfounded.

73.    Plaintiff is informed and believes, and upon such information and belief, alleges that CITY and NEU have now proposed and commenced NAZIR's termination from employment as a result of, and in retaliation for the complaints made to his employer, for NAZIR disclosing to COUNTY and DISTRICT ATTORNEY'S OFFICE the policy of not disclosing the use of confidential informants in PCDs and arrest reports; NAZIR filing grievances and initiating and maintaining litigation directed at NEU's actions on behalf of the CITY and seeking

**Exhibit  B - 19**

to compel compliance with the CITY's municipal code and memorandum of understanding adopted by CITY through its city council; these same issues were of widespread concern such that the Torrance police officers association brought similar grievances and petitions against  CITY and NEU.  On September 9, 2010, the CITY, through its Assistant City Administrative, did in fact terminate NAZIR for those same reasons.

74.     The retaliation exercised by CITY and NEU against Plaintiff has created a chilling effect on his First Amendment rights of redress and has directly resulted in his proposal for termination and resulting loss of income and benefits, pain and suffering, and emotional distress.

75.     In doing the things alleged herein, Defendants, and each of them, violated the rights of Plaintiff under the First and Fourteenth Amendments to the United States Constitution to free expression.  Specifically, Defendants have taken the aforementioned action against Plaintiff in direct retaliation for, and in response to the various protected activities of Plaintiff.  The acts and omissions of Defendants, and each of them, were done by Defendants under color of state law in their capacity as a municipality chartered under state law, and as policy making authorities to which Defendant City delegated its governing powers in the subject matter areas in which these policies were promulgated or decisions taken or customs and practices followed.

76.     The acts and omissions described above were taken by Defendant CITY's official policy makers as members charged with such responsibility.  It was or should have been plainly obvious to any reasonable policy making official of Defendant CITY that the acts and omissions of Defendants as alleged herein, taken singly or in conjunction, directly violated and continued to violate Plaintiff's clearly established constitutional and statutory rights.  In doing the things alleged herein, Defendants acted with malicious intent to violate Plaintiff's rights, or at

**Exhibit  B - 20**

1   least in conscious, reckless, and callous disregard of Plaintiff's rights and to the

2   injurious consequences likely to result from a violation of said rights. General,

3   special, and exemplary damages are sought according to proof. Punitive damages

4   are sought against the individual defendants, according to proof.

5       77.     Plaintiff has no plain, speedy nor adequate remedy at law to prevent

6   future violations of his civil rights, and therefore seeks extraordinary relief in the

7   form of permanent injunctions, as hereafter described. Damages alone are

8   inadequate and injunctive relief is sought to command Defendants to reinstate

9   Plaintiff, in order to place him in a position he would have been in, absent the

10  unlawful conduct by Defendants.

11

12

13                          **SIXTH CAUSE OF ACTION**

14  *California Government Code §§ 3304(d); 3309.5 – As Against Defendant CITY*

15      78.     Plaintiff hereby incorporates each and every preceding paragraph as

16  though fully set forth herein.

17      79.     Plaintiff is a peace officer as that term is defined in California

18  Government Code Section 3301 and is therefore entitled to the rights and

19  protections of the Public Safety Officers Procedural Bill of Rights Act ("Act")

20  (Cal. Govt. Code § 3300 et seq.).

21      80.     Although as early as April 2007, and no later than October 2008,

22  CITY and NEU were aware of all facts and circumstances of the PCDs and Arrest

23  Report concerning the arrest of Arrestee, as well as omission by NAZIR of the

24  information concerning the confidential informant from the PCDs and Arrest

25  Report, it did not investigate and notify NAZIR of the intent to terminate or

26  otherwise discipline him based upon said conduct until June 2010.

27      81.     California Government Code Section 3304(d) provides that, with

28  certain exceptions not applicable herein, no punitive action shall be undertaken for

                                    21

**Exhibit B - 21**

**51**

1  any act, omission, or other allegation of misconduct if the investigation of the

2  allegation is not completed within one year of the public agency's discovery by a

3  person authorized to initiate an investigation of the allegation of an act, omission,

4  or other misconduct; in the event the public agency determines that discipline may

5  be taken, it shall complete its investigation and notify the police officer of its

6  proposed disciplinary action within that year.

7      82.    Defendants CITY and NEU were aware of the acts constituting the

8  misconduct for which they now propose NAZIR's termination, more than one year

9  prior to proposing NAZIR's termination, and therefore the proposed termination

10  violates California Government Code Section 3304(a).

11      83.    California Government Code Section 3309.5(c) authorizes this court

12  to have initial jurisdiction over this action without requiring Plaintiff to first

13  exhaust any administrative remedies.

14

15      84.    Defendants CITY and NEU, on behalf of CITY, acted maliciously to

16  violate Plaintiff's rights herein by imposing discipline in part for acts, omissions or

17  other allegations of misconduct well beyond the one-year statute of limitations in

18  Cal. Govt. Code Section 3304(d), and did so with intent to injure Plaintiff, and

19  therefore pursuant to California Government Code Section 3309.5(e), Plaintiff

20  seeks actual damages according to proof and a civil penalty of up to $25,000.

21      85.    Plaintiff seeks extraordinary relief, in the form of this Court's writ of

22  mandate, or injunctive relief, pursuant to California Government Code Section

23  3309.5(d)(1), enjoining CITY and NEU from disciplining Plaintiff based on the

24  acts, omissions, or other allegations of misconduct concern the arrest of Arrestee,

25  the PCDs and Arrest Report.

26

27

28

22

SECOND AMENDED COMPLAINT FOR DAMAGES

**52**

**Exhibit  B - 22**

## SEVENTH CAUSE OF ACTION

### *Negligent Training and Supervision – As Against CITY and NEU*

86.    Plaintiff hereby realleges and incorporates by reference each and every preceding allegation as though fully set forth herein.

87.    The basis for Plaintiff's termination is purported conduct that he was trained, educated and told to perform.  More specifically, from the start of his career at CITY, Plaintiff was trained, educated and told to protect the identify of a confidential informant by omitting any reference of the informant in any given arrest and/or declaration.

88.    Plaintiff was specifically trained, educated and told to always indicate a different basis for probable cause to make contact with a suspect.  Plaintiff was taught and trained before filing a major narcotics case with the DISTRICT ATTORNEY'S OFFICE to inform the DISTRICT ATTORNEY'S OFFICE of the involvement of such an informant.  If the Plaintiff was to testify in any case where an informant was utilized, the Plaintiff would then have the right to have an in-camera hearing with the prosecuting attorney and the judge to let the judge know in regards to the informant, which is also covered under California Evidence Code Section 1040-1042.   This was taught to Plaintiff by his training officers, superiors, other officers, and NEU. In addition, Claimant was provided on-the-job training to this effect.

89.    On August 16, 2010, Plaintiff was notified of the CITY's intent to terminate his employment with the CITY for performing his job in the manner that he was trained, educated and taught to do so.

90.    Defendants negligently trained Plaintiff, and negligently retained individuals who negligently trained Plaintiff in a manner that has caused him significant damages.

23

**Exhibit  B - 23**

53

91.     On August 25, 2010, Plaintiff filed a claim concerning the above with the CITY pursuant to the Government Claims Act (Cal. Govt. Code Section 905 et seq.).

92.     On September 9, 2010, Plaintiff was terminated for the reasons stated in the August 16, 2010, notice of intent to terminate.

93.     On October 1, 2010, CITY denied Plaintiff's claim for unstated reasons.

94.     Plaintiff has exhausted all available administrative remedies concerning this claim.

## PRAYER

WHEREFORE, Plaintiff prays:

1.     For general, special, exemplary and punitive damages according to proof;

2.     For a writ of mandate commanding Defendants COUNTY, DISTRICT ATTORNEY'S OFFICE and MASON, to set aside their findings and decision to place Plaintiff in the Brady Alert System and/or to afford Plaintiff with an administrative appeal that comports with due process and California Government Code Section 3304(b);

3.     For an injunction and/or writ of mandate enjoining Defendants CITY and NEU from disciplining for the acts, omissions, or other allegations of misconduct described in the August 16, 2010, disciplinary notice issued by NEU and September 9, 2010, disciplinary notice issued by CITY;

4.     For costs of suit;

24

**Exhibit B - 24**

54

5. For attorneys fees under the 42 U.S.C. Section 1988; California Government Code Sections 800, 1021.5 and 3309.5; and as otherwise permitted by law;

6. For other appropriate relief.


Dated: November 15, 2010          Respectfully Submitted,

LACKIE, DAMMEIER & MCGILL APC

_____
Michael A. Morguess
Attorneys for Plaintiff,
REHAN NAZIR

SECOND AMENDED COMPLAINT FOR DAMAGES

**Exhibit B - 25**

**DEMAND FOR JURY**

1

Plaintiff hereby demands a jury trial under F.R. Civ. P., Rule 38 and C.D.

2

Cal. Rule 3.4.10.1.

3

Dated: November 15, 2010

4

Respectfully Submitted,

5

LACKIE, DAMMEIER & MCGILL APC

6

7

8 Michael A. Morguess
Attorneys for Plaintiff,

9 REHAN NAZIR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

26

**Exhibit B - 26**

56

## PROOF OF SERVICE

2      I declare that I am over the age of eighteen (18) and not a party to this
action.  My business address is 367 North Second Ave., Upland, California
3   91786.

4      On **November 24, 2010,** I served the following document described as
**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE
5   RELIEF FOR VIOLATION OF INDIVIDUAL CIVIL RIGHTS AND
LIBERTIES WITH SUPPLEMENATE STATE LAW CLAIMS** on the
6   interested parties in this action by placing a true and correct copy of each
document thereof, enclosed in a sealed envelope addressed as follows:

| *Attorneys for Defendants, City of Torrance and John J. Neu* | *Attorneys for Defendants, County of Los Angeles, County of Los Angeles District Attorney's Office and Lawrence Mason* |
|---|---|
| Mark H. Meyerhoff, Esq. mmeyerhoff@lcwlegal.com Joung H. Yim, Esq. jyim@lcwlegal.com LIEBERT CASSIDY WHITMORE 6033 W. Century Blvd., Ste 500 Los Angeles, CA  90045 Tel: (310) 981-2000 Fax: (310) 337-0837 | Nathan A. Oyster, Esq. LAWRENCE BEACH ALLEN CHOI, PC 100 West Broadway, Suite 1200 Glendale, CA  91210 Tel:  (818) 545-1925 Fax:  (818) 545-1937 |

16   [X]    I am readily familiar with the business practice for collection and
17           processing of correspondence for mailing with the United States Postal
18           Service.  I know that the correspondence was deposited with the United
             States Postal Service on the same day this declaration was executed in
19           the ordinary course of business.  I know that the envelope was sealed
             and, with postage thereon fully prepaid, placed for collection and
20           mailing on this date in the United States mail at Upland, California.

21
22   [ ]    By Personal Service, I caused such envelope to be delivered by hand to
             the above addressee(s).

23
24   [ ]    By facsimile machine, I caused the above-referenced document(s) to be
             transmitted to the above-named persons(s) at the following telecopy
25           number:

26
27           I declare under penalty of perjury under the laws of the State of California
             that the foregoing is true and correct.  Executed  November 24, 2010 at
28           Upland, California.

_Muriel Mateer_ (signature)

Muriel Mateer

**57**

**Exhibit  B - 27**

Exhibit C

**58**

Page 1

UNITED STATES DISTRICT COURT

FOR THE STATE OF CALIFORNIA

REHAN NAZIR,                          )
                                      )
                    Plaintiff,        )Case No.
                                      )CV 10-65465VW
vs.                                   )
                                      )
COUNTY OF LOS ANGELES [an entity of   )
unknown form}; COUNTY OF LOS ANGELES  )
DISTRICT ATTORNEY'S OFFICE [an entity )
of unknown form] LAWRENCE E. MASON,   )
in his capacity as Senior Special     )
Assistant for the COUNTY of           )
LOS ANGELES DISTRICT ATTORNEY'S       )
OFFICE; CITY of TORRANCE, a municipal )
corporation; JOHN J. NEU,             )
individually and as Chief of Police   )
of the CITY of TORRANCE POLICE        )
DEPARTMENT; Does 1 through 30,        )
                                      )
                    Defendants.       )
_____)


DEPOSITION OF REHAN NAZIR

MARCH 14, 2011


REPORTED BY:      IMHOF AND ASSOCIATES, INC.
                  COURT REPORTERS AND VIDEOGRAPHERS
VICTORIA IMHOF WERTZ, RPR
CSR NO. 7999      7720 Painter Ave  20650 Adam Cir.
                  Suite A           Yorba Linda, CA
                  Whittier, Ca 90602        92886
Job No. 110314V

**59**

Exhibit C - 1

Page 11

| | | |
|---|---|---|
| 09:37:33 | 1 | you let me know. |
| 09:37:35 | 2 | Is that fair? |
| 09:37:36 | 3 | A    Yes. |
| 09:37:36 | 4 | Q    Okay. |
| 09:37:37 | 5 | Mr. Nazir, you formally worked for the |
| 09:37:40 | 6 | City of Torrance as a police officer; is that |
| 09:37:41 | 7 | correct? |
| 09:37:42 | 8 | A    Yes. |
| 09:37:43 | 9 | Q    And when did you start with the City, just |
| 09:37:46 | 10 | approximately? |
| 09:37:49 | 11 | A    2000. |
| 09:37:50 | 12 | Q    All right. |
| 09:37:55 | 13 | I just want to verify your assignments |
| 09:37:58 | 14 | with you if you don't mind. |
| 09:38:01 | 15 | Now, when you started with the City of |
| 09:38:03 | 16 | Torrance, you were in a patrol position; is that |
| 09:38:06 | 17 | correct? |
| 09:38:07 | 18 | A    Yes. |
| 09:38:10 | 19 | Q    And approximately November of 2002, you |
| 09:38:12 | 20 | went to Vice and Narcotics. |
| 09:38:14 | 21 | Does that sound right? |
| 09:38:15 | 22 | A    Yes. |
| 09:38:17 | 23 | Q    In Vice and Narcotics, if you can explain |
| 09:38:20 | 24 | what your general duties were as a Vice and |
| 09:38:23 | 25 | Narcotics officer? |

**60**

**Exhibit  C - 2**

Page 48

| | | |
|---|---|---|
| 10:38:29 | 1 | the transaction with the weapon didn't work out? |
| 10:38:32 | 2 | MR. MORGUESS:  Objection, relevance. |
| 10:38:34 | 3 | BY MR. MEYERHOFF: |
| 10:38:34 | 4 | Q   You can answer. |
| 10:38:35 | 5 | A   Yes. |
| 10:38:40 | 6 | Q   And what was -- do you believe what the |
| 10:38:42 | 7 | discussion was which led to this other |
| 10:38:45 | 8 | transaction? |
| 10:38:45 | 9 | MR. MORGUESS:  Objection, relevance -- in |
| 10:38:47 | 10 | fact, all of these questions I'm going to object |
| 10:38:50 | 11 | based on my prior objection, no relevance to this |
| 10:38:53 | 12 | case whatsoever. |
| 10:38:55 | 13 | MR. MEYERHOFF:  That's fine.  You can have |
| 10:38:57 | 14 | a standing objection. |
| 10:38:58 | 15 | MR. MORGUESS:  Thank you. |
| 10:38:58 | 16 | BY MR. MEYERHOFF: |
| 10:38:58 | 17 | Q   Do you recall what the circumstance was |
| 10:39:00 | 18 | which led to the conversation about the second |
| 10:39:04 | 19 | offer -- the second transaction? |
| 10:39:07 | 20 | A   That was the informant -- he was |
| 10:39:12 | 21 | volunteering information.  He was the one that, "I |
| 10:39:20 | 22 | can get PCP.  I can get this guy and that guy."  He |
| 10:39:25 | 23 | was very forthcoming with the information because I |
| 10:39:28 | 24 | believe the informant thought that we had something |
| 10:39:31 | 25 | on him, which we only have a traffic stop -- very |

**61**

**Exhibit C - 3**

Page 49

| | | |
|---|---|---|
| 10:39:35 | 1 | minor traffic violation, I believe, at the time. |
| 10:39:41 | 2 | Q   Do you have any idea why the informant |
| 10:39:45 | 3 | believed that you had something on him, as you |
| 10:39:47 | 4 | say? |
| 10:39:48 | 5 | A   No. |
| 10:39:48 | 6 | MR. MORGUESS:   Objection, calls for |
| 10:39:50 | 7 | speculation. |
| 10:39:57 | 8 | BY MR. MEYERHOFF: |
| 10:39:57 | 9 | Q   And was there a discussion with the |
| 10:40:00 | 10 | informant about what this second transaction would |
| 10:40:05 | 11 | be?  Did you talk to him about what he was offering |
| 10:40:08 | 12 | to do for you? |
| 10:40:11 | 13 | A   Yes. |
| 10:40:11 | 14 | Q   What do you recall was the transaction? |
| 10:40:15 | 15 | What did you and him discuss? |
| 10:40:21 | 16 | A   The PCP, I believe.  It was PCP. |
| 10:40:34 | 17 | Q   And what do you recall he offered |
| 10:40:35 | 18 | regarding the PCP? |
| 10:40:43 | 19 | A   That he can get the guy and bring PCP to |
| 10:40:49 | 20 | him. |
| 10:40:56 | 21 | Q   Was he having this conversation with you? |
| 10:40:58 | 22 | Officer Okazaki?  Both of you?  What do you recall? |
| 10:41:02 | 23 | A   You know what, like I said again, it's |
| 10:41:05 | 24 | been a long time.  And it was back and forth. |
| 10:41:12 | 25 | Q   Okay. |

**62**

**Exhibit C - 4**

Page 50

10:41:13    1          So he offered that he can have an
10:41:15    2    individual come with PCP; is that correct?
10:41:19    3          A   Yes.
10:41:22    4          Q   And again, this was voluntarily offered by
10:41:25    5    him?  You don't know of any -- anything that you
10:41:30    6    said to him that would cause him to feel that he
10:41:34    7    was going to get arrested?
10:41:37    8          MR. MORGUESS:  Objection, asked and
10:41:40    9    answered.
10:41:40   10    BY MR. MEYERHOFF:
10:41:40   11          Q   If you can answer.
10:41:44   12          A   Your question is if I threatened him to be
10:41:49   13    arrested?
10:41:50   14          Q   I didn't say "threaten."  In your mind,
10:41:53   15    did he just voluntarily offer to have this
10:41:56   16    individual with the PCP come and make the deal?
10:41:59   17          A   Yes.
10:42:01   18          Q   Did you discuss with the informant about
10:42:03   19    how the deal was going to happen?
10:42:10   20          A   Yes.
10:42:10   21          Q   What do you recall discussing with the
10:42:14   22    informant about the details of the deal itself?
10:42:25   23          A   Once again, like I said, you were asking
10:42:29   24    me the event that occurred four years ago.  And it
10:42:35   25    was -- the discussion between me and that person --

**63**

**Exhibit C - 5**

Page 51

| | | |
|---|---|---|
| 10:42:39 | 1 | that individual -- he was going to have some guy -- |
| 10:42:45 | 2 | he gave me a description of the guy, what -- what |
| 10:42:48 | 3 | he kind of looked like -- come down with the PCP |
| 10:42:52 | 4 | and meet him in Torrance. |
| 10:42:54 | 5 | Q   Okay. |
| 10:42:57 | 6 | Did you and the informant discuss the |
| 10:42:59 | 7 | exact location of where the purchase was going to |
| 10:43:03 | 8 | take place? |
| 10:43:06 | 9 | A   Yes. |
| 10:43:06 | 10 | Q   And what do you recall was the occasion of |
| 10:43:09 | 11 | the purchase? |
| 10:43:13 | 12 | A   It was the 7-Eleven convenience store. |
| 10:43:18 | 13 | Q   In the -- is that 66th and Crenshaw? |
| 10:43:22 | 14 | A   I believe so, yes. |
| 10:43:23 | 15 | Q   And that's the location that you and the |
| 10:43:26 | 16 | informant agreed upon? |
| 10:43:28 | 17 | A   Yes. |
| 10:43:30 | 18 | Q   You mentioned that he had -- the informant |
| 10:43:33 | 19 | mentioned the description of the suspect or the |
| 10:43:36 | 20 | person who was going to bring the PCP; is that |
| 10:43:41 | 21 | accurate? |
| 10:43:41 | 22 | A   Yes. |
| 10:43:42 | 23 | Q   What do you recall the informant told you |
| 10:43:43 | 24 | about what the individual was -- looked like? |
| 10:43:50 | 25 | A   Black male, stocky build, I believe, |

**64**

**Exhibit C - 6**

Page 52

| | | |
|---|---|---|
| 10:43:58 | 1 | approximately in his thirties. |
| 10:44:05 | 2 |     Q   Anything else that he told you about the |
| 10:44:07 | 3 | physical description? |
| 10:44:08 | 4 |     A   Not that I recall, no. |
| 10:44:10 | 5 |     Q   Did he mention the height of the |
| 10:44:12 | 6 | individual? |
| 10:44:13 | 7 |     A   I don't remember, no. |
| 10:44:18 | 8 |     Q   Did you arrange with the informant |
| 10:44:20 | 9 | regarding the time that this would happen -- when |
| 10:44:23 | 10 | this was going to happen? |
| 10:44:29 | 11 |     A   It was arranged, the time.  It was right |
| 10:44:33 | 12 | after the traffic stop with that individual.  I |
| 10:44:39 | 13 | know I remember it was nighttime and basically |
| 10:44:43 | 14 | after the traffic stop. |
| 10:44:54 | 15 |     Q   So did you agree upon -- if I told you |
| 10:44:57 | 16 | that the arrest of Mr. Baker, the individual with |
| 10:45:01 | 17 | PCP happened at 10:30 -- 10:35 p.m., do you recall |
| 10:45:07 | 18 | how much earlier than that that you had this |
| 10:45:09 | 19 | conversation with the informant -- how much before |
| 10:45:12 | 20 | that did that occur? |
| 10:45:16 | 21 |     A   Half an hour, maybe -- maybe 45 minutes. |
| 10:45:19 | 22 | I'm not sure.  It was before the arrest, obviously. |
| 10:45:22 | 23 |     Q   Did you arrange with the informant an |
| 10:45:24 | 24 | exact time that this would happen or a window of |
| 10:45:26 | 25 | time? |

**65**

Exhibit C - 7

Page 53

| | | |
|---|---|---|
| 10:45:29 | 1 | A    No, nothing. |
| 10:45:33 | 2 | Q    Did you talk to the informant -- how were |
| 10:45:36 | 3 | you supposed to know when the suspect arrived at |
| 10:45:40 | 4 | the location? |
| 10:45:44 | 5 | A    I believe the description he gave and -- |
| 10:45:59 | 6 | Q    The description being a black male, stocky |
| 10:46:02 | 7 | build.  And you don't recall the height? |
| 10:46:05 | 8 | A    Not at this time, no. |
| 10:46:08 | 9 | Q    Did the informant tell you of anything |
| 10:46:11 | 10 | about the vehicle that the suspect would be |
| 10:46:13 | 11 | driving?  Did that come up? |
| 10:46:15 | 12 | A    You know, I believe it could have, |
| 10:46:18 | 13 | possibly, but I don't remember, no. |
| 10:46:20 | 14 | Q    When you say it could have possibly, is |
| 10:46:23 | 15 | that you just don't recall if it did or not? |
| 10:46:26 | 16 | A    Yes. |
| 10:46:26 | 17 | Q    But it's possible the informant told you |
| 10:46:28 | 18 | what the vehicle was? |
| 10:46:30 | 19 | A    It's possible.  But I don't remember for |
| 10:46:32 | 20 | sure. |
| 10:46:37 | 21 | Q    Do you recall -- I will come back to that. |
| 10:46:47 | 22 | Was there any arrangement that the |
| 10:46:48 | 23 | informant would call you when the suspect arrived |
| 10:46:51 | 24 | at the location?  Or were you basically just |
| 10:46:59 | 25 | surveilling the location at the time? |

**66**

**Exhibit C - 8**

Page 82

| | | |
|---|---|---|
| 12:02:19 | 1 | the guy as he was bringing the drugs? |
| 12:02:22 | 2 | A   Yes. |
| 12:02:23 | 3 | Q   Okay. |
| 12:02:29 | 4 | I'm going to mark this as Exhibit 1.  The |
| 12:02:33 | 5 | documents that I gave you, Mr. Nazir, you can take |
| 12:02:38 | 6 | a look whatever time you need to take a look at it. |
| 12:02:44 | 7 | The question I will have for you is just |
| 12:02:46 | 8 | if you recognize this document. |
| 12:03:07 | 9 | A   Yes. |
| 12:03:10 | 10 | (Defendant's Exhibit 1 was marked |
| 12:03:10 | 11 | for identification, a copy of which is |
| 12:03:10 | 12 | attached hereto.) |
| 12:03:10 | 13 | BY MR. MEYERHOFF: |
| 12:03:10 | 14 | Q   And it's titled, "arrest report." |
| 12:03:14 | 15 | Is this the arrest report relating to the |
| 12:03:17 | 16 | arrest of Mr. Baker, to your recollection? |
| 12:03:19 | 17 | A   I assume so, yes. |
| 12:03:21 | 18 | Q   Did you prepare this report? |
| 12:03:23 | 19 | A   I think, yes. |
| 12:03:24 | 20 | Q   Okay. |
| 12:03:38 | 21 | Now, the report -- looking at the second |
| 12:03:41 | 22 | paragraph -- it mentioned that you were conducting |
| 12:03:46 | 23 | surveillance of the 7-Eleven convenience store. |
| 12:03:49 | 24 | And as you testified, you were conducting |
| 12:03:53 | 25 | surveillance based on what you had arranged with |

**67**

**Exhibit C - 9**

Page 83

| | | |
|---|---|---|
| 12:03:56 | 1 | the informant; would that be correct? |
| 12:04:03 | 2 | A   No, that's not correct. |
| 12:04:06 | 3 | Q   Okay. |
| 12:04:06 | 4 | Why were you conducting surveillance at |
| 12:04:09 | 5 | the 7-Eleven at this time, approximately 2235 |
| 12:04:12 | 6 | hours? |
| 12:04:14 | 7 | A   It was for the possible narcotics |
| 12:04:22 | 8 | transaction that the informant set, but also |
| 12:04:26 | 9 | additional -- there had been a robbery earlier that |
| 12:04:30 | 10 | 7-Eleven, also, so they were also conducting |
| 12:04:37 | 11 | surveillance on that. |
| 12:04:40 | 12 | Q   As I recall, correct me if I'm wrong -- |
| 12:04:44 | 13 | MR. MORGUESS:  Do you mind if I take a |
| 12:04:45 | 14 | minute just to look at this? |
| 12:04:47 | 15 | MR. MEYERHOFF:  Sure. |
| 12:04:52 | 16 | (Pause in the proceedings.) |
| 12:09:16 | 17 | BY MR. MEYERHOFF: |
| 12:09:16 | 18 | Q   Have you had a chance to look at |
| 12:09:17 | 19 | Exhibit 1, Mr. Nazir, the arrest report? |
| 12:09:20 | 20 | A   Yes, quickly. |
| 12:09:24 | 21 | Q   And if you need any more time, just let me |
| 12:09:26 | 22 | know -- but so -- I believe you said that you were |
| 12:09:32 | 23 | surveilling the 7-Eleven for two reasons, the |
| 12:09:37 | 24 | informant -- you had set up this location that |
| 12:09:40 | 25 | the -- with the informant and also that there had |

**68**

**Exhibit  C - 10**

Page 84

| | | |
|---|---|---|
| 12:09:44 | 1 | been a robbery at that location earlier that shift; |
| 12:09:50 | 2 | is that fair to say? |
| 12:09:51 | 3 | A   Yes. |
| 12:09:51 | 4 | Q   When you set up the location with the |
| 12:09:54 | 5 | informant, why was that particular location picked, |
| 12:09:59 | 6 | if you recall? |
| 12:10:06 | 7 | A   Not for any particular reason.  It was |
| 12:10:12 | 8 | close to where we stopped the informant. |
| 12:10:19 | 9 | Q   Any other reason that you can think of? |
| 12:10:21 | 10 | A   Not really. |
| 12:10:23 | 11 | Q   At the time that you had set up this |
| 12:10:27 | 12 | location with the informant, did you know about the |
| 12:10:29 | 13 | previous robbery that evening at the 7-Eleven? |
| 12:10:34 | 14 | A   Yes. |
| 12:10:34 | 15 | Q   Okay. |
| 12:10:34 | 16 | Do you recall how you found out about that |
| 12:10:36 | 17 | robbery?  Did you hear it over dispatch or some |
| 12:10:39 | 18 | other way? |
| 12:10:43 | 19 | A   Yes. |
| 12:10:43 | 20 | Q   And the question was poor, but tell me how |
| 12:10:47 | 21 | you recall that about the robbery. |
| 12:10:51 | 22 | A   I believe it was at the time it happened. |
| 12:10:55 | 23 | I mean, me and Officer Okazaki were working already |
| 12:11:00 | 24 | and through the dispatch, I heard about the robbery |
| 12:11:09 | 25 | and I don't really know if we were working -- to |

**69**

**Exhibit C - 11**

Page 85

| | | |
|---|---|---|
| 12:11:12 | 1 | answer your question -- through dispatch. |
| 12:11:19 | 2 | Q   Okay. |
| 12:11:19 | 3 | Do you recall any other follow-up that you |
| 12:11:21 | 4 | did after hearing from dispatch?  Did you get any |
| 12:11:23 | 5 | other information about the robbery other than what |
| 12:11:27 | 6 | you heard from dispatch? |
| 12:11:31 | 7 | A   Regarding the robbery? |
| 12:11:33 | 8 | Q   Regarding the robbery. |
| 12:11:35 | 9 | A   Did we do any follow-up on it? |
| 12:11:37 | 10 | Q   Other than hearing from dispatch that |
| 12:11:39 | 11 | there was a robbery, did you know anything else |
| 12:11:41 | 12 | about the robbery prior to making the arrest on |
| 12:11:45 | 13 | Mr. Baker? |
| 12:11:47 | 14 | A   The suspect description. |
| 12:11:49 | 15 | Q   Okay. |
| 12:11:50 | 16 | A   Weapon used. |
| 12:11:52 | 17 | Q   Now, just educate me -- when dispatch puts |
| 12:11:55 | 18 | out the information, what information do they |
| 12:11:58 | 19 | usually provide when they put out the information |
| 12:12:01 | 20 | about the robbery?  What did you know from |
| 12:12:03 | 21 | dispatch? |
| 12:12:06 | 22 | A   In regards to the robbery? |
| 12:12:08 | 23 | Q   In regards to this robbery. |
| 12:12:10 | 24 | A   This robbery? |
| 12:12:12 | 25 | Q   This shift at the 7-Eleven. |

**70**

**Exhibit C - 12**

Page 86

12:12:22    1        A    I'm not sure of the suspect in question,

12:12:25    2    the description.

12:12:26    3              MR. MORGUESS:  Did you say "I'm sure --"

12:12:29    4              THE WITNESS:  Yeah, I don't know what they

12:12:30    5    put out.

12:12:32    6    BY MR. MEYERHOFF:

12:12:32    7        Q    You don't recall?

12:12:33    8        A    What exactly they put out.

12:12:36    9        Q    Just being an officer for many years, is

12:12:38    10   there, I guess, routine information that will be

12:12:41    11   put out by dispatch in terms of a robbery call?  Or

12:12:44    12   does it change from call to call?

12:12:48    13       A    That's the later, change from call to

12:12:51    14   call.

12:12:52    15       Q    Okay.

12:12:53    16            Would the identification of the suspect be

12:12:56    17   something that would normally be put out by

12:13:01    18   dispatch?

12:13:05    19       A    It depends on what you mean by

12:13:07    20   "identification."

12:13:07    21       Q    Physical description, ethnicity, height,

12:13:12    22   body type, and that sort of thing.

12:13:14    23       A    Yes.

12:13:14    24       Q    Do you recall if that was put out on this

12:13:16    25   robbery call?  If you knew what the physical

**71**

**Exhibit C - 13**

Page 87

| | | |
|---|---|---|
| 12:13:20 | 1 | description was? |
| 12:13:22 | 2 | A   I don't know for sure what was put out. |
| 12:13:24 | 3 | Q   Okay. |
| 12:13:28 | 4 | Did you receive any information relating |
| 12:13:29 | 5 | to how many suspects were involved in this |
| 12:13:32 | 6 | robbery -- how many people were involved in the |
| 12:13:35 | 7 | robbery? |
| 12:13:38 | 8 | A   No. |
| 12:13:38 | 9 | Q   Okay. |
| 12:13:41 | 10 | Did you have any information that you |
| 12:13:43 | 11 | recall regarding any vehicle that was used during |
| 12:13:45 | 12 | the robbery?  Any type of vehicle, whether there |
| 12:13:48 | 13 | was a vehicle or anything like that? |
| 12:13:54 | 14 | A   No. |
| 12:13:54 | 15 | Q   Any information that you recall regarding |
| 12:13:55 | 16 | whether there was a weapon used during the robbery |
| 12:13:59 | 17 | of any type? |
| 12:14:02 | 18 | A   Yes. |
| 12:14:02 | 19 | Q   And what do you recall about that? |
| 12:14:06 | 20 | A   Possible chrome revolver. |
| 12:14:16 | 21 | Q   Any other information about the robbery |
| 12:14:17 | 22 | other than that there was a robbery and there may |
| 12:14:22 | 23 | have been a chrome revolver used during the |
| 12:14:26 | 24 | robbery? |
| 12:14:29 | 25 | A   Not that I can remember. |

**72**

**Exhibit C - 14**

Page 88

| | | |
|---|---|---|
| 12:14:32 | 1 | Q    Okay. |
| 12:14:33 | 2 | Whose decision was it to keep an eye on |
| 12:14:34 | 3 | the 7-Eleven location because there had been a |
| 12:14:40 | 4 | robbery there previously? |
| 12:14:51 | 5 | A    You are asking the question, if I |
| 12:14:54 | 6 | understand it correctly -- whose decision is |
| 12:14:57 | 7 | between me and Officer Okazaki?  Or is it |
| 12:15:00 | 8 | between -- if the sergeant told us to go there and |
| 12:15:03 | 9 | do extra patrol?  What is your question asking? |
| 12:15:07 | 10 | Q    You said that part of the reason you were |
| 12:15:09 | 11 | surveilling this location was because of the |
| 12:15:12 | 12 | robbery. |
| 12:15:13 | 13 | Whose decision was it to surveil the |
| 12:15:15 | 14 | location because of the robbery?  Was that you? |
| 12:15:19 | 15 | Officer Okazaki?  A sergeant?  Somebody else? |
| 12:15:22 | 16 | A    I believe it was both of us as part of |
| 12:15:27 | 17 | assigned patrol in that area, extra patrol of the |
| 12:15:30 | 18 | crime has occurred in that area, to show your |
| 12:15:33 | 19 | presence. |
| 12:15:34 | 20 | Q    So that would be you and Officer Okazaki? |
| 12:15:37 | 21 | A    Yes. |
| 12:15:39 | 22 | Q    In your experience, would it be common for |
| 12:15:44 | 23 | a robbery suspect to return in the same location, |
| 12:15:48 | 24 | same -- just hours after a robbery had occurred? |
| 12:15:52 | 25 | Is that -- just in your experience, is that common? |

**73**

**Exhibit  C - 15**

Page 89

| | | |
|---|---|---|
| 12:15:57 | 1 | A    Not in every situation, but it has |
| 12:15:59 | 2 | happened before, yes. |
| 12:16:00 | 3 | Q    How many times, in your career, if you |
| 12:16:02 | 4 | recall, has that happened -- happened that a |
| 12:16:05 | 5 | robbery suspect returned to the same location that |
| 12:16:08 | 6 | he or she had just robbed? |
| 12:16:10 | 7 | A    I don't know how many times. |
| 12:16:13 | 8 | Q    Can you give any estimate at all? |
| 12:16:16 | 9 | A    No. |
| 12:16:16 | 10 | Q    Would you say it was -- |
| 12:16:20 | 11 | A    No, I don't know any numbers. |
| 12:16:22 | 12 | Q    Can you just say it was rare or common or |
| 12:16:24 | 13 | anything at all that you can say about that? |
| 12:16:27 | 14 | A    No. |
| 12:16:27 | 15 | Q    Can you think of any specific situation |
| 12:16:28 | 16 | that that happened? |
| 12:16:31 | 17 | A    It has happened over my career a lot of |
| 12:16:35 | 18 | times, I believe.  But I can't give you an exact |
| 12:16:38 | 19 | number. |
| 12:16:41 | 20 | Q    Now, according to your arrest report -- |
| 12:16:44 | 21 | you write -- and again, this is on the first page, |
| 12:16:48 | 22 | second paragraph, that you and Officer Okazaki |
| 12:16:55 | 23 | observed a light blue Buick LeSabre, and then the |
| 12:17:00 | 24 | license plate is given -- pulling into the 7-Eleven |
| 12:17:03 | 25 | parking lot.  And a couple of sentences after that |

74

**Exhibit C - 16**

Page 90

| | | |
|---|---|---|
| 12:17:05 | 1 | it says, "Based on our training and experience, we |
| 12:17:09 | 2 | formed the opinion that the suspects were possibly |
| 12:17:12 | 3 | casing a 7-Eleven store for a robbery." |
| 12:17:15 | 4 | Do you recall what it was about the |
| 12:17:16 | 5 | vehicle or occupants that led you to believe that |
| 12:17:20 | 6 | they were casing the store for a robbery? |
| 12:17:27 | 7 | A   Like I said, it's been a while, a long |
| 12:17:29 | 8 | time ago.  But at that time, we didn't know if it |
| 12:17:38 | 9 | was particularly -- particularly if it was a |
| 12:17:41 | 10 | robbery suspect -- if it was the Narcotics suspect |
| 12:17:44 | 11 | that showed up or it was neither. |
| 12:17:46 | 12 | I do remember that the car did not park in |
| 12:17:50 | 13 | front of the location or the 7-Eleven -- front door |
| 12:17:54 | 14 | of the 7-Eleven.  It backed into a parking stall |
| 12:17:59 | 15 | facing southbound and then northbound -- north of |
| 12:18:05 | 16 | the business away in the business doors where the |
| 12:18:10 | 17 | parking lot was completely emptied. |
| 12:18:26 | 18 | Q   Okay. |
| 12:18:28 | 19 | In those observations, the same -- as I |
| 12:18:32 | 20 | understood -- car backed into a parking stall that |
| 12:18:35 | 21 | was away from the front door; is that correct? |
| 12:18:37 | 22 | A   Yes. |
| 12:18:38 | 23 | Q   Okay. |
| 12:18:38 | 24 | Would that also be, in your experience, |
| 12:18:40 | 25 | consistent with a suspect that was awaiting a drug |

**75**

**Exhibit C - 17**

Page 91

| | | |
|---|---|---|
| 12:18:45 | 1 | buy -- in your experience, would a suspect awaiting |
| 12:18:50 | 2 | a drug buy engage in the same type of activity? |
| 12:18:54 | 3 | A   No, not really. |
| 12:18:57 | 4 | Q   How would a suspect waiting for a drug buy |
| 12:19:00 | 5 | behave typically in that situation if they -- the |
| 12:19:03 | 6 | buy was happening in a parking lot, what would a |
| 12:19:07 | 7 | suspect -- or making a -- or selling the drug, how |
| 12:19:11 | 8 | would they act? |
| 12:19:12 | 9 | A   I don't know how they act.  It depends on |
| 12:19:14 | 10 | the suspect. |
| 12:19:15 | 11 | Q   Okay. |
| 12:19:16 | 12 | But you said it's not typical that the |
| 12:19:18 | 13 | suspect may back into a stall away from the front |
| 12:19:22 | 14 | entrance of the establishment if they were selling |
| 12:19:24 | 15 | or buying drugs.  How would they act then? |
| 12:19:27 | 16 | A   I didn't say that.  Now you are putting |
| 12:19:29 | 17 | words in my mouth now -- or you are trying to. |
| 12:19:32 | 18 | Q   I'm just asking questions. |
| 12:19:33 | 19 | A   I know, but you are trying to twist my |
| 12:19:36 | 20 | words.  I never said anything about the suspect |
| 12:19:40 | 21 | buying or selling drugs into a parking lot or |
| 12:19:45 | 22 | backing into stalls.  You asked me a question. |
| 12:19:47 | 23 | Q   The initial question was whether what you |
| 12:19:49 | 24 | observed of this Buick -- if this was consistent, |
| 12:19:52 | 25 | in your experience, with a suspect waiting to buy |

**76**

**Exhibit C - 18**

Page 92

| | | |
|---|---|---|
| 12:19:56 | 1 | or sell drugs in a public parking lot. |
| 12:20:01 | 2 | A   It could be.   It could be. |
| 12:20:02 | 3 | Q   Okay. |
| 12:20:03 | 4 | A   But there's a few possibilities. |
| 12:20:04 | 5 | Q   And those are -- it's the drug informant |
| 12:20:08 | 6 | set-up? |
| 12:20:09 | 7 | A   Possibly. |
| 12:20:09 | 8 | Q   Robbery suspect or neither one of those? |
| 12:20:13 | 9 | A   Yes. |
| 12:20:14 | 10 | Q   Okay. |
| 12:20:14 | 11 | So when you see the Buick pull into the |
| 12:20:17 | 12 | parking lot -- and this is the last paragraph on |
| 12:20:21 | 13 | the first page -- you are observing the parking lot |
| 12:20:25 | 14 | from -- it says Cherry Avenue facing Crenshaw; is |
| 12:20:30 | 15 | that accurate? |
| 12:20:31 | 16 | MR. MORGUESS:   Last full paragraph. |
| 12:20:34 | 17 | BY MR. MEYERHOFF: |
| 12:20:34 | 18 | Q   Where it says, "We drove eastbound on |
| 12:20:37 | 19 | Cherry Avenue"? |
| 12:20:38 | 20 | A   Okay. |
| 12:20:39 | 21 | Q   Is that where you were surveilling the |
| 12:20:41 | 22 | parking lot from Cherry Avenue facing Crenshaw? |
| 12:20:45 | 23 | A   Uh-huh. |
| 12:20:45 | 24 | Q   And you described the suspect that came |
| 12:20:47 | 25 | out of the vehicle, long-sleeved shirt, dark |

77

**Exhibit C - 19**

Page 93

| | | |
|---|---|---|
| 12:20:53 | 1 | beanie, dark pants.  And that's accurate?  You saw |
| 12:20:57 | 2 | the suspect get out of the Buick; is that correct? |
| 12:21:00 | 3 | A   Yes. |
| 12:21:01 | 4 | Q   Okay. |
| 12:21:02 | 5 | And does this refresh your recollection as |
| 12:21:03 | 6 | to whether you knew anything about the physical |
| 12:21:06 | 7 | identification of the robbery suspect prior to |
| 12:21:08 | 8 | making this arrest? |
| 12:21:18 | 9 | MR. MORGUESS:  Do you understand the |
| 12:21:19 | 10 | question? |
| 12:21:20 | 11 | THE WITNESS:  No. |
| 12:21:21 | 12 | BY MR. MEYERHOFF: |
| 12:21:21 | 13 | Q   It says "this subject --" just reading |
| 12:21:24 | 14 | along.  "This subject matched the description of |
| 12:21:27 | 15 | the robbery suspect who had committed the robbery |
| 12:21:31 | 16 | earlier at the 7-Eleven store." |
| 12:21:34 | 17 | I assume at the time you knew what the |
| 12:21:35 | 18 | description of the robbery suspect was. |
| 12:21:38 | 19 | Sitting here today, do you recall what |
| 12:21:39 | 20 | that description was? |
| 12:21:40 | 21 | I think I already told you, a black |
| 12:21:42 | 22 | male -- that's -- like I said -- it happened four |
| 12:21:46 | 23 | years ago.  Black male, stocky build, in mid 30's, |
| 12:21:51 | 24 | or something like that. |
| 12:21:53 | 25 | Q   Okay. |

**78**

**Exhibit  C - 20**

Page 94

| | | |
|---|---|---|
| 12:21:53 | 1 | Is that the same description generally |
| 12:21:54 | 2 | that the informant gave you of the person who was |
| 12:21:57 | 3 | coming with the PCP? |
| 12:21:59 | 4 | A   I believe so, yes. |
| 12:22:00 | 5 | Q   Okay. |
| 12:22:03 | 6 | Did you pick the location of the 7-Eleven |
| 12:22:05 | 7 | knowing that a robbery had occurred there earlier |
| 12:22:09 | 8 | that day?  Was that part of taking that location? |
| 12:22:15 | 9 | A   No.  Like I said before, it was close to |
| 12:22:17 | 10 | where we had stopped the informant. |
| 12:22:26 | 11 | Q   And that was the only reason?  It was just |
| 12:22:29 | 12 | close to where the informant had been stopped based |
| 12:22:31 | 13 | on your recollection? |
| 12:22:33 | 14 | A   Yes.  It was a well lit area. |
| 12:22:36 | 15 | Q   Okay. |
| 12:22:39 | 16 | Now when you saw the suspect get out of |
| 12:22:41 | 17 | the vehicle who turned out to be Baker, that's when |
| 12:22:43 | 18 | you and Officer Okazaki pulled into the parking |
| 12:22:47 | 19 | lot; is that correct? |
| 12:22:54 | 20 | A   I'm trying to follow you here. |
| 12:22:55 | 21 | Q   Sure. |
| 12:22:56 | 22 | Going back to doing the surveillance on |
| 12:22:58 | 23 | the 7-Eleven and you see the suspect, Baker, get |
| 12:23:02 | 24 | out of the vehicle and walk towards the store. |
| 12:23:05 | 25 | A   Yes. |

**79**

**Exhibit C - 21**

Page 95

| | | |
|---|---|---|
| 12:23:05 | 1 | Q   Is that when you and Officer Okazaki drive |
| 12:23:08 | 2 | into the parking lot? |
| 12:23:10 | 3 | A   Yes. |
| 12:23:11 | 4 | Q   Okay. |
| 12:23:13 | 5 | And did you have your lights going or your |
| 12:23:16 | 6 | siren or anything at all? |
| 12:23:17 | 7 | A   No. |
| 12:23:17 | 8 | Q   Okay. |
| 12:23:19 | 9 | How do you first approach Baker?  How do |
| 12:23:24 | 10 | you initiate contact with him, if you remember? |
| 12:23:27 | 11 | A   With consensual encounter. |
| 12:23:31 | 12 | Q   Now, at this point, you had -- at least |
| 12:23:33 | 13 | according to your report, there was some suspicion |
| 12:23:35 | 14 | that he may be the robbery suspect?  Would that be |
| 12:23:38 | 15 | accurate to say? |
| 12:23:39 | 16 | A   Possibly. |
| 12:23:41 | 17 | Q   Is there a customary way that as a patrol |
| 12:23:45 | 18 | officer -- that you would approach a robbery |
| 12:23:48 | 19 | suspect in the field that you know of? |
| 12:23:54 | 20 | A   Customary?  If you know he is a robbery |
| 12:23:56 | 21 | suspect -- but we had no idea. |
| 12:23:59 | 22 | Q   Okay. |
| 12:23:59 | 23 | At this point, you knew that there had |
| 12:24:00 | 24 | been a robbery in which a weapon was utilized, |
| 12:24:04 | 25 | correct? |

**80**

**Exhibit C - 22**

Page 96

| | | |
|---|---|---|
| 12:24:06 | 1 | Did you feel that there was any need to at |
| 12:24:08 | 2 | least approach this suspect with your weapon drawn? |
| 12:24:12 | 3 | Anything like that? |
| 12:24:17 | 4 | A   No, because we were unsure. |
| 12:24:19 | 5 | Q   Okay. |
| 12:24:25 | 6 | Was there a reason that you didn't believe |
| 12:24:27 | 7 | it was necessary to pull your weapon or to at least |
| 12:24:30 | 8 | have your weapon ready as you approached the |
| 12:24:33 | 9 | suspect? |
| 12:24:38 | 10 | A   If he did that, that would defeat the |
| 12:24:41 | 11 | purpose of the consensual encounter. |
| 12:24:44 | 12 | Q   When you say "consensual encounter," |
| 12:24:47 | 13 | explain that to me.  What's "consensual encounter"? |
| 12:24:52 | 14 | A   It's normal contact with the citizen |
| 12:24:55 | 15 | where, you know, you don't -- you have utilized the |
| 12:24:59 | 16 | independent cause or reasonable suspicion but the |
| 12:25:03 | 17 | person is free to -- you don't block their way. |
| 12:25:07 | 18 | You don't turn on the lights and siren, you don't |
| 12:25:10 | 19 | direct them any.  As long as a reasonable person |
| 12:25:15 | 20 | believes they are free to leave by contact. |
| 12:25:18 | 21 | Q   You believe that initially this was a |
| 12:25:21 | 22 | consensual encounter, you just wanted to talk to |
| 12:25:24 | 23 | the person? |
| 12:25:25 | 24 | A   Yes. |
| 12:25:25 | 25 | Q   What was your goal in talking to the |

**81**

**Exhibit  C - 23**

Page 97

12:25:27  1    person at that time?  What did you want to find

12:25:29  2    out?

12:25:34  3         A    Well, it was a tri-fold question again.

12:25:38  4    And I already answered that.

12:25:40  5         Q    You wanted to verify if this was the

12:25:43  6    person the informant had sent, the robbery suspect

12:25:46  7    or neither?

12:25:49  8         A    Yes.

12:25:50  9         Q    And if it was possibly the robbery

12:25:52  10   suspect, you didn't see any need to just be

12:25:54  11   cautious and have your weapon ready to go?  Have it

12:26:00  12   drawn?

12:26:05  13        A    Well, you don't have to have your weapons

12:26:10  14   drawn to be cautious.  We are cautious at all times

12:26:12  15   while we are doing consensual encounters or

12:26:16  16   detentions.  It just depends what you have at the

12:26:19  17   time.  And we didn't feel a need for the lights to

12:26:25  18   go on and to block his way or draw weapons.  So the

12:26:30  19   best I can remember, I didn't feel threatened.  I

12:26:33  20   mean, yeah, it could have been.  But that doesn't

12:26:37  21   mean that we were not cautious.  We are cautious at

12:26:41  22   all times of the day while we are working.

12:26:45  23        Q    Okay.

12:26:57  24             Prior to driving into the parking lot --

12:27:00  25   and I asked you this earlier -- I think you didn't

**82**

**Exhibit  C - 24**

Page 98

| Time | Line | Text |
|------|------|------|
| 12:27:04 | 1 | recall -- but had the informant given you a |
| 12:27:07 | 2 | description of the vehicle that the suspect was |
| 12:27:09 | 3 | coming in? |
| 12:27:10 | 4 | MR. MORGUESS:  Objection, asked and |
| 12:27:16 | 5 | answered. |
| 12:27:17 | 6 | THE WITNESS:  I don't recall.  It's been |
| 12:27:20 | 7 | so long. |
| 12:27:21 | 8 | BY MR. MEYERHOFF: |
| 12:27:21 | 9 | Q    Sure. |
| 12:27:22 | 10 | Just looking at your report and seeing the |
| 12:27:26 | 11 | description of the vehicle, light blue |
| 12:27:28 | 12 | Buick LeSabre, does that refresh your recollection |
| 12:27:32 | 13 | at all as to whether the informant told you that |
| 12:27:34 | 14 | that would be the vehicle that the suspect would be |
| 12:27:36 | 15 | coming in?  Does that trigger anything? |
| 12:27:38 | 16 | A    It could have.  But I don't know.  Like I |
| 12:27:40 | 17 | said, it's been a long time. |
| 12:27:42 | 18 | Q    Okay. |
| 12:27:52 | 19 | I'm going to hand you this document, |
| 12:27:54 | 20 | Mr. Nazir.  And we will mark this as Exhibit 2. |
| 12:28:11 | 21 | Again, you can take a look at this, but I |
| 12:28:14 | 22 | just want to ask you if you have seen this document |
| 12:28:17 | 23 | before. |
| 12:28:22 | 24 | A    Yes. |
| 12:28:32 | 25 | (Defendant's Exhibit 2 was marked |

**83**

**Exhibit  C - 25**

Page 99

| | | |
|---|---|---|
| 12:28:32 | 1 | for identification, a copy of which is |
| 12:28:32 | 2 | attached hereto.) |
| 12:28:32 | 3 | BY MR. MEYERHOFF: |
| 12:28:32 | 4 | Q    Did you prepare this Probable Cause |
| 12:28:35 | 5 | Declaration? |
| 12:28:35 | 6 | A    Yes. |
| 12:28:35 | 7 | Q    That's your signature about the middle of |
| 12:28:37 | 8 | the page there? |
| 12:28:38 | 9 | A    Yes. |
| 12:28:41 | 10 | Q    The first sentence where it says, "Facts |
| 12:28:44 | 11 | establishing elements and identification of the |
| 12:28:46 | 12 | defendant," it's a little cut off, but I think we |
| 12:28:51 | 13 | can agree what it says.  "On 14 April, '07 at |
| 12:28:56 | 14 | approximately 2235 hours, Officer Okazaki and I, |
| 12:29:02 | 15 | Nazir, contacted a Rusty Baker because he matched |
| 12:29:05 | 16 | the description for the robbery suspect." |
| 12:29:08 | 17 | Was that statement true and correct at the |
| 12:29:10 | 18 | time you put it into this declaration? |
| 12:29:12 | 19 | A    Yes. |
| 12:29:12 | 20 | Q    Okay. |
| 12:29:13 | 21 | Is that the only reason that you contacted |
| 12:29:15 | 22 | the suspect at the time? |
| 12:29:22 | 23 | A    No. |
| 12:29:22 | 24 | Q    Okay. |
| 12:29:23 | 25 | The other reason being, as you testified, |

**84**

**Exhibit  C - 26**

Page 100

| | | |
|---|---|---|
| 12:29:25 | 1 | that he may have been the person a confidential |
| 12:29:30 | 2 | informant had set up; is that correct? |
| 12:29:32 | 3 | A   Or third reason, neither. |
| 12:29:34 | 4 | Q   Or neither. |
| 12:29:41 | 5 | In your arrest report, the first exhibit I |
| 12:29:43 | 6 | gave you, you didn't include any information in the |
| 12:29:46 | 7 | arrest report regarding confidential informant or |
| 12:29:50 | 8 | what had been set up; is that correct? |
| 12:29:53 | 9 | A   Sorry?  You lost me. |
| 12:29:54 | 10 | Q   First document.  The arrest report, you |
| 12:29:56 | 11 | didn't include any information in that report |
| 12:29:58 | 12 | regarding the confidential informant or what had |
| 12:30:02 | 13 | been set up with the informant; is that correct? |
| 12:30:05 | 14 | A   Yes. |
| 12:30:05 | 15 | Q   And then the Probable Cause Declaration, |
| 12:30:07 | 16 | was it -- you didn't include any information |
| 12:30:09 | 17 | regarding the confidential informant in that |
| 12:30:13 | 18 | Declaration, either; is that correct? |
| 12:30:14 | 19 | A   Yes. |
| 12:30:16 | 20 | Q   And I will ask you this:  Have you ever |
| 12:30:20 | 21 | been trained by anybody in Torrance -- Torrance |
| 12:30:25 | 22 | Police Department -- that it was okay to make |
| 12:30:26 | 23 | inaccurate statements in your report?  Did anybody |
| 12:30:30 | 24 | ever tell you that that was okay? |
| 12:30:32 | 25 | MR. MORGUESS:  Objection, assumes facts |

**85**

**Exhibit  C - 27**

Page 101

| | | |
|---|---|---|
| 12:30:33 | 1 | not in evidence.  Mischaracterizes the prior |
| 12:30:36 | 2 | testimony. |
| 12:30:37 | 3 | MR. MEYERHOFF:  Not to say it happened. |
| 12:30:38 | 4 | BY MR. MEYERHOFF: |
| 12:30:38 | 5 | Q   I just want to make sure that nobody told |
| 12:30:41 | 6 | you if it was okay to do that? |
| 12:30:44 | 7 | A   Mr. Meyerhoff, you are asking me if I lied |
| 12:30:46 | 8 | on a police report. |
| 12:30:48 | 9 | MR. MORGUESS:  Vague and ambiguous. |
| 12:30:49 | 10 | BY MR. MEYERHOFF: |
| 12:30:49 | 11 | Q   Did anybody ever train you, for whatever |
| 12:30:52 | 12 | reason, it was okay to put false statements in a |
| 12:30:57 | 13 | report that you prepared as a police officer? |
| 12:30:59 | 14 | MR. MORGUESS:  Vague and ambiguous and |
| 12:31:00 | 15 | same objections as before. |
| 12:31:01 | 16 | BY MR. MEYERHOFF: |
| 12:31:01 | 17 | Q   You can answer. |
| 12:31:02 | 18 | A   There's nothing in documents that I |
| 12:31:04 | 19 | prepared that is false.  Nobody has trained me to |
| 12:31:07 | 20 | do false information in police reports. |
| 12:31:11 | 21 | Q   Okay. |
| 12:31:19 | 22 | Would you agree that as you are |
| 12:31:25 | 23 | surveilling the 7-Eleven and as it turned out |
| 12:31:29 | 24 | Mr. Baker was the individual who had been arranged |
| 12:31:32 | 25 | with the informant -- would you agree with that? |

**86**

**Exhibit  C - 28**

Page 134

| | | |
|---|---|---|
| 14:02:05 | 1 | BY MR. MEYERHOFF: |
| 14:02:05 | 2 | Q   That your statement of probable cause was |
| 14:02:08 | 3 | inaccurate or problematic in any way? |
| 14:02:16 | 4 | A   No. |
| 14:02:16 | 5 | Q   Okay. |
| 14:02:33 | 6 | I want to hand you this document, |
| 14:02:34 | 7 | Mr. Nazir.  I will mark this as Exhibit 3. |
| 14:02:53 | 8 | I will ask you if you -- again, you can |
| 14:02:56 | 9 | take whatever time you need to look at it, but I |
| 14:02:59 | 10 | will ask if you recognize this document. |
| 14:03:03 | 11 | A   Yes. |
| 14:03:04 | 12 | (Defendant's Exhibit 3 was marked |
| 14:03:04 | 13 | for identification, a copy of which is |
| 14:03:04 | 14 | attached hereto.) |
| 14:03:05 | 15 | BY MR. MEYERHOFF: |
| 14:03:05 | 16 | Q   Did you receive this document from the |
| 14:03:06 | 17 | district attorney's office on or about |
| 14:03:09 | 18 | February 2nd, 2009? |
| 14:03:11 | 19 | A   Yes. |
| 14:03:11 | 20 | Q   Okay. |
| 14:03:20 | 21 | MR. MORGUESS:  Let's just take a quick |
| 14:03:22 | 22 | break -- a very quick break. |
| 14:05:02 | 23 | (Recess) |
| 14:05:02 | 24 | BY MR. MEYERHOFF: |
| 14:05:02 | 25 | Q   I think we left it that you did receive |

**87**

**Exhibit C - 29**

Page 135

| | | |
|---|---|---|
| 14:05:04 | 1 | this letter, Exhibit 3; is that correct? |
| 14:05:07 | 2 | A   Yes. |
| 14:05:08 | 3 | Q   Okay. |
| 14:05:08 | 4 | And as a police officer for approximately |
| 14:05:16 | 5 | 10 years in Torrance, how often would you testify |
| 14:05:20 | 6 | in court on cases in which you were involved? |
| 14:05:23 | 7 | A   Are you asking percentagewise? |
| 14:05:33 | 8 | Q   Was there any averages per week or per |
| 14:05:38 | 9 | month?  Or how many hours per pay period you would |
| 14:05:42 | 10 | spend in court testifying? |
| 14:05:43 | 11 | A   It just depends.  Every week was |
| 14:05:45 | 12 | different.  Every Monday was different. |
| 14:05:48 | 13 | Q   I assume -- |
| 14:05:49 | 14 | A   Every case was different. |
| 14:05:51 | 15 | Q   I assume you testified in court many, many |
| 14:05:53 | 16 | times as a police officer regarding cases in which |
| 14:05:55 | 17 | you were involved. |
| 14:05:57 | 18 | Is that fair to say? |
| 14:05:58 | 19 | A   Yes. |
| 14:05:58 | 20 | Q   And this letter talks about you being |
| 14:06:02 | 21 | placed on the district attorney's Brady list. |
| 14:06:07 | 22 | Is that how you took the letter? |
| 14:06:09 | 23 | A   That's the intent of me being placed on |
| 14:06:11 | 24 | the Brady list. |
| 14:06:12 | 25 | Q   Okay. |

**88**

**Exhibit  C - 30**

Page 136

| | | |
|---|---|---|
| 14:06:17 | 1 | And did you feel at the time that you |
| 14:06:19 | 2 | received this of being placed on a Brady list could |
| 14:06:22 | 3 | impact your ability to be a police officer for the |
| 14:06:24 | 4 | City of Torrance? |
| 14:06:26 | 5 | A   No. |
| 14:06:26 | 6 | Q   Okay. |
| 14:06:27 | 7 | And is there a reason that you felt that |
| 14:06:29 | 8 | being put on the Brady list would not impact your |
| 14:06:33 | 9 | ability to be a police officer for the City? |
| 14:06:35 | 10 | A   Okay. |
| 14:06:40 | 11 | Can you repeat that question? |
| 14:06:44 | 12 | Q   Let me ask you the first question again. |
| 14:06:46 | 13 | When you received this, I assume you were concerned |
| 14:06:49 | 14 | about it, to say the least? |
| 14:06:52 | 15 | A   Of course. |
| 14:06:53 | 16 | Q   Why were you concerned about this letter? |
| 14:06:55 | 17 | If you can tell me that at least. |
| 14:06:57 | 18 | A   I didn't want to be on the Brady list. |
| 14:07:02 | 19 | Q   Why not? |
| 14:07:09 | 20 | MR. MORGUESS:  At the time that you |
| 14:07:10 | 21 | received the letter. |
| 14:07:12 | 22 | THE WITNESS:  First of all, I didn't |
| 14:07:13 | 23 | understand why the heck I was being placed on the |
| 14:07:16 | 24 | Brady list because of -- off of an incident that |
| 14:07:20 | 25 | occurred two years ago where no issue will arise |

**89**

**Exhibit C - 31**

Page 137

| | | |
|---|---|---|
| 14:07:25 | 1 | from the initial filing of the district attorney's |
| 14:07:29 | 2 | office, but the issue arose when a federal |
| 14:07:35 | 3 | affidavit was unsealed sometime in October 2008 of |
| 14:07:40 | 4 | me losing an informant on the case.  So I didn't |
| 14:07:46 | 5 | understand why this was even an issue. |
| 14:07:52 | 6 | Moreover, that I don't think it was a DA's |
| 14:07:55 | 7 | office.  It was the Department pushing the issue of |
| 14:07:59 | 8 | me being placed on the Brady list.  Because I did |
| 14:08:04 | 9 | have grievances going with the Department.  I did |
| 14:08:07 | 10 | have hostile work environment against the |
| 14:08:10 | 11 | Department.  I had received discipline from the |
| 14:08:13 | 12 | Department for no reason.  I was placed on admin |
| 14:08:17 | 13 | leave for no reason from the Department.  So I |
| 14:08:26 | 14 | believe that it was a Department -- especially |
| 14:08:31 | 15 | Kevin Kreager, who was Captain Kreager, who was in |
| 14:08:36 | 16 | charge of the admin bureau, had conversations with |
| 14:08:38 | 17 | DA -- district attorney named Maggie Mow who was in |
| 14:08:43 | 18 | charge of possible Brady initial letters and was |
| 14:08:47 | 19 | trying to attempt -- attempting to get me on the |
| 14:08:51 | 20 | Brady list. |
| 14:08:53 | 21 |     Q    Okay. |
| 14:08:58 | 22 | Let me go back to my initial question. |
| 14:09:03 | 23 | Was there -- are you saying this concerned |
| 14:09:04 | 24 | you because you felt the Department was behind |
| 14:09:06 | 25 | it? |

**90**

**Exhibit  C - 32**

Page 138

| | | |
|---|---|---|
| 14:09:06 | 1 | A   Absolutely. |
| 14:09:08 | 2 | Q   Okay. |
| 14:09:08 | 3 |     Did you have any concern that being placed |
| 14:09:09 | 4 | on a Brady list could impact your ability to be a |
| 14:09:13 | 5 | police officer for the department? |
| 14:09:14 | 6 | A   Absolutely not. |
| 14:09:14 | 7 | Q   Okay. |
| 14:09:17 | 8 |     Do you know of any officer in Torrance who |
| 14:09:21 | 9 | is on the Brady list who still operates as a patrol |
| 14:09:24 | 10 | officer? |
| 14:09:24 | 11 | A   As an officer or a patrol officer? |
| 14:09:27 | 12 | Q   As a patrol officer.  Let's start with |
| 14:09:29 | 13 | that. |
| 14:09:30 | 14 | A   I have tried to get that information.  But |
| 14:09:34 | 15 | they won't give it to me. |
| 14:09:39 | 16 | Q   "Yes" or "no"?  Do you know anybody? |
| 14:09:41 | 17 | A   No. |
| 14:09:41 | 18 | Q   Do you know any officer at all in |
| 14:09:42 | 19 | Torrance -- any sworn personnel who is on the Brady |
| 14:09:46 | 20 | list who still works for the Department? |
| 14:09:49 | 21 | A   No. |
| 14:09:49 | 22 | Q   In Oxnard, did you know any sworn |
| 14:09:51 | 23 | personnel who were on the Brady list who continue |
| 14:09:57 | 24 | to work for the Department? |
| 14:09:58 | 25 | A   No. |

**91**

**Exhibit  C - 33**

Page 147

| | | |
|---|---|---|
| 14:20:54 | 1 | were discussions.  I can't say it any more clear. |
| 14:20:58 | 2 | What discussions or conversations did you have with |
| 14:21:00 | 3 | anybody to support your statement that the |
| 14:21:03 | 4 | Department was responsible for you being placed on |
| 14:21:04 | 5 | this Brady list? |
| 14:21:07 | 6 | THE WITNESS:  Well, we need to ask that of |
| 14:21:08 | 7 | Captain Kreager who was in contact with the |
| 14:21:14 | 8 | district attorney's office the whole time.  So you |
| 14:21:16 | 9 | need to ask him that.  I had conversations with him |
| 14:21:18 | 10 | and he told me -- like I related to you already not |
| 14:21:21 | 11 | to answer your question any more clearly, either. |
| 14:21:24 | 12 | I don't have any written facts, "Hey, by the way, |
| 14:21:27 | 13 | Captain Kreager wrote this for me." |
| 14:21:31 | 14 | MR. MORGUESS:  He is asking what Kreager |
| 14:21:34 | 15 | told you. |
| 14:21:35 | 16 | THE WITNESS:  Yeah. |
| 14:21:36 | 17 | BY MR. MEYERHOFF: |
| 14:21:36 | 18 | Q   You are not aware of any conversations -- |
| 14:21:39 | 19 | A   I was not privileged to any conversations |
| 14:21:42 | 20 | between Kreager and the district attorney's if they |
| 14:21:44 | 21 | were having e-mail exchanges, no. |
| 14:21:49 | 22 | Q   Do you know of any specific conversations |
| 14:21:51 | 23 | between the Torrance Police Department and the |
| 14:21:53 | 24 | district attorney's office relating to you being |
| 14:21:56 | 25 | placed on a Brady list? |

**92**

**Exhibit C - 34**

Page 148

| | | |
|---|---|---|
| 14:21:58 | 1 | A   No. |
| 14:21:58 | 2 | MR. MORGUESS:  Sorry.  Just to clarify, |
| 14:22:01 | 3 | you mean leading up to this February 2nd letter. |
| 14:22:07 | 4 | MR. MEYERHOFF:  Anytime. |
| 14:22:08 | 5 | BY MR. MEYERHOFF: |
| 14:22:08 | 6 | Q   You made a statement -- okay -- it's my |
| 14:22:11 | 7 | job to probe your statements, your allegations, you |
| 14:22:14 | 8 | told me that the Department was responsible for |
| 14:22:16 | 9 | putting you on the Brady list -- from the time you |
| 14:22:18 | 10 | are sitting here today to anytime in the past, I |
| 14:22:21 | 11 | need to know the facts that you believe supports |
| 14:22:25 | 12 | that statement. |
| 14:22:26 | 13 | So I'm asking you, what evidence do you |
| 14:22:27 | 14 | have to support that claim? |
| 14:22:31 | 15 | You told me about what happened to you in |
| 14:22:33 | 16 | the past and we will talk about that. |
| 14:22:35 | 17 | Other than what you have told me about |
| 14:22:36 | 18 | what happened in the past, do you know of any |
| 14:22:39 | 19 | conversation -- did anybody ever tell you that the |
| 14:22:41 | 20 | Department was responsible for you being placed on |
| 14:22:44 | 21 | the Brady list? |
| 14:22:46 | 22 | A   No. |
| 14:22:46 | 23 | Q   Okay. |
| 14:22:46 | 24 | Did anybody ever tell you that the |
| 14:22:48 | 25 | Department was responsible for any alleged delay in |

**93**

**Exhibit C - 35**

Page 151

| | | |
|---|---|---|
| 14:24:59 | 1 | But my question is do you believe the City |
| 14:25:02 | 2 | had any involvement in this -- you being placed on |
| 14:25:07 | 3 | a Brady list long after or according to you so long |
| 14:25:12 | 4 | after this case was filed? |
| 14:25:15 | 5 | A   I believe so. |
| 14:25:15 | 6 | Q   Okay. |
| 14:25:16 | 7 | What evidence do you have to support that |
| 14:25:19 | 8 | statement? |
| 14:25:19 | 9 | A   I think I already answered that.  I don't |
| 14:25:22 | 10 | have anything -- written facts. |
| 14:25:24 | 11 | Q   Okay. |
| 14:25:25 | 12 | A   I told you that the captain was -- you |
| 14:25:28 | 13 | know, in contact with the district attorney. |
| 14:25:30 | 14 | Q   Okay. |
| 14:25:31 | 15 | A   My attorney was unable to get information |
| 14:25:35 | 16 | from the other -- all of the parties, and it was |
| 14:25:39 | 17 | delayed by the Department, because I received the |
| 14:25:44 | 18 | letter on February 2nd, and I was not placed on -- |
| 14:25:48 | 19 | or this was the intent.  But I was not placed on |
| 14:25:50 | 20 | the Brady list until I believe June of 2010, so the |
| 14:25:56 | 21 | whole -- over a year, there was delays from the |
| 14:25:58 | 22 | Department not being able to talk to those |
| 14:26:00 | 23 | witnesses.  And there's -- I don't know how many |
| 14:26:03 | 24 | extensions, like I said already -- my attorney |
| 14:26:06 | 25 | received from Maggie Mow, same attorney -- or same |

**94**

**Exhibit  C - 36**

Page 152

| | | |
|---|---|---|
| 14:26:10 | 1 | DA that Captain Kreager was in contact with. |
| 14:26:15 | 2 | Q   Do you have any direct knowledge of any |
| 14:26:17 | 3 | conversations between Captain Kreager and |
| 14:26:19 | 4 | Maggie Mow? |
| 14:26:22 | 5 | A   No. |
| 14:26:22 | 6 | MR. MORGUESS:  Objection, asked and |
| 14:26:23 | 7 | answered. |
| 14:26:25 | 8 | BY MR. MEYERHOFF: |
| 14:26:25 | 9 | Q   Have you seen any documentation that |
| 14:26:26 | 10 | relates to any involvement the Department had in |
| 14:26:32 | 11 | your being placed on a Brady list?  Do you have any |
| 14:26:37 | 12 | documents to support that claim? |
| 14:26:40 | 13 | A   No. |
| 14:26:40 | 14 | Q   How do you know the Department -- and I |
| 14:26:45 | 15 | assume when you talk about the Department not |
| 14:26:48 | 16 | allowing your attorney to talk to witnesses, you |
| 14:26:51 | 17 | are talking about after you received this |
| 14:26:52 | 18 | Exhibit 3, you're contending that the Department |
| 14:26:57 | 19 | delayed your appeal of this determination; is that |
| 14:27:00 | 20 | right? |
| 14:27:00 | 21 | A   Yes. |
| 14:27:00 | 22 | Q   What evidence do you have that the |
| 14:27:04 | 23 | Department intentionally wanted to delay you being |
| 14:27:09 | 24 | able to appeal this? |
| 14:27:10 | 25 | A   The IA investigations against the other |

**95**

**Exhibit  C - 37**

Page 156

| | | |
|---|---|---|
| 14:30:07 | 1 | leave. |
| 14:30:07 | 2 | Q   Okay. |
| 14:30:08 | 3 | Now, this letter came from a male, |
| 14:30:24 | 4 | Ruben -- have you ever spoken to this person, |
| 14:30:27 | 5 | Ruben? |
| 14:30:29 | 6 | A   No. |
| 14:30:29 | 7 | Q   Do you know of any conversations that |
| 14:30:30 | 8 | anybody in the Torrance Police Department had with |
| 14:30:32 | 9 | Ruben? |
| 14:30:34 | 10 | A   No. |
| 14:30:34 | 11 | Q   So when you said that Captain Kreager |
| 14:30:42 | 12 | was -- that it was his intention to get you on to |
| 14:30:45 | 13 | the Brady list, do you have any evidence to support |
| 14:30:49 | 14 | that? |
| 14:30:52 | 15 | MR. MORGUESS:  Objection, asked and |
| 14:30:53 | 16 | answered. |
| 14:31:01 | 17 | THE WITNESS:  The only evidence I have is |
| 14:31:02 | 18 | I told you he was in contact with Maggie Mow the |
| 14:31:04 | 19 | whole time.  I was being determined to be placed on |
| 14:31:08 | 20 | Brady list from before that incident. |
| 14:31:11 | 21 | BY MR. MEYERHOFF: |
| 14:31:11 | 22 | Q   But you don't know what he and Ms. Mow |
| 14:31:14 | 23 | were discussing? |
| 14:31:16 | 24 | A   No.  And the only other thing I know is |
| 14:31:20 | 25 | they attempted to file criminal charges against me. |

**96**

**Exhibit  C - 38**

Page 157

| | | |
|---|---|---|
| 14:31:23 | 1 | So they wanted to get rid of me for any reason |
| 14:31:25 | 2 | possible. |
| 14:31:27 | 3 | Q   So is it just -- are you just assuming |
| 14:31:30 | 4 | that Mr. Kreager and Ms. Mow were discussing |
| 14:31:34 | 5 | putting you on the Brady list? |
| 14:31:37 | 6 | A   I'm not -- |
| 14:31:38 | 7 | MR. MORGUESS:  Objection, argumentative. |
| 14:31:40 | 8 | THE WITNESS:  I'm not assuming anything. |
| 14:31:42 | 9 | BY MR. MEYERHOFF: |
| 14:31:42 | 10 | Q   Do you have that in evidence that they |
| 14:31:43 | 11 | were discussing you being on the Brady list? |
| 14:31:47 | 12 | MR. MORGUESS:  Objection, it appears to be |
| 14:31:48 | 13 | vague and ambiguous as to evidence.  I mean, he has |
| 14:31:51 | 14 | answered your question. |
| 14:31:53 | 15 | BY MR. MEYERHOFF: |
| 14:31:53 | 16 | Q   Okay. |
| 14:31:58 | 17 | MR. MORGUESS:  Maybe you mean something |
| 14:31:59 | 18 | different by "evidence." |
| 14:32:05 | 19 | MR. MEYERHOFF:  "Facts." |
| 14:32:07 | 20 | BY MR. MEYERHOFF: |
| 14:32:07 | 21 | Q   Let me ask you this:  Are you familiar |
| 14:32:10 | 22 | with the Brady process, what the protocol that the |
| 14:32:13 | 23 | Brady compliance unit uses to determine if an |
| 14:32:16 | 24 | officer should be on a Brady list? |
| 14:32:20 | 25 | MR. MORGUESS:  Objection, calls for a |

**97**

**Exhibit C - 39**

Page 158

| | | |
|---|---|---|
| 14:32:21 | 1 | legal conclusion. |
| 14:32:22 | 2 | BY MR. MEYERHOFF: |
| 14:32:22 | 3 | Q   If you know. |
| 14:32:23 | 4 | A   No. |
| 14:32:23 | 5 | Q   I'm asking if you know protocol. |
| 14:32:26 | 6 | A   No. |
| 14:32:26 | 7 | Q   Okay. |
| 14:32:40 | 8 |      Are you aware of any statements at all |
| 14:32:42 | 9 | that were made by anybody in the Department to the |
| 14:32:45 | 10 | DA's office advising that you be put on the Brady |
| 14:32:49 | 11 | list or asking the DA to put you on the Brady list? |
| 14:32:54 | 12 | Are you aware of any actual statements from anybody |
| 14:32:56 | 13 | from the Department to the DA?  Along those lines? |
| 14:33:00 | 14 | A   From the Department, no. |
| 14:33:12 | 15 | Q   Are you aware of any documents that were |
| 14:33:15 | 16 | sent from anybody in the Department to the DA |
| 14:33:18 | 17 | asking the DA in any way to put you on the Brady |
| 14:33:26 | 18 | list? |
| 14:33:26 | 19 | A   Not to the extent they put me on the Brady |
| 14:33:31 | 20 | list, but my termination paperwork and you have in |
| 14:33:33 | 21 | your possession, Captain Stark and Deputy Chief |
| 14:33:37 | 22 | Brown, Mike Brown, had conversation with the |
| 14:33:39 | 23 | Torrance DA, head of Torrance DA, Diane Vezzani, |
| 14:33:43 | 24 | and she said she wouldn't use me as a witness.  And |
| 14:33:48 | 25 | they based their decision on that regarding |

**98**

**Exhibit  C - 40**

Page 161

| | | |
|---|---|---|
| 14:35:58 | 1 | met with the district attorney.  And they were |
| 14:36:00 | 2 | figuring out stuff.  And when I was -- you know, I |
| 14:36:06 | 3 | bugged him.  "Why am I on the radio?  Why are you |
| 14:36:11 | 4 | treating me like a piece of shit?"  And he was |
| 14:36:14 | 5 | like, "Don't worry about it.  Come and ask me |
| 14:36:18 | 6 | anything."  He told me that he would call the |
| 14:36:20 | 7 | district attorney and I kept him updated what's |
| 14:36:24 | 8 | going on with my case, regarding other stuff.  So I |
| 14:36:28 | 9 | kept him updated on everything. |
| 14:36:30 | 10 | Q   Okay. |
| 14:36:33 | 11 | Did he ever tell you any specifics about |
| 14:36:34 | 12 | any conversations he had with the DA? |
| 14:36:37 | 13 | A   No. |
| 14:36:37 | 14 | Q   Other than Captain Kreager, do you believe |
| 14:36:40 | 15 | any other Department employee had conversations |
| 14:36:43 | 16 | with the DA about you and your placement on the |
| 14:36:46 | 17 | Brady list? |
| 14:36:47 | 18 | A   I don't know. |
| 14:36:47 | 19 | Q   Okay. |
| 14:36:48 | 20 | MR. MORGUESS:  Other than to what he |
| 14:36:49 | 21 | testified to. |
| 14:36:53 | 22 | BY MR. MEYERHOFF: |
| 14:36:53 | 23 | Q   Now, after you learned that you had been |
| 14:36:56 | 24 | placed on the Brady list, do you recall having a |
| 14:36:59 | 25 | meeting with a Deputy DA named Goodwin?  Does that |

**99**

**Exhibit  C - 41**

Page 167

| | | |
|---|---|---|
| 14:42:52 | 1 | the time of the arrest? |
| 14:42:53 | 2 | A   No, it was told that it could have been. |
| 14:42:56 | 3 | Could have been. |
| 14:42:57 | 4 | Q   Just answer. |
| 14:43:03 | 5 | MR. MORGUESS:   Just answer the question. |
| 14:43:04 | 6 | BY MR. MEYERHOFF: |
| 14:43:04 | 7 | Q   Did you tell him something about that -- |
| 14:43:06 | 8 | that it could have been?  Tell me about the |
| 14:43:07 | 9 | conversation that you recall -- the basis for the |
| 14:43:10 | 10 | probable cause during this meeting. |
| 14:43:12 | 11 | A   I think I already answered that.  I think, |
| 14:43:14 | 12 | to summarize it, I just -- |
| 14:43:16 | 13 | Q   Did you tell Goodman or Esposito that, |
| 14:43:19 | 14 | again, Baker could have been the robbery suspect? |
| 14:43:22 | 15 | Did you have a conversation like that with them? |
| 14:43:24 | 16 | A   Possibly.  Like I said, it's two and a |
| 14:43:27 | 17 | half years ago. |
| 14:43:29 | 18 | Q   You don't know specifically? |
| 14:43:30 | 19 | A   Specifically, no. |
| 14:43:32 | 20 | Q   Did you in any way take any notes of this |
| 14:43:44 | 21 | conversation you had with Goodwin or Esposito? |
| 14:43:48 | 22 | A   No. |
| 14:43:48 | 23 | Q   Okay. |
| 14:43:48 | 24 | Now, after you were placed -- after you |
| 14:44:03 | 25 | received this Exhibit 3, this notice, as you |

**100**

**Exhibit  C - 42**

Page 168

| | | |
|---|---|---|
| 14:44:05 | 1 | already mentioned, you appealed that determination |
| 14:44:09 | 2 | that you were going to be placed on a Brady list. |
| 14:44:13 | 3 | Is that accurate to say? |
| 14:44:14 | 4 | A   Yes. |
| 14:44:14 | 5 | Q   Okay. |
| 14:44:23 | 6 | And this appeal was prepared by the law |
| 14:44:25 | 7 | firm of Lackie & Dammeier; is that right? |
| 14:44:29 | 8 | A   Yes. |
| 14:44:29 | 9 | Q   And Ms. Kawar, she was your attorney for |
| 14:44:33 | 10 | this? |
| 14:44:34 | 11 | A   Yes. |
| 14:44:34 | 12 | Q   I will mark this as Exhibit 4. |
| 14:44:45 | 13 | And if you can take a look.  I assume |
| 14:44:48 | 14 | Ms. Kawar prepared this document.  You didn't |
| 14:44:52 | 15 | prepare this, did you? |
| 14:44:56 | 16 | A   No. |
| 14:44:56 | 17 | (Defendant's Exhibit 4 was marked |
| 14:44:56 | 18 | for identification, a copy of which is |
| 14:44:56 | 19 | attached hereto.) |
| 14:44:57 | 20 | BY MR. MEYERHOFF: |
| 14:44:57 | 21 | Q   Did you review this, do you recall, prior |
| 14:45:00 | 22 | to it being submitted to the DA's office? |
| 14:45:05 | 23 | A   Yes. |
| 14:45:05 | 24 | Q   To your knowledge, was everything in |
| 14:45:08 | 25 | here -- did you approve everything in here?  Was it |

**101**

**Exhibit C - 43**

Page 169

| | | |
|---|---|---|
| 14:45:10 | 1 | all factual? |
| 14:45:11 | 2 | A   Yes, to my knowledge. |
| 14:45:12 | 3 | Q   Okay. |
| 14:45:22 | 4 | Now, at some point after you appealed it, |
| 14:45:25 | 5 | did you receive a final determination from the DA's |
| 14:45:27 | 6 | office? |
| 14:45:29 | 7 | A   Yes. |
| 14:45:29 | 8 | Q   And I will mark this as Exhibit 5. |
| 14:45:37 | 9 | MR. MORGUESS:  You know that Exhibit 4 is |
| 14:45:38 | 10 | not a complete -- |
| 14:45:39 | 11 | MR. MEYERHOFF:  Sorry.  I think there were |
| 14:45:41 | 12 | attachments to it.  I just included the argument. |
| 14:46:01 | 13 | (Defendant's Exhibit 5 was marked |
| 14:46:01 | 14 | for identification, a copy of which is |
| 14:46:01 | 15 | attached hereto.) |
| 14:46:01 | 16 | BY MR. MEYERHOFF: |
| 14:46:01 | 17 | Q   Did you at some time receive this document |
| 14:46:04 | 18 | from the DA's office? |
| 14:46:06 | 19 | A   Yes. |
| 14:46:06 | 20 | Q   This would be the final determination |
| 14:46:08 | 21 | regarding your appeal? |
| 14:46:10 | 22 | A   Yes. |
| 14:46:10 | 23 | Q   And this was sent by -- did you ever meet |
| 14:46:14 | 24 | with Lawrence Mason, senior special assistant for |
| 14:46:19 | 25 | the DA? |

**102**

**Exhibit  C - 44**

Page 170

| | | | |
|---|---|---|---|
| 14:46:21 | 1 | A | No. |
| 14:46:21 | 2 | Q | Do you know who that is? |
| 14:46:23 | 3 | A | No. |
| 14:46:23 | 4 | Q | You never met him in your life? |
| 14:46:25 | 5 | A | No. |
| 14:46:25 | 6 | Q | To your knowledge? |
| 14:46:27 | 7 | A | No. |

14:46:27  8      Q   Other than what you have testified to
14:46:34  9  already, do you have any facts that the Torrance
14:46:38  10  Police Department was involved in this
14:46:41  11  determination from the DA's office to place you on
14:46:45  12  a Brady list?
14:46:47  13          MR. MORGUESS:  Objection, vague and
14:46:48  14  ambiguous as to "was involved in this
14:46:53  15  determination."
14:46:54  16  BY MR. MEYERHOFF:
14:46:54  17      Q   You have already testified a little bit
14:46:56  18  about how you believed somebody in the Department
14:46:58  19  was involved.
14:47:00  20          Do you know if the Department had any
14:47:01  21  involvement with the DA reaching the determination
14:47:06  22  set forth in this exhibit?
14:47:09  23      A   No.
14:47:09  24      Q   When you received this document, did you
14:47:21  25  realize that you had been placed on the Brady

**103**

**Exhibit C - 45**

Page 171

14:47:24    1    list?

14:47:25    2              A    When I received it, yes.

14:47:27    3              Q    Okay.

14:47:27    4              Did you believe at the time that you

14:47:28    5    received it that this would impact your ability to

14:47:32    6    be a police officer for the City of Torrance?

14:47:36    7              A    Absolutely not.

14:47:37    8              Q    And why do you think that this

14:47:40    9    determination from the DA would not impact your

14:47:43   10    ability to be a police officer?

14:47:44   11              A    Because being on the Brady list doesn't

14:47:52   12    mean you can't be a police officer.  And as you can

14:47:56   13    see by the DA's letter, to be on the Brady list,

14:48:02   14    you know, just state, you know, in a couple of

14:48:05   15    their letters -- not to use that against you in a

14:48:11   16    personnel action by the Department -- which they

14:48:13   17    directly did -- and they stated on the chief's

14:48:16   18    letter from the DA to the chief to a letter to me,

14:48:19   19    my February 2nd letter.

14:48:21   20              It doesn't limit your ability to be a

14:48:24   21    police officer.  It only -- you know, being on the

14:48:27   22    Brady list just means that if you are successfully

14:48:29   23    placed on the list, you have to -- prosecution has

14:48:35   24    to release the information that applies to the case

14:48:38   25    at that time in hand to the defense -- which is

**104**

Exhibit C - 46

Page 172

14:48:41  1    possibly favorable to the defense.  And a judge

14:48:45  2    decides the information and what to do with it.

14:48:53  3         Q    In your Complaint, there's an allegation

14:48:55  4    that you believed that placement in the Brady alert

14:49:00  5    system effectively blacklists you from federal

14:49:03  6    employment because no law enforcement agency will

14:49:09  7    hire you as long as you remain on the Brady list

14:49:11  8    system.

14:49:13  9         Why do you believe that?

14:49:13  10        A    Well, once you get terminated, no other

14:49:19  11   Department is going to hire you in the law

14:49:22  12   enforcement community.  I mean, it's just a fact.

14:49:31  13        Q    A tenure officer, Mr. Nazir, isn't it true

14:49:38  14   that you are very aware if you are placed on a

14:49:42  15   Brady list, you can't continue to be an officer?

14:49:44  16        A    Absolutely not.

14:49:45  17        Q    Yet you don't know of any officers who

14:49:48  18   have been placed on the list and continue to be

14:49:50  19   officers for the department?

14:49:53  20             MR. MORGUESS:  Objection, argumentative.

14:49:54  21             THE WITNESS:  For the Torrance Police

14:49:55  22   Department?

14:49:56  23   BY MR. MEYERHOFF:

14:49:56  24        Q    Yes.

14:49:57  25        A    No.

**105**

**Exhibit  C - 47**

Page 173

| | | |
|---|---|---|
| 14:49:57 | 1 | Q    Do you acknowledge that if the information |
| 14:50:01 | 2 | relating to -- and I understand you dispute it -- |
| 14:50:04 | 3 | but the determination that you falsified the |
| 14:50:08 | 4 | Probable Cause Declaration -- if that information |
| 14:50:10 | 5 | was given to a public defender or a defendant, do |
| 14:50:15 | 6 | you think that that could have an impact on the |
| 14:50:17 | 7 | case in which you were a witness? |
| 14:50:18 | 8 | MR. MORGUESS:  Objection, calls for legal |
| 14:50:19 | 9 | conclusion.  Argumentative. |
| 14:50:23 | 10 | BY MR. MEYERHOFF: |
| 14:50:23 | 11 | Q    Do you have any opinion on that? |
| 14:50:24 | 12 | A    I have an opinion.  There was no |
| 14:50:25 | 13 | falsification on the probable cause as well as the |
| 14:50:28 | 14 | arrest report. |
| 14:50:30 | 15 | Q    Understanding that.  But you acknowledge |
| 14:50:32 | 16 | that the DA reached a different conclusion? |
| 14:50:34 | 17 | A    They can reach whatever conclusion they |
| 14:50:37 | 18 | want, but my understanding is being on the Brady |
| 14:50:42 | 19 | list doesn't mean you can't be a police officer |
| 14:50:44 | 20 | anymore. |
| 14:50:45 | 21 | Q    Do you acknowledge that if these |
| 14:50:47 | 22 | conclusions the DA reached that you had falsified |
| 14:50:50 | 23 | the information on the Probable Cause Declaration |
| 14:50:52 | 24 | and/or the arrest report -- that was given to the |
| 14:50:56 | 25 | defense in the criminal prosecution in which you |

**106**

**Exhibit C - 48**

Page 185

| | | |
|---|---|---|
| 15:03:51 | 1 | circumstances the last couple of years with me. |
| 15:03:53 | 2 | Q   Has anybody in the Department told you |
| 15:03:55 | 3 | that you were fired for reasons other than stated |
| 15:03:58 | 4 | in this Notice of Intent? |
| 15:03:59 | 5 | A   Just what happened subject of |
| 15:04:02 | 6 | investigation of B.S. investigations by the |
| 15:04:06 | 7 | Department, continuously targeting me, of trying to |
| 15:04:13 | 8 | get rid of me.  I mean, come on -- let me finish. |
| 15:04:16 | 9 | If you are asking me a question, please let me |
| 15:04:19 | 10 | finish. |
| 15:04:20 | 11 | Q   Let me focus. |
| 15:04:21 | 12 | A   Well, you are asking me if there's |
| 15:04:23 | 13 | anything else -- they have been trying to get rid |
| 15:04:28 | 14 | of me for two years for bullshit investigations, |
| 15:04:32 | 15 | trying to file criminal charges against me for B.S. |
| 15:04:36 | 16 | reasons so they were attempting to do anything |
| 15:04:38 | 17 | against me because I didn't go with the grain, I |
| 15:04:41 | 18 | went against the grain.  I didn't go along with the |
| 15:04:45 | 19 | program after my initial insubordination case.  If |
| 15:04:51 | 20 | this was the reason I got terminated -- I don't |
| 15:04:54 | 21 | think so.  I think I already told that, so we can |
| 15:04:56 | 22 | save some time. |
| 15:04:58 | 23 | Q   My question is:  Has anybody made a |
| 15:05:01 | 24 | statement to you that these reasons that are set |
| 15:05:04 | 25 | forth in this document are not the real reasons |

**107**

**Exhibit  C - 49**

Page 186

| | | |
|---|---|---|
| 15:05:05 | 1 | that you were fired? |
| 15:05:08 | 2 | A   No, once again -- no, but I'm going to add |
| 15:05:11 | 3 | what I have been through the last few years. |
| 15:05:17 | 4 | Q   Have you seen any documents -- |
| 15:05:19 | 5 | A   No. |
| 15:05:20 | 6 | Q   -- which indicate that you weren't fired |
| 15:05:21 | 7 | for the reasons that were set forth in this letter? |
| 15:05:25 | 8 | A   No. |
| 15:05:25 | 9 | Q   But you believed that there were other |
| 15:05:26 | 10 | reasons? |
| 15:05:26 | 11 | A   Yes. |
| 15:05:26 | 12 | Q   Other than Exhibit 5 -- |
| 15:05:29 | 13 | A   Yes.  And hold on.  I'm going to take a |
| 15:05:31 | 14 | bathroom break. |
| 15:05:34 | 15 | MR. MEYERHOFF:  Sure. |
| 15:14:01 | 16 | (Recess) |
| 15:14:01 | 17 | BY MR. MEYERHOFF: |
| 15:14:01 | 18 | Q   Mr. Nazir, during the time that the DA was |
| 15:14:05 | 19 | determining whether to put you on the Brady list, |
| 15:14:09 | 20 | did you have any conversations with the DA's office |
| 15:14:18 | 21 | about the City's policy regarding disclosing |
| 15:14:24 | 22 | informants on arrest reports? |
| 15:14:27 | 23 | MR. MORGUESS:  During what time? |
| 15:14:29 | 24 | BY MR. MEYERHOFF: |
| 15:14:29 | 25 | Q   Just at any time.  Let me start with that. |

**108**

Exhibit  C - 50

Page 187

| | | |
|---|---|---|
| 15:14:32 | 1 | Have you ever discussed with anybody in |
| 15:14:33 | 2 | the DA's office any policy the City had regarding |
| 15:14:37 | 3 | the disclosing the use of confidential informants? |
| 15:14:42 | 4 | A   I want to understand the question. |
| 15:14:50 | 5 | Q   Sure. |
| 15:14:51 | 6 | A   DA -- |
| 15:14:52 | 7 | Q   Did you discuss with anybody in the DA's |
| 15:14:54 | 8 | office, the City's policy relating to the |
| 15:14:57 | 9 | disclosure of the informants on arrest reports? |
| 15:15:03 | 10 | A   No. |
| 15:15:03 | 11 | Q   Did you discuss with anybody in the DA's |
| 15:15:06 | 12 | office the City's policy regarding the disclosure |
| 15:15:11 | 13 | of informants in Probable Cause Declarations? |
| 15:15:16 | 14 | A   No. |
| 15:15:16 | 15 | Q   Did you discuss with anybody in the |
| 15:15:18 | 16 | County of Los Angeles the City's policy relating to |
| 15:15:23 | 17 | the disclosure of informants on arrest reports? |
| 15:15:30 | 18 | A   No. |
| 15:15:30 | 19 | Q   Did you discuss with anybody in the |
| 15:15:32 | 20 | County of Los Angeles, the City's policy regarding |
| 15:15:35 | 21 | the disclosure of informants in Probable Cause |
| 15:15:43 | 22 | Declarations? |
| 15:15:46 | 23 | A   No. |
| 15:15:46 | 24 | Q   Now, you testified a little back about |
| 15:16:10 | 25 | some personnel issues or investigations that |

**109**

**Exhibit  C - 51**

Page 233

| | | |
|---|---|---|
| 16:14:21 | 1 | MR. MEYERHOFF:  Sorry. |
| 16:14:22 | 2 | BY MR. MEYERHOFF: |
| 16:14:22 | 3 | Q    Petition was denied by the court. |
| 16:14:24 | 4 | Do you recall that? |
| 16:14:25 | 5 | A    If you say so, yes. |
| 16:14:26 | 6 | Q    Now, you have also alleged that you have |
| 16:14:32 | 7 | submitted a hostile work environment claim with the |
| 16:14:35 | 8 | Department; is that correct? |
| 16:14:37 | 9 | A    Yes. |
| 16:14:37 | 10 | Q    I want to give you this Exhibit 14.  I |
| 16:14:49 | 11 | just want to see if this is -- if you recognize |
| 16:14:51 | 12 | this claim as a claim that you submitted to the |
| 16:14:57 | 13 | Department. |
| 16:16:14 | 14 | Is that a copy of the Complaint you |
| 16:16:15 | 15 | submitted? |
| 16:16:16 | 16 | A    I think, part of it. |
| 16:16:20 | 17 | (Defendant's Exhibit 14 was marked |
| 16:16:20 | 18 | for identification, a copy of which is |
| 16:16:20 | 19 | attached hereto.) |
| 16:16:20 | 20 | BY MR. MEYERHOFF: |
| 16:16:20 | 21 | Q    Was there more to it that you recall? |
| 16:16:23 | 22 | A    It looks like it.  It does say page 5 of |
| 16:16:29 | 23 | 38. |
| 16:16:32 | 24 | MR. MEYERHOFF:  Right.  That's the stamp |
| 16:16:34 | 25 | from the investigator. |

**110**

**Exhibit C - 52**

Page 234

16:16:38   1    BY MR. MEYERHOFF:

16:16:38   2       Q    Do you recall any more to it? Or was this

16:16:41   3    the entire complaint pack that you sealed?

16:16:44   4       A    I believe there was more. I got a letter

16:16:55   5    that I wrote to HR director that day instead of

16:17:01   6    removing Sergeant Bock, they removed me and forced

16:17:06   7    me to move with Communication -- which was a

16:17:07   8    different watch, taking my overtime away again

16:17:10   9    after I worked -- filed the hostile work

16:17:14   10    environment. They took my overtime away, with the

16:17:17   11    Communications division that I signed up for, they

16:17:20   12    basically said, "Okay. Go to the afternoon shift."

16:17:23   13       Q    That was something that happened after you

16:17:25   14    filed this Complaint?

16:17:27   15       A    Yes.

16:17:27   16       Q    Okay.

16:17:27   17       A    I sent a letter to HR director, another

16:17:30   18    letter. I don't believe it's in there.

16:17:32   19       Q    But just focus again on what you submitted

16:17:35   20    that the time you made this claim of harassment.

16:17:39   21    Does this look like a complete packet of what you

16:17:42   22    sent?

16:17:42   23       A    Not a complete. We were missing a few

16:17:45   24    documents. Almost complete.

16:17:46   25       Q    Anything -- those documents you

**111**

Exhibit C - 53

Page 235

| | | |
|---|---|---|
| 16:17:48 | 1 | mentioned -- as I understand it, those are |
| 16:17:50 | 2 | documents that relate to things that happen after |
| 16:17:52 | 3 | you submit this complaint; is that correct?  Or am |
| 16:17:55 | 4 | I wrong? |
| 16:17:56 | 5 |     A   Yes. |
| 16:17:56 | 6 |     Q   What is missing from this document that |
| 16:17:59 | 7 | you know of? |
| 16:18:00 | 8 |     A   Original document?  Or overall document? |
| 16:18:04 | 9 |     Q   Let me clarify. |
| 16:18:05 | 10 |         At some point, you submitted a hostile |
| 16:18:07 | 11 | work environment claim to the Department, correct? |
| 16:18:10 | 12 |     A   Yes. |
| 16:18:10 | 13 |     Q   This that claim that you submitted? |
| 16:18:12 | 14 |     A   That's the original letter that I sent |
| 16:18:14 | 15 | out -- actually, I dropped it off with HR director. |
| 16:18:19 | 16 |     Q   Okay. |
| 16:18:19 | 17 |         Then there were some related things that |
| 16:18:21 | 18 | you submitted after this? |
| 16:18:22 | 19 |     A   Yes. |
| 16:18:22 | 20 |     Q   I noticed that -- starting on page 3, you |
| 16:18:29 | 21 | list a number of allegations against Sergeant Bock. |
| 16:18:33 | 22 |         Were these -- do you feel that these |
| 16:18:35 | 23 | encompass all of the allegations you had against |
| 16:18:38 | 24 | him? |
| 16:18:38 | 25 |     A   At the time, yes. |

**112**

**Exhibit C - 54**

Page 236

| | | |
|---|---|---|
| 16:18:39 | 1 | Q   Okay. |
| 16:18:43 | 2 | Who did you submit this to?   Elaine Winer |
| 16:18:46 | 3 | in HR; is that correct? |
| 16:18:48 | 4 | A   Yes. |
| 16:18:48 | 5 | Q   Were you interviewed as part of this |
| 16:18:50 | 6 | Complaint? |
| 16:18:51 | 7 | A   Yes. |
| 16:18:51 | 8 | Q   Did the City retain an independent |
| 16:18:55 | 9 | investigator or somebody outside of the Department |
| 16:18:57 | 10 | to investigate this? |
| 16:18:59 | 11 | A   Yes. |
| 16:18:59 | 12 | Q   These witnesses that you listed on page 2, |
| 16:19:03 | 13 | do you know if these witnesses were interviewed as |
| 16:19:05 | 14 | part of the investigation? |
| 16:19:06 | 15 | A   I believe so. |
| 16:19:07 | 16 | Q   Okay. |
| 16:19:09 | 17 | Did you have conversations with anybody in |
| 16:19:10 | 18 | the Department -- other than the fact that you were |
| 16:19:13 | 19 | interviewed, did you have any other conversations |
| 16:19:17 | 20 | with anybody in the City about submitting this |
| 16:19:19 | 21 | Complaint? |
| 16:19:21 | 22 | A   No, just with my attorney. |
| 16:19:23 | 23 | Q   Okay. |
| 16:19:24 | 24 | Did Sergeant Bock ever talk to you about |
| 16:19:26 | 25 | this Complaint that you recall? |

**113**

**Exhibit  C - 55**

Page 245

| | | |
|---|---|---|
| 16:45:01 | 1 | BY MR. MEYERHOFF: |
| 16:45:01 | 2 | Q   Okay. |
| 16:45:02 | 3 | We were talking about Exhibit 14, your |
| 16:45:04 | 4 | harassment claim. |
| 16:45:09 | 5 | Did you receive word that the Department |
| 16:45:10 | 6 | had reached some disposition in regards to your |
| 16:45:13 | 7 | claim? |
| 16:45:14 | 8 | MR. MORGUESS:  The City. |
| 16:45:15 | 9 | BY MR. MEYERHOFF: |
| 16:45:15 | 10 | Q   How did the City communicate to you what |
| 16:45:17 | 11 | the conclusion of this was? |
| 16:45:20 | 12 | A   I received a letter from HR Director, |
| 16:45:25 | 13 | Elaine Winer. |
| 16:45:26 | 14 | Q   And what do you recall the letter saying? |
| 16:45:29 | 15 | A   Something -- I'm sure you have it in front |
| 16:45:39 | 16 | of you.  But basically denying all of my |
| 16:45:45 | 17 | allegations.  And I asked for a copy of all of the |
| 16:45:51 | 18 | interviews and regarding the investigation.  And I |
| 16:45:54 | 19 | never received it. |
| 16:45:55 | 20 | Q   Okay. |
| 16:45:57 | 21 | Were you given any reasons for not |
| 16:45:58 | 22 | receiving the copy of the actual investigation? |
| 16:46:01 | 23 | A   No. |
| 16:46:01 | 24 | Q   And you also claimed that you submitted a |
| 16:46:11 | 25 | personnel complaint relating to Lieutenant Joslyn; |

**114**

**Exhibit  C - 56**

Page 246

16:46:15    1    is that correct?

16:46:15    2        A    Yes.

16:46:15    3        Q    And I just want to hand you this document

16:46:18    4    and ask if this is the personnel complaint that you

16:46:22    5    submitted?

16:46:23    6        A    Yes.

16:46:23    7        Q    And I will mark that as Exhibit 15.

16:46:35    8             And this is in regards to allegations that

16:46:36    9    Lieutenant Joslyn said it was good news that you

16:46:40   10    had been suspended; is that correct?

16:46:42   11        A    Not suspended, but relieved off duty.

16:46:48   12             (Defendant's Exhibit 15 was marked

16:46:48   13             for identification, a copy of which is

16:46:48   14             attached hereto.)

16:46:48   15    BY MR. MEYERHOFF:

16:46:48   16        Q    Sorry.

16:46:49   17             Put on administrative leave with pay.

16:46:52   18             Is that a proper way to say it?

16:46:54   19        A    Yes.

16:46:54   20        Q    Did anybody discuss this personnel

16:46:58   21    complaint with you that you recall?

16:46:59   22        A    Glenn -- discussed in which way?

16:47:10   23        Q    Did you talk to anybody in the City about

16:47:11   24    this complaint?

16:47:12   25        A    Just -- I just handed it to -- the

**115**

**Exhibit C - 57**

Page 247

| | | |
|---|---|---|
| 16:47:17 | 1 | complaint to Captain Matsuda and he handed up the |
| 16:47:20 | 2 | chain of command. |
| 16:47:22 | 3 | Q    After you handed it to Captain Matsuda, |
| 16:47:27 | 4 | did anybody in the City or Department talk to you |
| 16:47:30 | 5 | about the allegations that you made or make any |
| 16:47:32 | 6 | comments to you? |
| 16:47:33 | 7 | A    I just received a letter in the mail |
| 16:47:36 | 8 | regarding the adjudication of the claim. |
| 16:47:38 | 9 | Q    Would that be a letter from Lieutenant |
| 16:47:41 | 10 | Stark? |
| 16:47:42 | 11 | A    Yes. |
| 16:47:42 | 12 | Q    We will mark that as Exhibit 16. |
| 16:47:46 | 13 | A    Yes. |
| 16:47:47 | 14 | (Defendant's Exhibit 16 was marked |
| 16:47:47 | 15 | for identification, a copy of which is |
| 16:47:47 | 16 | attached hereto.) |
| 16:47:47 | 17 | BY MR. MEYERHOFF: |
| 16:47:47 | 18 | Q    Prior to receiving the adjudication, did |
| 16:47:49 | 19 | anybody else come to you or make any comments to |
| 16:47:52 | 20 | you about the claim? |
| 16:47:55 | 21 | A    No. |
| 16:47:55 | 22 | Q    Were you interviewed in regards to this |
| 16:47:57 | 23 | claim, if you recall? |
| 16:47:59 | 24 | A    No. |
| 16:47:59 | 25 | Q    Now, in your complaint, you have mentioned |

**116**

**Exhibit C - 58**

Page 248

| | | |
|---|---|---|
| 16:48:08 | 1 | that you believe you were terminated due to a |
| 16:48:10 | 2 | certain speech you made when you worked for the |
| 16:48:13 | 3 | Department?   And we have gone through some of |
| 16:48:15 | 4 | these.   But other than the two grievances that we |
| 16:48:18 | 5 | looked at, the two petitions, the harassment |
| 16:48:24 | 6 | packet, we looked at Exhibit 14 and this internal |
| 16:48:27 | 7 | complaint that we just looked at -- Exhibit 15, is |
| 16:48:32 | 8 | there any other speech that you believe -- that you |
| 16:48:35 | 9 | engaged in which you believe led to your |
| 16:48:37 | 10 | termination in September of 2010? |
| 16:48:44 | 11 | A    No. |
| 16:48:44 | 12 | Q    Okay. |
| 16:48:53 | 13 | And I understand that you talked about the |
| 16:48:54 | 14 | chronology.   Sitting here today, do you recall any |
| 16:48:58 | 15 | comments from anybody in the City in which you were |
| 16:49:03 | 16 | told that the speech that you engaged in was a |
| 16:49:07 | 17 | reason for your termination in September of 2010? |
| 16:49:14 | 18 | A    No. |
| 16:49:14 | 19 | Q    Okay. |
| 16:49:15 | 20 | Have you seen any documents prepared by |
| 16:49:17 | 21 | anybody in the City that indicates to you that |
| 16:49:22 | 22 | your -- the speech that we just went over was the |
| 16:49:26 | 23 | reason for your termination in December -- |
| 16:49:29 | 24 | September of 2010? |
| 16:49:38 | 25 | A    No. |

**117**

Exhibit  C - 59

Page 284

| | | |
|---|---|---|
| 17:36:30 | 1 | for work, so I was able to do my job -- |
| 17:36:33 | 2 | Q   Okay. |
| 17:36:35 | 3 | A   -- in Communications at the time. |
| 17:36:36 | 4 | Q   Now, you have also -- you also had brought |
| 17:36:42 | 5 | suit against the County of Los Angeles. |
| 17:36:44 | 6 | Are you aware of that? |
| 17:36:47 | 7 | A   Yes. |
| 17:36:47 | 8 | Q   Okay. |
| 17:36:48 | 9 | Do you attribute any of the injuries that |
| 17:36:51 | 10 | we have talked about, emotional or physical, to the |
| 17:36:55 | 11 | county in any way? |
| 17:37:05 | 12 | A   Yes. |
| 17:37:05 | 13 | Q   What do you believe the County did to you |
| 17:37:11 | 14 | that resulted in injuries to you? |
| 17:37:13 | 15 | A   Being placed -- they placed me on the -- |
| 17:37:19 | 16 | wrongfully placed me on the Brady list, which |
| 17:37:22 | 17 | caused my termination from the Department. |
| 17:37:52 | 18 | MR. MEYERHOFF:  Let me just take a few |
| 17:37:54 | 19 | minutes.  I might be done. |
| 17:40:45 | 20 | (Pause in the proceedings.) |
| 17:41:05 | 21 | MR. MEYERHOFF:  I don't believe I have any |
| 17:41:07 | 22 | further questions. |
| 17:41:08 | 23 | Michael, do you have anything to ask? |
| 17:41:10 | 24 | MR. MORGUESS:  No. |
| 17:41:12 | 25 | MR. MEYERHOFF:  At this time, I will offer |

**118**

Exhibit  C - 60

Page 287

```
1

2

3

4

5

6

7

8            I, REHAN NAZIR, declare under

9    penalty of perjury under the laws of the

10   State of California that the foregoing is

11   true and accurate.

12           Executed at _____,

13   California, this _____ day of _____,

14   2011.

15

16

17

18

19

20                  _____

21                    REHAN NAZIR

22

23

24

25
```

**119**

**Exhibit C - 61**

```
 1              REPORTER CERTIFICATION OF CERTIFIED COPY

 2

 3

 4

 5              I, VICTORIA IMHOF WERTZ, RPR, CSR

 6      No. 7999, a Certified Shorthand Reporter in

 7      the State of California, certify that the

 8      foregoing pages 1 through 288 constitute a

 9      true and correct copy of the original

10      deposition of REHAN NAZIR taken on

11      MARCH 14, 2011, I declare under penalty of

12      perjury under the laws of the State of

13      California that the foregoing is true and

14      correct.

15              Dated this 20th day of March,

16      2011.

17

18

19

20

21

22      _____

23      VICTORIA IMHOF WERTZ, RPR, CSR No. 7999

24

25
```

289

**120**