Mark H. Meyerhoff, Bar No. 180414
mmeyerhoff@lcwlegal.com
Joung H. Yim, Bar No. 216136
jyim@lcwlegal.com
LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

Telephone: (310) 981-2000
Facsimile: (310) 337-0837

Attorneys for Defendants
CITY OF TORRANCE and
JOHN J. NEU

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| REHAN NAZIR,<br><br>                Plaintiff,<br><br>v.<br><br>COUNTY OF LOS ANGELES [an entity of unknown form]; COUNTY OF LOS ANGELES DISTRICT ATTORNEY'S OFFICE [an entity of unknown form]; LAWRENCE E. MASON, in his capacity as Senior Special Assistant for the COUNTY OF LOS ANGELES DISTRICT ATTORNEY'S OFFICE; CITY OF TORRANCE, a municipal corporation; JOHN J. NEU, individually and as Chief of Police of the City of Torrance Police Department; DOES 1 THROUGH 10,<br><br>                Defendants. | Case No. CV 10-6546 SVW (AGRx)<br><br>Assigned to Hon. Stephen V. Wilson<br>Courtroom: 6<br>Complaint Filed: September 1, 2010<br><br>**DEFENDANTS CITY OF TORRANCE AND JOHN J. NEU'S APPENDIX OF EVIDENCE IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF (Part 2)**<br><br>Date:        May 16, 2011<br>Time:        1:30 p.m.<br>Courtroom:        6<br><br>[Filed concurrently with Defendant's Notice and Motion for Summary Judgment; Statement of Uncontroverted Facts and Conclusions of Law; [Proposed] Order and Judgment] |

LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
6033 W. Century Boulevard, Suite 500
Los Angeles, CA 90045

**121**

Exhibit D

## SUPERIOR COURT OF LOS ANGELES
## CRIME SUMMARY INFORMATION
## PROBABLE CAUSE DECLARATION

DR #: __070024540__

OFFICER'S NAME: Nazir #16279

FAX TO: (310) 328-7535      FAX #: (310) 618-2355

PHONE #: (310) 222-2285      PHONE #: (310) 618-5737

| ARRESTEE (last, first, mi) | BAKER, MICHAEL EDWARD | BOOKING # | |
|---|---|---|---|
| ES. ADDRESS (city, St, zip) | 710 E. IMPERIAL HWY, LOS ANGELES, 90059 | D.O.B. | 12-16-74 |
| BOOKING CHARGES | 11378.5 HS, 11379.5 HS, 11359 HS, 11360 HS, 3056 PC | DATE/TIME OF ARREST | 04-14-07/ 2250 HRS |
| HOLDS | PAROLE | 48 HR EXP DATE/TIME | |
| ARRESTING OFFICERS | NAZIR #16279/ OKAZAKI #17616 | ARRESTING AGENCY | TORRANCE POLICE DEPARTMENT |

ACTS ESTABLISHING ELEMENTS AND IDENTIFICATION OF DEFENDANT:

On 14 April 07, at approximately 2235 hours, Officer Okazaki and I (Nazir) contacted Arrestee Baker because he matched the description of a robbery suspect. Arrestee Baker told us that he was currently on parole for sales of PCP. We found approximately one-half gallon of PCP in his vehicle and a large amount of marijuana on his person. Arrestee Baker arrested for the above listed charges. Arrestee Baker parole status was confirmed by TPD communications.

☒ SEE ATTACHED REPORTS, INCORPORATED HEREIN BY THIS REFERENCE

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

EXECUTED ON __04-14-07__ AT LOS ANGELES COUNTY, CA, BY _____
          Date                                               Signature

ON THE BASIS OF      ☐ THE OFFICER'S DECLARATION ☐ REPORTS REVIEWED

I HEREBY DETERMINE THAT THERE      ☐ IS      ☐ IS NOT

PROBABLE CAUSE TO BELIEVE THIS ARRESTEE HAS COMMITTED A CRIME.

_____                  _____
   Date                                           Signature of Judicial Officer

_____                  _____
   Time                                         Name of Judicial Officer       **122**

**Exhibit D**

D 281 (Rev 7/06)

**123**

Exhibit E



# LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE
## BUREAU OF PROSECUTION SUPPORT OPERATIONS
## BRADY COMPLIANCE UNIT

STEVE COOLEY ● District Attorney                                          JOHN PAUL BERNARDI ● Director
JOHN K. SPILLANE ● Chief Deputy District Attorney
SHARON J. MATSUMOTO ● Assistant District Attorney

February 2, 2009                                                                    **CONFIDENTIAL**

Officer Rehan Nazir
Torrance Police Department
3300 Civic Center Drive
Torrance, California 90503

Dear Officer Nazir:

The Brady Compliance Unit of the Los Angeles County District Attorney's Office
has carefully reviewed the investigation of an allegation made that you authored an
arrest report and two Declarations of Probable Cause which contained false
information. We have determined that the evidence presented contains **Brady**
**material**.

The United States Supreme Court in **Brady v. Maryland** has held that a prosecutor
has the legal duty to turn over to the defense evidence favorable to a defendant which
is either exculpatory or impeaching and is material on guilt or punishment. Evidence
impeaching a material prosecution witness is Brady material.

When you are a material witness in a case on either guilt or punishment, we must turn
over to the defense attorney information which establishes that on or about April 14,
2007, you wrote in the report and PCDs that you made contact with the suspects you
arrested for possession for sales of phencyclidine because one of them resembled a
robbery suspect, when the truth was that you had utilized an informant to set up a
narcotics purchase. Falsification of arrest documents is an act involving moral
turpitude.

You have the right, 30 days from the date of this letter, to appeal our decision. You
and your attorney have the right to review the material that is the basis for our
determination to place you in the Brady Alert System.  Your attorney should contact
Los Angeles District Attorney's Law Enforcement Liaison at (213) 893-0829.

During this 30-day period, you have the right to submit your written objections to
Senior Special Assistant Lawrence Mason at the Los Angeles District Attorney's
Office, 1725 Main Street, Room 228, Santa Monica CA 90401. You should include

Hall of Records
320 West Temple Street, Suite 540
Los Angeles, CA 90012
(213) 974-5080
Fax (213) 229-2812

124

RN0027

**Exhibit E - 1**

Torrance Police Officer Rehan Nazir
February 2, 2009
Page Two

the basis for your objections and any additional information that you believe may be relevant to the matter.  Mr. Mason, who is a former judge, will make the final decision as to whether or not you are placed on the Brady Alert System.  He will inform you and your attorney in writing of his decision within 30 days.

Absent a successful appeal, you will be placed on the Brady Alert System 30 days from the date of this letter.   The fact that you are placed on the Brady Alert System does not mean that the District Attorney's Office will never use you as a witness. That decision will be made on a case-by-case basis by the trial lawyer in consultation with his or her supervisor.

If you are placed on the Brady Alert System, your employer will be notified by way of a letter to your chief.  The letter will also state that placement on the Brady Alert System should not be used as a basis for a personnel action.


Very truly yours,

STEVE COOLEY
District Attorney

By
LAEL R. RUBIN, Head Deputy
Appellate Division
Brady Compliance Unit

**125**

**Exhibit  E - 2**

RN0028

**126**

Exhibit F

PROUDLY SERVING MEMBERS OF
THE FOLLOWING PUBLIC
SAFETY UNIONS:

ADELANTO CORRECTIONAL PRA
ALHAMBRA POA
ANAHEIM POA
ARCADIA POA
AZUSA PMA
AZUSA CSPP
ARCISA POA
BALDWIN PARK POA
BALDWIN PARK SCHOOLS POA
BARSTOW POA
BEAUMONT POA
BELL POA
BELL GARDENS POA
BUENA PARK POA
BURBANK AIRPORT POA
BURBANK POA
CALEXICO POA
CA CORRECT SUPV ORG
CATHEDRAL CITY POA
CHAFFEY COLLEGE POA
CHINO POA
CHINO POA
CHULA VISTA POA
CLAREMONT POA
COLTON POA
COMPTON UFD POA
CORONA POA
COVINA POA
CULVER CITY POA
CYPRESS POA
DELANO POA
DESERT HOT SPRINGS POA
EAST SAN GABRIEL POA
EL MONTE POA
ESCONDIDO POA
FONTANA PBA
FONTANA POA
FONTANA SCHOOLS POA
GARDENA POA
GARDEN GROVE POA
GLENDALE PARK RANGERS
GLENDORA POA
GRAMA POA
HUNTINGTON PARK POA
IMPERIAL COUNTY DA INV ASSN
IMPERIAL POA
INYO PCU
INGLEWOOD POA
INGLEWOOD SCHOOLS POA
INYO DSA
IRWINDALE POA
LANCASTER CBCA
LA HABRA POA
LA PALMA POA
LA VERNE POA
LONG BEACH AIRPORT POA
LONG BEACH PD POA
LOS ALAMITOS POA
LA AIRPORT POA
LA CORONER DIV ASSN
LA COUNTY PROFESSIONAL POA
LA GENERAL SERV POA
LA POLICE PROTECTIVE LEAGUE
LA PORT POA
LA SCHOOLS POA
MAMMOTH LAKES POA
MAYWOOD POA
MONO COUNTY DSA
MONO COUNTY PSA
MONROVIA POA
MONTCLAIR POA
MONTEBELLO POA
MONTEREY PARK POA
MONTEREY POA
MT SAC/MENTO COLLEGE POA
MURRIETA POA
NEWPORT BEACH POA
NEWPORT BEACH POA
PALM SPRINGS POA
PASADENA POA
PASADENA COLLEGE POA
PLACENTIA POA
PORAC V LDF
REDLANDS PMC
RIALTO POA
RIALTO POA
RIDGECREST POA
RIVERSIDE POA
SAN BERNARDINO POA
SAN BERNARDINO SCHOOLS POA
SAN DIEGO COLLEGE POA
SAN FERNANDO POA
SAN GABRIEL POA
SANTA MARIA POA
SAN MARINO POA
SANTA FE LA POA
SIERRA MADRE POA
SIGNAL HILL POA
SOLEDAD POA
SOUTH GATE POA
TRIUCKEE POA
TEAMSTERS LOCAL 911
TORRANCE POA
TRINIDAD POA
TUSTIN POA
UPLAND POA
UPLAND PSA
UC BERKELEY POA
UC DAVIS POA
UC IRVINE POA
UC LOS ANGELES POA
UC MERCED POA
UC RIVERSIDE POA
UC SAN DIEGO POA
UC SAN FRANCISCO POA
UC SANTA BARBARA POA
UC SANTA CRUZ POA
WEST COVINA POA
WESTMINSTER POA

LACKIE, DAMMEIER & McGILL
A PROFESSIONAL CORPORATION

367 NORTH SECOND AVENUE
UPLAND, CALIFORNIA 91786
TELEPHONE: (909) 985-4003
FACSIMILE: (909) 985-3299
EMAIL: office@policeattorney.com
WEBSITE: www.policeattorney.com

DIETER C. DAMMEIER
MICHAEL A. MCGILL
SAKU E. ETHIR
ANDREW M. DAWSON
STEVEN J. BRUCK
SANJAY BANSAL
DANIELLE K. LITTLE
ROBIN L. SIRGI
KIMBERLY D. RILEY
MARK JOHNSON
RANA M. KAWAR

OF COUNSEL
MICHAEL D. LACKIE, APC

SENDERS EMAIL:
RANA@POLICEATTORNEY.COM

April 23, 2010

**VIA E-MAIL AND U.S. MAIL**

Lawrence Mason, Senior Special Assistant
Brady Compliance Unit
Los Angeles District Attorney's Office
1725 Main St., Room 228
Santa Monica, CA 90401

> *Re:    Officer Rehan Nazir of Torrance Police Department*

**APPEAL OF DECISION FOR INCLUSION IN BRADY ALERT SYSTEM**

Dear Mr. Mason:

Our office represents Torrance Police Officer Rehan Nazir in the above referenced matter. This serves as an **appeal/objection** to the Determination made by the Los Angeles County District Attorney's Office (Determination), to place Officer Nazir on the Brady Alert System.

It is our understanding based on the District Attorney's letter of February 2, 2009, that the Brady Compliance Unit has determined that it must turn over information which establishes *"that on or about April 14, 2007, [Officer Nazir] wrote in the report and PCDs that [he] made contact with the suspects [he] arrested for possession for sales of phencyclidine because one of them resembled a robbery suspect, when the truth was that [he] had utilized an informant to set up a narcotics purchase"* because the finding is deemed an act of moral turpitude.

Because said finding is not evidence evincing moral turpitude, is inadmissible, is too remote, not material, and in light of the following authorities and corresponding rationale, it is clear that it does not tread into *Brady* waters.

I.      **BACKGROUND INFORMATION**

A.      **THE ARREST OF MICHAEL BAKER ON APRIL 14, 2007**

On or about April 14, 2007, Officers Rehan Nazir and Brian Okazaki were working a patrol shift from 1600 hours to 2400 hours.  *See, Exhibit "1," Declaration of Officer Brian Okazaki.* Earlier during the shift, a robbery had

1

**127**

occurred at the 7-11 convenience store located at 16250 Crenshaw Blvd. *Id.* The robbery suspect was described as a black male adult, approximately 35 years old and stocky build. *See, Exhibit "2," Declaration of Sergeant Patrick Such.* Later that same shift, Officers Nazir and Okazaki utilized a confidential informant to arrange a narcotics transaction. *See, Exhibit "1."* At approximately 2235 hours, Officers Nazir and Okazaki observed a black male adult, who matched the description of the robbery suspect, in the same vicinity of the 7-11 convenience store acting suspiciously. Although Officers Nazir and Okazaki were aware that the confidential informant had arranged a meeting with a black male for the purchase of one half gallon of PCP, this was the first time that they were working with the informant, and did not know whether or not he was trustworthy and reliable. *Id.*

Upon observing the suspicious black male adult in the vicinity of the 7-11 convenience store, Officers Nazir and Okazaki contacted such individual to ascertain whether or not he was the earlier robbery suspect, or rather, the drug dealer the informant had arranged a meeting with, or neither. *See, Exhibits "1" and "2."* Subsequent to initiating the consensual encounter with such subject, Officers Nazir and Okazaki learned that the black male adult was, indeed, the drug dealer the informant had arranged a meeting with, and placed him under arrest. *Id.*

Thereafter, Police Sergeant Patrick Such arrived at 16250 Crenshaw Blvd. to provide assistance and was briefed by Officers Nazir and Okazaki regarding the circumstances of the subject's arrest, including the involvement of a confidential informant. *See, Exhibit "2."* Sgt. Such observed the arrestee and confirmed that he did in fact match the description of the earlier robbery suspect. *Id.* As is customary when working with a confidential informant, Officers Nazir and Okazaki omitted the involvement of the confidential informant from the contents of the Probable Cause Declaration ("PCD") and Arrest Report ("Report").

**B.** **DISTRICT ATTORNEY'S AWARENESS OF THE USE OF A CONFIDENTIAL INFORMANT**

In or about mid April 2007, the Los Angeles District Attorney filed for criminal prosecution of arrestee Michael Baker. *See, Exhibit "3," Declaration of Detective Fareed Ahmad.* On that same day, the District Attorney was informed of the involvement of a confidential informant in the arrest of Mr. Baker, as well as the omission of such information from the PCD and Report. *Id.* Nevertheless, the Office of the District Attorney proceeded with the prosecution of Mr. Baker. *Id.*

Incidentally, during that same time period, arrestee Baker was one of many subjects in a pending Federal wiretap investigation with the DEA and various other police agencies, including LAPD and FBI. *Id.* Due to a declaration that was subsequently unsealed in the federal prosecution, in or about October 2008, the Office of the Public Defender learned of the involvement of a Confidential Informant in the arrest of Mr. Baker, and filed a Motion to Dismiss the state action. *Id.*

Upon receipt of said motion, the District Attorney's Office, for the first time, discussed the prospect of dismissing the case against Michael Baker, so as to minimize the risk of damaging the corresponding federal wiretap investigation of the multiple subjects, including Mr.

2

**128**

**Exhibit F - 2**

RN0007

Baker. *Id.* As a result, the state case against Mr. Baker was dismissed. *Id.* Subsequent to said dismissal, Officer Rehan Nazir received notice of the District Attorney's *Brady* notice. Officer Okizake, Sgt. Pat Such, and Detective Ahmad did not receive any such *Brady* notice. *See, Exhibits "1," "2," and "3."*

## C.   TORRANCE POLICE DEPARTMENT'S INTERNAL AFFAIRS INVESTIGATION

On or about December 2008, Officer Okazaki, Sgt. Patrick Such, and Detective Fareed Ahmad received a Notice of Internal Affairs Investigation regarding the circumstances of the arrest of Michael Baker on April 14, 2008. The Torrance Police Department conducted a thorough investigation regarding potential misconduct of such officers. *See, Exhibit "1," "2," and "3".* All such individuals were cleared of all allegations of potential misconduct and no discipline was issued. *See, Exhibit "2."*

## II.   ARGUMENT

### 1.   Pursuant to California Law, there is No Duty of Disclosure on Part of a Police Officer Regarding the Use and/or Involvement of a Confidential Informant

Pursuant to California Evidence Code §1041, "...a public entity has a privilege to refuse to disclose the identity of a person who has furnished information...purporting to disclose a violation of a law of the United States or of this state or of a public entity in this state, and to prevent another from disclosing such identity, if the privilege is claimed by a person authorized by the public entity to do so and...[d]isclosure of the identity of the informer is against the public interest because there is a necessity for preserving the confidentiality of his identity that outweighs the necessity for disclosure in the interest of justice..." In the present case, Officer Nazir was justified in relying upon Evid. Code. §1041 to omit the presence and involvement of the confidential informant from the PCD and Report. Indeed, as declared by Sgt. Patrick Such, it is customary for narcotics police officers to omit such information from their reports so as to protect the safety of confidential informants. *See, Exhibit "2."*

As set forth in *U.S. v. Johns,* 948 F.2d 599, the Ninth Circuit Court of Appeals has specifically held that the omission of the use of a confidential informant does not undermine the existence of probable cause to a search warrant, where separate facts exist to support such determination of probable cause. *Id.* at 603. In *Johns,* FBI agents utilized a confidential informant to obtain information in support of a narcotics search warrant. However, the FBI agents failed to include the involvement and/or identity of the confidential informant in filing the affidavit used to support the application for search warrant. In determining whether the FBI agent's omission undermined the probable cause determination, the Ninth Circuit Court of Appeals, specifically held that "[t]he government need not include all of the information in its possession to obtain a search warrant. An affidavit need only show facts adequate to support a finding of probable cause." *Id.* at 606-607; See also, *United States v. Ellison,* 793 F.2d 9421, 947 (1986). Moreover, "[t]he omission of facts rises to the level of misrepresentation only if the omitted facts 'cast doubt on the existence of probable cause,'" *Id.,* quoting *United States v. Dennis,* 625 F.2d 782, 781 (8th Cir. 1980). The court further reasoned that "...the omitted

**129**

RN0008

## Exhibit F - 3

information does not detract from probable cause, but adds to it. If the informant were proved reliable, his statements would lend further support to a probable cause finding." *Id.* at 607.

Similar to *Johns*, the omission of the confidential informant's involvement in the arrest of Michael Baker does not detract from a finding of probable cause to effectuate the encounter and subsequent arrest of Michael Baker. Rather, as declared by Sgt. Patrick Such and Officer Brian Okazaki, Mr. Baker did in fact **match the description** of the earlier robbery suspect and was acting suspiciously, thereby providing sufficient probable cause for Officers Nazir and Okazaki to initiate a consensual encounter and investigate the reason for Baker's presence at the scene of the robbery. *See, Exhibits* "1" and "2." This is particularly true considering the fact that it was the first time that Officers Nazir and Okazaki had worked with the informant, and did not therefore know if he was a reliable, trustworthy source. Accordingly, Officer Nazir's omission from the PCD and Report did not cast any doubt on the existence of probable cause, and cannot be characterized as a form of misrepresentation.

2.   **The PCD and Report Does Not Contain any Inaccurate, False or Misleading Information and Is Not Therefore Impeaching Evidence Within the Meaning of Brady as it Does Not Reflect on Officer Nazir's Character for Honesty and Veracity.**

**Applicable Law**

In *Brady v. Maryland*, 373 U. S. 83, 87 (1963) the United States Supreme Court held that "…the suppression by the prosecution of evidence favorable to an accused upon request violated due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Since then, the Court has held that the duty to disclose such evidence is applicable even though there has been no request by the accused. *United States v. Agurs*, 427 U.S. 97, 107. The duty to disclose encompasses impeachment evidence as well as exculpatory evidence. *United States v. Bagley*, 473 U.S. 667, 676. See also *Strickler v. Greene*, 527 U.S. 263 (1999). Impeachment Evidence is defined as any matter that *"has any tendency in reason to prove or disprove the truthfulness of his (witness) testimony at the hearing including, but not limited to… (e) His character for honesty or veracity or their opposites."* (Cal. Evid. Code 782) Information of mere speculative value does not reflect on a witness' character for honesty or veracity. *People v. Gutierrez* (2004) 112 Cal. App. 4th 1463, 1472. "'The prosecution has no general duty to seek out, obtain, and disclose all evidence that might be beneficial to the defense.'[Citation]" *Id. Brady* "did not create a general constitutional right to discovery in a criminal case. *People v. Jordan* (2003) 108 Cal. App. 4th 349, 361.

**Law as Applied to the Facts of This Case**

As set forth in the Declarations of Sgt. Such and Officer Okazaki, Michael Baker did in fact match the description of the earlier robbery suspect, and was acting suspiciously in the same vicinity of the robbery. *See, Exhibit "1" and "2."* The mere fact that Baker turned out to be the drug dealer that the informant had arranged a meeting with does not negate the truth of the PCD and Report and/or lead to the conclusion that Officer Nazir falsified the contents of such documents. To the contrary, as set forth in Sgt. Such's declaration, the possibility existed that

4

**130**

**Exhibit F - 4**

RN0009

Baker could be the earlier robbery suspect, the drug dealer the informant arranged a meeting with, or neither of such individuals.  Officers Nazir and Okazaki did not know the reason for Baker's suspicious behavior, and believed he may have been the robbery suspect.  Accordingly, there is no evidence of **any** dishonest or untruthful information within the PCD and Report and the omission of confidential informant's involvement does not make the remaining information within the PCD and Report false.  Indeed, the facts in the PCD and Report are entirely reconcilable with the omission dealing with the involvement of a confidential informant.  There existed the valid possibility that Baker was the both the robbery suspect, as well as the drug dealer, or conversely, neither the robbery suspect nor drug dealer.  Irrespective, the contents of the PCD and Report, are truthful insomuch as Baker **did** match the earlier description of the robbery suspect, and **was** acting suspiciously in a manner consistent with that of a robbery suspect.  Accordingly, there is no evidence of dishonesty indicative of impeachment evidence as defined by *Brady* and applicable law.

**3.      The conduct does not meet the Brady clear and convincing evidence standard.**

**Applicable Law**

"The decision to include information concerning a peace officer in the alert system will be made using a standard of clear and convincing evidence which is higher than a preponderance of the evidence." (Los Angeles District Attorney's Office, Special Directive 02-08)

When clear and convincing evidence is the standard in order to establish the fact in issue, the jury or trial judge should not be satisfied with a slight preponderance in favor of the plaintiff. (See *Sheehan v. Sullivan* (1899) 126 C. 189, 193, 58 P. 543; *In re Jost* (1953) 117 C.A.2d 379, 383, 256 P.2d 71; *United Professional Planning v. Superior Court* (1970) 9 C.A.3d 377, 386, 88 C.R. 551, citing the text; *In re Marriage of Peters* (1997) 52 C.A.4th 1487, 1490, 1491, 61 C.R.2d 493, citing the text; *Addington v. Texas* (1979) 441 U.S. 418, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323, 329, 7 *Summary* (9th), *Constitutional Law*, §514; 2 McCormick 5th, §340; 9 Wigmore (Chadbourn Rev.) §2498; 29 Am.Jur.2d (1994 ed.), Evidence §157.)

Clear and convincing evidence has been defined as "**clear, explicit and unequivocal,**" "so clear as to leave **no substantial doubt,**" and "sufficiently strong to command the unhesitating assent of every reasonable mind." (*In re Jost,* 1953 117 C. A. 2d 379, 383) Otherwise stated, a preponderance calls for probability, while clear and convincing proof demands a *high probability.* (See BAJI (8th ed.), No. 2.62; Ev.C. 115, 502, supra, §34 [recognizing the distinction but not defining the terms]; 25 Southwestern U. L. Rev. 173, 197.) Witkin, Cal. Evid. 4th (2006 supp.) Burden, § 38, p. 40, 1 Witkin, Cal. Evid. 4th (2000) Burden, § 38, p. 187

**Law as Applied to the Facts of This Case**

The facts in the case at bar do not even meet the preponderance of the evidence standard, let alone the clear and convincing standard!

To begin with, as declared by two separate police officers, Baker did in fact match the description of the earlier robbery suspect, and was in fact acting suspiciously.  Moreover, it is entirely consistent with good police practice to omit the involvement and identity of a

5

**131**

RN0010

confidential informant in order to protect the informant's safety. Accordingly, there is no evidence of dishonesy, yet alone evidence to satisfy the clear and convincing standard. More importantly, INADMISSIBLE hearsay was relied upon in issuing the Brady Notice to Officer Nazir, and such evidence is entirely false and unreliable. Indeed, upon requesting the material which formed the basis of the Brady notice, Officer Nazir's counsel was provided with four separate newspaper articles regarding the dismissal of Michael Baker's case, all of which contained false and unreliable hearsay. Moreover, the materials included a fifth newspaper article dealing with a prior allegation that was adjudicated in Officer Nazir's favor, which again included false, unreliable hearsay. Such information is inadmissible in any lawful court proceeding and cannot lawfully form the basis of the Brady notice, which requires a clear and convincing evidentiary standard. Accordingly, there is no merit to the Brady notice issued to Officer Nazir.

## III.   CONCLUSION

Wherefore, for the reasons aforementioned, we respectfully request that the finding regarding Officer Nazir's PCD and Report not be deemed material for the purposes of *Brady*.

Please contact me at (909) 985-4003, if you have any questions or concerns. Kindly keep the undersigned appraised of any developments and review of this matter. Thank you.

Very truly yours,

LACKIE & DAMMEIER APC

Rana M. Kawar
Dieter Dammeier


cc:    Officer Rehan Nazir

6

RN0011

**Exhibit  F - 6**

EXHIBIT "1"

**133**

**Exhibit  F - 7**

RN0012

# DECLARATION OF OFFICER BRYAN OKAZAKI

I, Bryan Okazaki, declare as follows:

1. I am currently employed as a Police Officer for the City of Torrance and have been employed in such capacity for approximately six years. I have cumulatively conducted hundreds of criminal investigations involving robberies, burglaries, fraud/forgery, domestic violence, narcotic violations, and many other crimes and have personally participated in arrests of individuals for the aforementioned crimes. From October 2005 to October 2007, I was assigned as a Crime Scene Investigator (CSI) responsible for identification, collection, and preservation of physical and biological evidence present at crime scenes.

2. I am familiar with the files and facts of the arrest of Michael Baker ("Baker") on April 14, 2007, and as such make the following statement of facts based upon my personal knowledge, and if called upon to do so, could and would testify competently as to them.

3. On April 14, 2007, I had worked a "day-watch" patrol shift as my regularly assigned shift. I had volunteered to work an additional patrol shift on overtime from 1600 hours to 2400 hours. I had been assigned to work with Officer Rehan Nazir as partners. Earlier during the shift, a robbery had occurred at the 7-11 convenience store located at 16520 Crenshaw Boulevard. At approximately 2235 hours, we observed a black male adult in the vicinity of the 7-11 convenience store acting suspicious. This subject appeared to have matched the description of the robbery suspect. Although we were aware that a confidential informant had arranged a meeting with a black male for the purchase of a half gallon of PCP, it was the first time we were working with such informant, and did not know whether or not he was credible and/or reliable.

4. Accordingly, upon observing arrestee Michael Baker, who matched the description of the earlier robbery suspect, we were unsure whether or not he was the drug dealer that the informant had arranged a meeting with, or rather the earlier robbery suspect. As a result, we contacted Baker and began a consensual encounter with him to inquire as to his presence at the location.

1

DECLARATION OF BRYAN OKIZAKI

**Exhibit F - 8**

134

RN0013

5. I reviewed the Probable Cause Declaration (PCD) and arrest report authored by Officer Rehan Nazir. It is customary for police partners to review arrest reports so as to make any necessary changes as well as confirm the accuracy of information contained therein.

6. I did not make any changes to the PCD or arrest report because I believed all of the information in such documents to be accurate and truthful. Officer Nazir and I purposely omitted the involvement and/or identity of the confidential informant in order to protect his safety as is customary when working with a confidential informant.

7. I was present on November 6, 2008, the date the state action against Michael Baker was dismissed. Officer Nazir, Detective Ahmad, and myself all met with Joseph Espinoza and Scott Goodwin to discuss the motion for dismissal filed by Baker's defense attorney. Neither Officer Nazir nor I ever stated that we knew for certain that Baker was not the robbery suspect. District Attorneys (DA) Espinoza and Goodwin stated because the information contained within PCD and arrest report regarding Baker matching the description was not completely accurate, the DA's Office would dismiss the case. I explained that given the fact that Baker matched the description of the robbery suspect, we were unsure of whether or not he was the drug dealer the informant had arranged a meeting with, the robbery suspect, or some totally unrelated person. I disputed DA Espinoza and Goodwin's earlier statements regarding inaccuracies contained with the PCD and arrest report and told them the information was true and accurate. There could be no way we could have known that Baker was not the robbery suspect until and unless we contacted him.

8. I later became aware that the district attorneys had knowledge of the involvement of a confidential informant as of the date of filing in April 2007. It was not until November 2008, that the prospect of dismissing the case was discussed with us. In the November 6, 2008 meeting, it was explained to us that given the fact that Baker was facing federal prosecution, the district attorneys did not want to compromise that case with the issues which were raised by his defense attorney in the state action. We did not object to their reasoning and their desire to dismiss the state action.

**135**

**Exhibit F - 9**

RN0014

9.  Unlike Officer Nazir, I never received a notice from the *Brady* Compliance Unit indicating I was going to be placed on the Brady alert system.

10. In approximately December 2008, I was notified via department email that I was a subject of an internal affairs investigation and questioned regarding the circumstances of the arrest of Michael Baker. Formal notice was never issued to me although a request was made. I gave a statement to my department regarding the circumstances of Michael Baker's arrest, and confirmed that I did not know that Baker was not the earlier robbery suspect.  I also confirmed the accuracy of information contained within the PCD and arrest report.

11. Although I have not officially been provided with the official disposition of said investigation, I have heard that the investigation is complete and there is no resulting discipline.

12. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: April 22, 2010

Bryan Okazaki

3

DECLARATION OF BRIAN OKIZAKI

**136**

**Exhibit F - 10**

RN0015

EXHIBIT "2"

**137**

Exhibit  F - 11

RN0016

## DECLARATION OF SERGEANT PATRICK SUCH

I, Patrick Such, declare as follows:

1. I am currently employed as a Torrance Police Sergeant- assigned as a Narcotics Supervisor- Vice & Narcotics Division , and have been employed in such capacity for the last 15+ months. Furthermore, I have been employed with the Torrance Police Department since August 1991. During my tenure, I have been assigned to several details to include the following; Uniformed Patrol Officer- Patrol, Uniformed Beach Patrol-Patrol, Narcotics Investigator- Vice & Narcotics, Narcotics Investigator- L.A. Impact (task force), Field Training Officer- Patrol, Auto Theft Investigator- Detective Division, Burglary/ Robbery Investigator- Vice & Narcotics, Field Sergeant- Patrol, and Crime Impact Sergeant- Vice & Narcotics

2. I am completely familiar with the files and facts of the arrest of Michael Baker on April 14, 2007, and as such make the following statement of facts based upon my personal knowledge, and if called upon to do so, could and would testify competently as to them.

3. I was the police sergeant who responded to the scene of 16520 Crenshaw Boulevard to assist with the arrest of Michael Baker ("Baker") and Latera Odom. At that time, I was informed of the involvement of a confidential informant leading up to the arrest of Michael Baker.

4. I am also aware of the fact that there was an earlier robbery in the same vicinity of the arrest of Michael Baker. The robbery suspect was described as a black male adult, approximately 35 years old and stocky build.

5. I discussed the circumstances of Michael Baker's arrest with Officer Nazir on April 14, 2007. Office Nazir confirmed that, a confidential informant had arranged a meeting with a black male for a drug deal, who was subsequently identified as arrestee Baker.

1

DECLARATION OF SGT. PATRICK SUCH

**138**

**Exhibit  F - 12**

RN0017

6. Although Officer Nazir suspected Baker may be the drug dealer, he (Officer Nazir) also was aware of the fact Baker matched the description of the earlier robbery suspect, and prior to contact with Baker he (Nazir) saw suspicious behavior displayed by Baker consistent with person(s) involved in criminal activity.

7. Officers Nazir and Okazaki contacted Baker to ascertain whether (a) he (Baker) was the drug dealer, (b) noted the possibility existed Baker could be the robbery suspect from earlier in the day, and (c) their was also the possibility Baker was neither a drug dealer nor a robber and/or was not involved in any criminal activity all together.

8. I observed arrestee Michael Baker on April 14, 2007, and I confirm that he did match the description of the earlier robbery suspect.

9. Upon learning that Baker was in fact the drug dealer the informant had arranged, Officers Nazir and Okazaki omitted such information from the PCD and police report in order to protect the identity and involvement of the confidential informant.

10. As the on-duty sergeant regarding the arrest of Baker, I was later able to review the arrest reports and paperwork submitted by Officer Rehan Nazir.  It is my opinion and belief that all of the information listed in the PCD and arrest report is factually accurate.  The fact that Baker turned out to be the drug dealer that the confidential informant had contacted does not negate the fact that he also matched the robbery suspect's description and was acting suspiciously.

11. I did not have any concern regarding the accuracy or veracity of any information contained within the arrest report or PCD.

12. As a Police Sergeant of the Torrance Police Department, it is my belief and understanding that there is no duty upon a police officer to disclose the involvement and/or identity of a confidential informant regarding an arrest.

13. In fact, I am aware of numerous incidents wherein the involvement of a confidential informant was omitted from the PCD and arrest report to protect the identity and involvement of the informant.

14. Unlike Officer Nazir, I never received a notice from the *Brady* Compliance Unit indicating I was going to be placed on the Brady alert system.

2

DECLARATION OF SGT. PATRICK SUCH

**139**

RN0018

15. Subsequent to the issuance of a Brady notice to Officer Nazir, I was provided with a notice of internal affairs investigation as a subject and questioned regarding the circumstances of the arrest of Michael Baker. I also learned that Officer Okazaki and Detective Freddy Ahmad were also investigated as subjects regarding the circumstances of Michael Baker's arrest.

16. I provided my department with a statement regarding the circumstances of Michael Baker's arrest. Among other things, I informed them of the same information contained within this declaration, namely, that I observed him on April 14, 2007, and believed him to match the description of the earlier robbery suspect. I also confirmed my belief that all the information contained within the arrest report and PCD was factually accurate and did not have any concern with Officers Nazir and Okazaki's omission regarding the involvement and identity of the confidential informant.

17. Although I have not officially been provided with written documentation concerning the disposition of said investigation, I have been verbally informed by my Lieutenant, and the investigating sergeant, that Officer Okazaki, Detective Ahmad, and I have been cleared of all allegations of potential misconduct regarding the arrest of Michael Baker, and no discipline will be issued.

18. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: April 22, 2010

Patrick Such

3

DECLARATION OF SGT. PATRICK SUCH

**140**

**Exhibit F - 14**

RN0019

RN0020

EXHIBIT "3"

**141**

Exhibit  F - 15

### DECLARATION OF DETECTIVE FAREED AHMAD
#### Homicide Section/Torrance Police Department

I, Fareed Ahmad, declare as follows:

1. I am currently employed as a Detective for the Torrance Police Department and have been employed in such capacity since 2004. During this time period I have worked in Vice & Narcotics Division and currently I am assigned to Homicide Section of Detectives Division.

2. I make the following statement of facts based upon my personal knowledge/recollection, and if called upon to do so, I could and would testify competently as to them.

3. On or about April 14, 2007, I was contacted by Torrance Police Department dispatch who asked for my response to the scene of the arrest of a male subject at the 7-Eleven store located on the N/E corner of 166 Street @ Crenshaw Blvd, who was in possession of PCP. The reason I was contacted is because it is the policy of Torrance Police Department for a Vice & Narcotics Detective to be summoned to the scene of an arrest, where the arrestee is in possession of large amounts of drugs.

4. Upon arriving at the scene of the arrest, I was informed by Officers Nazir and Okazaki of the circumstances of the arrest, however I was not told about the involvement of a confidential informant.

5. Coincidentally, during that same time period, I was working on a Federal wiretap investigation with DEA and various other police agencies, including FBI and LAPD. Aforementioned investigation was in to a PCP drug trafficking organization in which several subjects were under investigation for sales of PCP. One of which was a male subject by the name of Michael Baker. Thus, upon observing Michael Baker, the arrestee, I immediately recognized him as the same subject who was one of the targets of the DEA wiretap investigation.

6. On the day that the District Attorney's Office filed for criminal prosecution of Michael Baker in April 2007, I was informed by Officer Nazir that there was an informant involved in the arrest of Michael Baker. That was the first time I had heard about the involvement of an informant. On that same date, I notified all

1

DECLARATION OF FAREED AHMAD

**142**

**Exhibit  F - 16**

RN0021

interested parties/supervisors of the new information. LAPD Detective Frank Lyga and I met with Assistant District Attorney Renee Rose who was the filing attorney, to inform her of the circumstances of Michael Baker's arrest, including the involvement of a confidential informant. Case was filed against Michael Baker even after the new information was told to the District Attorney's Office.

7. On the date of the preliminary hearing, Michael Baker pled guilty to the charges filed against him.

8. On or about October/November 2008, subsequent to the Public Defender who was representing Michael Baker filed a motion to dismiss the state case against his client. Per Deputy District Attorney Joseph Esposito and Scott Goodwin's request, Officers Nazir, Okazaki and I met with Joseph Esposito and Scott Goodwin at the District Attorney's Office (Major Narcotics Section) to discuss the Michael Baker case. During the discussion, subject of a case dismissal was brought up. I advised all four personnel present that if a decision needed to be made regarding a dismissal, it had to come from them (District Attorney's Office) or the Officers Nazir and Okazaki who initially made the arrest.

9. The District Attorney's Office was aware of the involvement of a confidential informant, and the omission of such fact from the PCD and arrest report, as of the date of filing in April 2007. It was not until October/November 2008, that the prospect of dismissing the case was discussed with us. In the October/November 2008 meeting, it was explained to us that given the fact that Baker was facing Federal prosecution, the District Attorney's Office did not want to compromise that case with the issues which were raised by Michael Baker's Defense Attorney in the state action. We did not object to their reasoning and their desire to dismiss the state case; however when we left the meeting there was no final decision had been made regarding the dismissal of the case. The case was subsequently dismissed by the District Attorney's Office in or about November 2008.

10. I never received a notice from the *Brady* Compliance Unit of the District Attorney's Office indicating that I was going to be placed on the Brady alert system. I do also believe that I am not a named subject in any Brady Compliance Unit of the District Attorney's Office investigation(s).

2

DECLARATION OF FAREED AHMAD

**Exhibit  F - 17**

143

RN0022

11. In approximately November/December 2009, I was provided with a notice of Torrance Police Department Internal Affairs investigation in which I was a named subject and was subsequently questioned regarding the circumstances of Michael Baker's case. I gave statements to my department as to my involvement in to the circumstances of Michael Baker's case.

12. Although I have not officially been provided with the official disposition of aforementioned Torrance Police Department Internal Affairs investigation, I have heard (per Lt. D. Chase) that the Torrance Police Department Internal Affairs investigation has been completed and I am free to make any statements regarding the Michael Baker case.

13. I testified in the Federal case in which Michael Baker was one of the defendants; however Michael Baker pled guilty to the charges filed against him prior to my testimony and he received a sentence in federal prison.

14. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: April 22, 2010

*Fareed Ahmad*
*Homicide Section*
*Torrance Police Department.*

3

DECLARATION OF FAREED AHMAD

**144**

**Exhibit  F - 18**

RN0023

**145**

Exhibit G



# STEVE COOLEY
# LOS ANGELES COUNTY DISTRICT ATTORNEY

18000 CLARA SHORTRIDGE FOLTZ CRIMINAL JUSTICE CENTER
210 WEST TEMPLE STREET   LOS ANGELES, CA 90012-3210   (213) 974-3501

June 3, 2010

Lackie, Dammeier & McGill
A Professional Corporation
367 North Second Avenue
Upland, California 91786

Attention:  Rana M. Kawar, Esq.
            Dieter Dammeier, Esq.

Re:   APPEAL OF PLACEMENT OF TORRANCE POLICE DEPARTMENT
      OFFICER REHAN NAZIR INTO THE DISTRICT ATTORNEY'S BRADY
      ALERT SYSTEM

Dear Ms. Kawar & Mr. Dammeier:

The District Attorney of Los Angeles County has appointed me to review the decision of Head Deputy District Attorney Lael Rubin of the District Attorney's Appellate Division that Officer Nazir be placed into the Brady Alert System.  That decision was based upon a finding by the Brady Compliance Division that Officer Nazir authored an arrest report and two Declarations of Probable Cause (PCDs) which contained false information.

Your letter appealing that decision, dated April 23, 2010 and consisting of six pages, urges that there is no duty of disclosure on the part of a police officer regarding the use and/or involvement of a confidential informant, that the PCDs and police report does not contain any false or misleading information, and that the conduct of Officer Nazir does not meet the *Brady* standard.

I have reviewed the material provided me by the Brady Compliance Division, which consists of a seven-page Crime Report, a two-page Supplemental Report, a LA Impact Report, a Currency Control Report, a handwritten statement written by arrestee Odom, a Disclaimer of Currency Report, signed by Odom, a Vehicle Report, a County Wide Warrant System Initial Case Filing Form, eight pages of color photos of an automobile, a one-page report by the Head Deputy District Attorney of the Major Narcotics Division, as well as your letter and the attached declarations of Brian Okizaki, Patrick Such and Fareed Ahmad, all of whom are Torrance police officers.  I have not considered a three-

**146**

## Exhibit  G - 1

RN0001

Rana M. Kawar, Esq.
Dieter Dammeier, Esq.
June 3, 2010
Page 2.



page Los Angeles Times article dated June 16, 2000, a copy of which you apparently received. In addition, I have also reviewed the Brady Compliance Division Operations Manual and Special Directives pertaining to its operations, duties and responsibilities.

On April 14, 2007 Officer Nazir and his partner, Officer Okizaki were on patrol and observed an individual who they later arrested and turned out to be in possession of a half-gallon of PCP as well some other material. Both Nazir and his partner claimed they were suspicious of the individual because he resembled what was described as a robbery suspect at the location earlier in the day and the individual and the woman with him were acting suspiciously at the location, a 7-11 store located on Crenshaw Boulevard in Torrance. That information was contained in the police report. The two PCDs indicated that the two were contacted because the male matched the description of a robbery suspect. In addition, when Narcotics detectives from the Torrance Police Department and LA Impact arrived Officers Nazir and his partner gave them the same information.

Earlier that evening the officers made contact with a person characterized as a "confidential informant" who made arrangements to purchase a half-gallon of PCP from a black male. It was apparently the first time the officers were working with the informant and they did not know whether or not he was credible and/or reliable. Declaration of Bryan Okazaki, p.1, l. 20-23. Declaration of Patrick Such, p.1, l. 23-25. Declaration of Fareed Ahmad, p.1, l. 26-28. In addition the officers indicated they were unsure whether the black male they subsequently arrested was the person the informant arranged to meet or the earlier robbery suspect. Declaration of Bryan Okazaki, Id, p.1, l. 24-27.

Your appeal letter indicates it is customary for officers to fail to disclose the involvement of an informant. It is so because the officers had reason to initiate a consensual encounter with the arrestee due to their knowledge of the prior robbery at the location and that the arrestee generally matched the description of the robbery subject. In addition, the declarations all indicate that it is common to fail to disclose information in narcotics cases of confidential informants. You point out that subsequent to the arrest and conviction of the individual, it was brought to light by the Office of the Public Defender that the informant was used, and a motion to dismiss the case was made and after discussions with the officers and federal officials, the case was in fact dismissed and thereafter the District Attorney's Office determined to place Officer Nazir into the Brady Alert System.

Apparently neither Officers Okazaki, Such or Ahmad were looked at by the Brady people, and according to your letter, no action was taken against them by the Torrance Police Department. While you pointedly make no mention as to whether Officer Nazir was the subject of an internal investigation by the Torrance Police Department, it can

**147**

RN0002

Rana M. Kawar, Esq.
Dieter Dammeier, Esq.
June 3, 2010
Page 3.



readily be assumed that he was in fact the primary subject of an internal investigation. That notwithstanding, there is nothing contained in the reports reviewed that indicate any investigation concerning Officer Nazir and whether any actions were taken regarding his conduct in connection with the writing of the reports and/or the PCDs.

The Brady Compliance Division, as indicated above, did review the material and concluded that Officer Nazir had falsified the reports, that the totality of the circumstances indicated by clear and convincing evidence that his conduct involved moral turpitude and that he should be placed into the Brady Alert System.

Under *Brady* (Brady v. Maryland (1963) 373 U.S. 83), the prosecution must disclose to the defense any evidence that is "favorable to the accused" and is "material" on the issue of either guilt or punishment. Evidence is material under the *Brady* standard "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." U.S. v. Bagley (1985) 473 U.S. 667, 682. The prosecution's disclosure duty under *Brady* applies even without a request by the accused; it pertains not only to exculpatory evidence but also to impeachment evidence. Strickler v. Greene (1999) 527 U.S. 263, 280-81; U.S. v. Bagley, supra, p. 676; U.S. v. Agurs (1976) 427 U.S. 97, 102. City of Los Angeles v. Superior Court (Brandon) (2002) 29 Cal. 4th 1. It is undisputed that materials that "may be used to impeach a witness" fall within the class of information subject to *Brady* because impeachment information affects the fairness of trial. Strickler v. Green, supra, p. 282.

According to the District Attorney's Brady Compliance Division Operations Manual, no officer will be placed in the Brady Alert System until there has been an investigation, either by the District Attorney's Office, the employee's department or by another law enforcement agency. Here, the case was reviewed by the Major Narcotics Division after having been alerted about the concerns of federal authorities. Thereafter a thorough review was conducted by the Brady Compliance Division which determined to place Officer Nazir into its Brady Alert System.

The Brady Compliance Division utilizes a standard of "clear and convincing evidence" in determining whether to find impeachment evidence that requires disclosure under *Brady*. The key element of clear and convincing evidence is that it must establish a high probability of the existence of the disputed fact, greater than proof by a preponderance of the evidence . . . Evidence of a charge is clear and convincing so long as there is a 'high probability' that the charge is true (People v. Mabini (2001) 92 Cal. App. 4th 654, 662), based on evidence so clear as to leave no substantial doubt and sufficiently strong to command the unhesitating assent of every reasonable mind. Conservatorship of Wendland (2001) 26 Cal. 4th 519, 552.

**148**

Rana M. Kawar, Esq.
Dieter Dammeier, Esq.
June 3, 2010
Page 4.

Your objections to placing Officer Nazir into the Brady Alert System overlook both the object and ultimate responsibility of the District Attorney's Office. It is clear that its obligations arise from the decisions of the United States and California Supreme Courts and their intermediate appellate courts decisions. The District Attorney's Office's primary objective is to prosecute those who violate California's criminal laws. It is obligated to do so fairly and objectively and in an ethical and just manner. In notifying defendants that a prosecution witness has been placed into the Brady Alert System, it does not make a finding that such information is relevant and/or admissible at a trial on the merits. That task is placed upon the trial court, which has the ultimate responsibility to assure that a charged defendant receives a fair trial. The trial court, utilizing appropriate standards, and taking into consideration the applicable law and the facts of the particular case in question, then makes a determination whether and to what extent such information may be utilized at a trial, utilizing its discretion under the Evidence Code.

While it may be true that the police reports and the PCDs authored by Officer Nazir are accurate, assuming he and his partner in fact had information concerning a robbery having occurred earlier in the day, the plain truth is that were it not for them having arranged for a purchase of narcotics by the informant, they would not have been at the location of the 7-11 store at that time and neither of the arrestees would have been there either. The entire case was predicated on the use of the informant by Officer Nazir and his partner. To claim they could omit to reveal the true and accurate reasons for being at the location and to claim other reasons is not only disingenuous but is misleading and fraudulent.

Finally, to now assert that it was entirely proper to omit that information does a disservice not only to the Torrance Police Department but to police agencies in general. In addition it calls into question the judgment, veracity, character and training of the three officers who submitted declarations in support of your position.

A review of the entire record establishes that there is substantial evidence to support the finding of the Brady Compliance Division that **Brady** material exists and that such information be placed into the District Attorney's Brady Alert System. This review constitutes the final decision of the District Attorney's Office.

Very truly yours,


STEVE COOLEY
District Attorney

**149**

**Exhibit G - 4**

RN0004

Rana M. Kawar, Esq.
Dieter Dammeier, Esq.
June 3, 2010
Page 5.

By: _(signature)_

LAWRENCE E. MASON
Sr. Special Assistant

lem

c: Officer Rehan Nazir, Torrance P.D.
   Irene Wakabayashi, HDDA, Appellate Division

**150**

**Exhibit  G - 5**

RN0005

**151**

# Exhibit H

# SPECIAL DIRECTIVE 02-08

TO:                    ALL DEPUTY DISTRICT ATTORNEYS

FROM:                  STEVE COOLEY
                       District Attorney

SUBJECT:               BRADY PROTOCOL

DATE:                  DECEMBER 7, 2002

**THIS SPECIAL DIRECTIVE SUPERSEDES SD 02-05**

On May 13, 2002, this office issued a comprehensive Brady policy set forth in Special Directive 02-04 and Special Directive 02-05. At that time, the Brady Alert System was being developed. In the intervening time, the U.S. Supreme Court and California Supreme Court have given us additional guidance through their decisions.

In order to ensure uniformity and consistency in meeting constitutionally required discovery obligations under *Brady v. Maryland* (1963) 373 U.S. 83, the Brady Compliance Division will coordinate and make available to deputy district attorneys known Brady information on peace officers and governmentally employed expert witnesses who are part of the "prosecution team."[1] The Brady Compliance Division will be the central repository of such known Brady information and is charged with answering any Brady questions that might arise. Subject to any future changes in the law, this Special Directive sets forth the office policy for handling these discovery obligations. This policy was carefully drafted to protect the statutory and privacy rights of police officers while fulfilling prosecutorial obligations.

## I.    WHAT IS REQUIRED UNDER *BRADY*

Prosecutors are required to disclose to the defense evidence <u>favorable to a defendant</u> which is either <u>exculpatory</u> or <u>impeaching</u> and is <u>material</u> to either <u>guilt</u> or <u>punishment</u>. Evidence is "favorable" to the defendant if it either helps the defendant or hurts the prosecution. (*In re Sassounian* (1995) 9 Cal.4th 535, 543-544.) In *Strickler v. Greene* (1999) 527 U.S. 203, 280-281, the United States Supreme Court stated:

> In *Brady* this Court held "that the suppression by the prosecution of evidence favorable to an accused upon

---

[1] The policy regarding possible Brady material in the possession of law enforcement is set forth in SD 02 – 07.

152

request violates due process where the evidence is material
either to guilt or to punishment, irrespective of the good faith
or bad faith of the prosecution." *Brady v. Maryland*, supra,
373 U.S. at 87. We have since held that the duty to disclose
such evidence is applicable even though there has been no
request by the accused, [*United States v. Agurs* (1976) 427
U.S. 97, 107], and that the duty encompasses impeachment
evidence as well as exculpatory evidence, [*United States v.
Bagley*, (1985) 473 U.S. 667, 676]. Such evidence is
material "if there is a reasonable probability that had the
evidence been disclosed to the defense, the result of the
proceeding would have been different." Id at 682; see also
[*Kyles v. Whitley* (1995) 514 U.S. 419, 433-434].

In order to ensure compliance with these rules, the United States Supreme Court
on more than one occasion has urged the "careful prosecutor" to err on the side
of disclosure. (*Kyles v. Whitley*, supra, 514 U.S. 419, 440; *United States. v.
Agurs*, supra, 427 U.S. 97, 110.)

## A.    Material Evidence

The definition of "material evidence" is generally provided in the context of an
appeal from a conviction. Evidence is material if there is a reasonable probability
that the result of the proceeding would have been different had the evidence
been disclosed. A reasonable probability of a different outcome is shown where
suppression undermines confidence in the outcome. Such evidence must have a
specific, plausible connection to the case, and must demonstrate more than
minor inaccuracies. (*Kyles v. Whitley*, supra; *U.S. v. Bagley*, supra; *People v.
Padilla* (1995) 11 Cal. 4th 891, 929-32; *People v. Clark* (1992) 3 Cal. 4th 41, 133-
34.)

However, as prosecutors we must determine what Brady evidence there may be
*before* trial. In making this assessment, the deputy shall utilize the above
guidelines.

## B.    Exculpatory Evidence

Exculpatory evidence is evidence favorable to the defendant and material to the
issue of guilt or punishment.

## C.    Impeachment Evidence

Evidence Code section 780 states in part that:

Except as otherwise provided by statute, the court or
jury may consider in determining the credibility of a witness
any matter that has any tendency in reason to prove or

2

153

Exhibit  H - 2

disprove the truthfulness of his testimony at the hearing including, but not limited to, any of the following:

* * *

(e) His character for honesty or veracity or their opposites.
(f) The existence or nonexistence of a bias, interest or other motive.
(h) A statement made by him that is inconsistent with any part of his testimony at the hearing.
(Emphasis added.)

CALJIC No. 2.20 (2000 rev.) incorporates the above listed factors and adds conviction of a felony and past criminal conduct of a witness amounting to a misdemeanor as well as several other considerations. If impeachment evidence is based upon the prior commission of a crime, the crime must involve moral turpitude to be admissible. (*People v. Castro* (1985) 38 Cal.3d 301, 314 [felonies]; *People v. Wheeler (1992)* 4 Cal.4th 284, 295-297 [misdemeanor conduct].)

Further examples of possible impeachment evidence of a material witness include:

1. False reports by a prosecution witness (*People v. Hayes* (1992) 3 Cal. App. 4th 1238, 1244);
2. Pending criminal charges against a prosecution witness (*People v. Coyer* (1983) 142 Cal.App.3rd 839, 842);
3. Parole or probation status of the witness (*Davis v. Alaska* (1974) 415 U.S. 308, 319; *People v. Price* (1991) 1 Cal.4th 324, 486);
4. Evidence contradicting a prosecution witness' statements or reports (*People v. Boyd* (1990) 222 Cal.App.3d 541, 568-569);
5. Evidence undermining a prosecution witness' expertise (e.g., inaccurate statements) (*People v. Garcia* (1993) 17 Cal.App.4th 1169, 1179);
6. A finding of misconduct by a Board of Rights or Civil Service Commission, that reflects on the witness' truthfulness, bias or moral turpitude (cf. *People v. Wheeler, supra,* 4 Cal. 4th at p. 293) (Note that the burden of proof in an administrative hearing is preponderance of the evidence);
7. Evidence that a witness has a reputation for untruthfulness (3 Witkin Cal. Evid., 4th Ed., § 288-290);
8. Evidence that a witness has a racial, religious or personal bias against the defendant individually or as a member of a group (*In re Anthony P.* (1985) 167 Cal.App. 3rd 502, 507-510); or
9. Promises, offers or inducements to the witnesses, including a grant of immunity (*United States v. Bagley, supra,* 473 U.S. 667, 676-677; *Giglio v. United States* (1972) 405 U.S. 150, 153-155).

3

154

Exhibit  H - 3

A thorough review of all other types of information must be made before a determination is reached that evidence concerning the credibility of a material prosecution witness is impeachment evidence.

**D.**   **What is *not* Brady material**

Allegations that cannot be substantiated, are not credible, or have been determined to be unfounded are not considered impeachment material and therefore will not be included in the Brady Alert System. (Please refer to section III below.) The prosecution has no obligation to communicate preliminary, challenged or speculative information. (*United States v. Agurs, supra,* 427 U.S. 97, 109, fn. 16.) Pending criminal or administrative investigations are considered preliminary in nature.

If a deputy has any question whether information falls within Brady, the Brady Compliance Division will be available for consultation.

**II.   PROCEDURES FOR NOTIFYING THE BRADY COMPLIANCE DIVISION OF POTENTIAL BRADY INFORMATION**

If a deputy is aware or becomes aware of potential Brady information, the deputy shall inform his or her Head Deputy or Deputy-in-Charge. If the Head Deputy or Deputy-in-Charge concurs with the deputy that the information is potential Brady material, a memorandum shall be written summarizing the material and setting forth why the supervisor and the deputy believe that Brady material exists. (If the Head Deputy or Deputy-in-Charge does not agree with the deputy, please refer to section IV D below.)

If it is believed that the conduct amounts to a crime, the memorandum and copies of all supporting evidence and relevant documentation (such as transcripts, disposition reports, police reports or expert reports) shall be forwarded to both the Brady Compliance Division and the Justice System Integrity Division (JSID). (See Special Directive 01-10.) JSID will either conduct an independent investigation or refer the matter to the employee's agency for investigation. JSID shall be responsible for monitoring the status of such investigation and encouraging a timely response from the agency.

If the discovered information is other than a potential crime, the memorandum and copies of all supporting evidence and relevant documentation shall be sent directly to the Brady Compliance Division. The Brady Compliance Division will refer the matter to the employee's agency for investigation.

**III.   BRADY ALERT SYSTEM**

The Brady Compliance Division will maintain a computer-based "Brady Alert System." The system includes both known historical and current Brady

4

**155**

**Exhibit  H - 4**

Information. This system will *not* create secondary personnel files on police officers or governmentally employed experts. The only information from an employee's personnel file to be included in the system is that which is received pursuant to a *Pitchess* motion, where a court has released information without a protective order prohibiting dissemination of the material, or pursuant to an investigation resulting in a criminal charge filed against the employee.

**A.      Access to the Brady Alert System**

Every deputy can access the Brady Alert System to determine whether information on a particular witness exists. The alert system will confirm if information exists as well as provide a brief summary of the Brady information. Deputies will then need to contact the Brady Compliance Division for further details if necessary.

At arraignment on an Information, deputies shall access the system to determine whether impeachment information exists for any witness. Calendar or trial deputies shall also check the system at least 30 days before trial. Any information learned from accessing the Brady Alert System shall be noted in the DA file. The deputy appearing in court on a case shall have the responsibility of notifying the defense of any information learned from the system. A notation shall be made in the DA file indicating the date, what information was provided and in what manner notification to the defense was made (i.e., in writing, on the record, etc.) Any information learned from the system shall be conveyed to the defense only on the particular case. Misuse of this system will subject an employee to disciplinary action up to, and including, discharge.

**B.      Security Log**

A security log has been built into the system and is maintained by our Systems Division. This log will track every Brady Alert System inquiry made by a member of this office.

**IV.      STANDARD OF REVIEW BY THE BRADY COMPLIANCE DIVISION**

**A.      Post Investigation**

The Brady Compliance Division will decide whether to include information concerning a peace officer or governmentally employed expert witness in the Brady Alert System. Such decision will be made after an investigation of the allegations by the employee's agency, another law enforcement agency or by JSID.

The decision to include such information in the alert system will be made using a standard of *clear and convincing evidence* which is higher than a

5

156

Exhibit  H - 5

preponderance of evidence but less than beyond a reasonable doubt. In other words, without clear and convincing evidence that the potential impeachment evidence is reliable and credible, it will not be included in the alert system.

Using the above standard, if the Brady Compliance Division determines that Brady material exists, it shall notify the Head Deputy or Deputy-in-Charge and place the information into the alert system. The Brady Compliance Division will advise Head Deputies and Deputies-in-Charge regarding the manner in which notification is made to the defense. (Please refer to section VI below.) The Brady Compliance Division will also notify the employee's agency in writing of this decision and action.

Only Brady Compliance Division deputies will input or delete information from the Brady Alert System.

### B.  Pending Investigations

If, while a matter is under investigation, the Brady Compliance Division determines that there is sufficient credible information that the potential evidence is reliable and credible and it is necessary to present such evidence to a court (such as where a trial has commenced), it will advise the Head Deputy or Deputy-in-Charge to notify the employee that the trial deputy will be requesting an *ex parte, in camera* hearing to present all relevant, material evidence to the court and ask the judge to make a decision whether the evidence should be revealed to the defense. If the judge rules that there is Brady material, a protective order shall be requested before the material is turned over to the defense. The trial deputy shall send a memorandum to the Brady Compliance Division setting forth the judge's reasoning.

### C.  Insufficient Time for an Investigation

In those unusual instances where alleged Brady material is discovered shortly before or during trial and there is insufficient time for an investigation, the trial deputy shall consult with his or her supervisor and the Brady Compliance Division. Upon a determination by the Brady Compliance Division that there appears to be sufficient credible information that the potential evidence is reliable and credible, the Head Deputy or Deputy-in-Charge shall notify the employee that the trial deputy will be requesting an *ex parte, in camera* hearing to present all relevant, material evidence to the court and ask the judge to make a decision whether the evidence should be revealed to the defense. If the judge rules that there is Brady material, a protective order shall be requested before the material is turned over to the defense. The trial deputy shall send a memorandum to the Brady Compliance Division setting forth the judge's reasoning.

In either situation described in section B or C above, if a court issues a protective order, the alleged Brady material will not be included in the Brady Alert System. If no protective order is issued, the Brady Compliance Division will wait for a full

157

**Exhibit H - 6**

investigation of the alleged Brady material before making a decision to include such information in the Brady Alert System.

**D.    Individual Responsibility**

Complying with Brady is the individual responsibility of each deputy. The decision whether to use a witness whose name appears on the alert system will be left to the discretion of the individual trial deputy after appropriate consultation with his or her Head Deputy or Deputy-in-Charge and the Brady Compliance Division. If the situation should ever arise in which a witness' name does not appear on the alert system and an individual trial deputy learns of information that he or she believes triggers his or her Brady obligation, the trial deputy shall review this information with his or her Head Deputy or Deputy-in-Charge and the Brady Compliance Division. If neither the deputy's Head Deputy or Deputy-in-Charge nor the Brady Compliance Division agree, upon request by the deputy, the Brady Compliance Division will refer the matter to the employee's agency for investigation.

**V.    JUSTICE SYSTEM INTEGRITY DIVISION, OFFICEWIDE DECLINATIONS AND NEWLY DISCOVERED BRADY MATERIAL**

**A.    Justice System Integrity Division/Officewide Declinations**

Because the Brady Alert System will include both known historical and current Brady information, JSID will share information with the Brady Compliance Division on current as well as past filed cases involving peace officers and governmentally employed experts.

A copy of every JSID declination involving a member of the prosecution team will be sent to the Brady Compliance Division. The latter will review the declination and make a preliminary determination if potential Brady information exists. If there has not been an investigation concerning the potential Brady material, it will be the responsibility of the Brady Compliance Division to ensure such an investigation is completed before making any determination. Following this investigation, if the information is determined to be Brady material, it will be included in the alert system and the notification process will be initiated.

In all other divisions, if a case is rejected but a deputy believes that potential impeachment information concerning a peace officer or governmentally employed expert witness is included, it shall be brought to the attention of the Head Deputy or Deputy-in-Charge. If the Head Deputy or Deputy-in-Charge agrees that Brady material exists, then the Head Deputy or Deputy-in-Charge shall send a memorandum summarizing and analyzing the Brady material to the Brady Compliance Division. The same procedures discussed above shall be followed.

7

**158**

## B. Newly Discovered Brady Material

If a deputy learns of "new" Brady material concerning any member of the prosecution team already identified in the alert system, the procedure described above shall be followed.

## VI. NOTIFICATION OF DEFENSE ATTORNEYS/PRO PER DEFENDANTS

Because obligations under *Brady* continue even after a case is concluded (*People v. Gonzalez* (1990) 51 Cal. 3rd 1179, 1260-1261), once the Brady Compliance Division determines that Brady material exists for a particular witness, the division shall obtain a computer run of all cases for that witness. The computer run will include all cases from the date of the alleged misconduct to the present. Head deputies in the offices where cases are located will be notified to send letters to all defense attorneys of record or pro per defendants, alerting them to the existence of potential Brady material. Head deputies shall not send notification letters in closed cases where the defendant has pled guilty or no contest. (See *U.S. v. Ruiz*, (2002) 536 U.S. __, 153 L. Ed 2nd 586, 597, 122 S. Ct __)

## VII. PRIMARY RESPONSIBILITIES OF THE BRADY COMPLIANCE DIVISION

1. Maintain the Brady alert system;
2. Collect and maintain Brady material;
3. Assist deputies in determining whether Brady material exists in a particular case, or against a particular witness;
4. Consult with individual deputies as to when it is appropriate to disclose potential impeachment information to the defense;
5. Advise deputies on issues relating to the Brady Protocol and on relevant case law;
6. Consult with deputies as to when it is appropriate to seek *ex parte*, *in camera* review by the court of potential Brady material; develop and maintain pleadings for this purpose; and
7. Coordinate responses to Public Records Act requests for Brady material within the office.

Compliance with this Directive will help fulfill our primary mission of fairly prosecuting those who violate criminal laws in Los Angeles County.

dtg

8

159

Exhibit H - 8

Exhibit I

**160**



**LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE**
BUREAU OF PROSECUTION SUPPORT OPERATIONS
BRADY COMPLIANCE UNIT

STEVE COOLEY • District Attorney
JOHN K. SPILLANE • Chief Deputy District Attorney
SHARON J. MATSUMOTO • Assistant District Attorney

LAEL R. RUBIN • Director

June 10, 2010

**CONFIDENTIAL**

John J. Neu, Chief
Torrance Police Department
3300 Civic Center Drive
Torrance, California 90503

Dear Chief Neu:

OFFICER REHAN (RAY) NAZIR, #16279

The Los Angeles County District Attorney's Office has reviewed information regarding Officer Rehan (Ray) Nazir, #16279, an employee of your department, and has determined that *Brady* impeachment material which relates to Officer Nazir exists. The review was conducted in accordance with the District Attorney's Brady Protocol as set forth in Special Directive 02-08.

The Brady Compliance Unit reviewed allegations that Officer Nazir authored two probable cause declarations and a police report for the arrests of Michael Baker and Latera Odom which contained false information and determined that his conduct involved moral turpitude and is, therefore, *Brady* material. Officer Nazir objected to the Brady Compliance Unit's determination and submitted an appeal to the District Attorney's Special Designee, a neutral third party. On June 3, 2010, the Special Designee found that there was substantial evidence to support the Brady Compliance Unit's determination that *Brady* material exists. The Special Designee's finding is final and Officer Nazir's name, along with a brief description of the conduct involved, has been placed in our office's Brady Alert System, a secure computerized database accessible only to Los Angeles County deputy district attorneys.

The placement of Officer Nazir's name and accompanying information in the Brady Alert System should not be used as a basis for a personnel action against him.

Hall of Records
320 West Temple Street, Suite 540
Los Angeles, CA 90012
(213) 974-5060
Fax (213) 229-2801

**161**

**Exhibit I - 1**

RN0050

Chief John J. Neu
Page Two
June 10, 2010

Should you have any questions, please contact Imogene M.N. Katayama, Deputy District Attorney, Brady Compliance Unit, at (213) 974-5060.

Very truly yours,

STEVE COOLEY
District Attorney

By *Irene Wakabayashi*

IRENE WAKABAYASHI
Head Deputy, Appellate Division

imnk

**162**

**Exhibit I - 2**

RN0051

**163**

# Exhibit J



# CITY OF
# TORRANCE

POLICE DEPARTMENT

JOHN J. NEU
CHIEF OF POLICE



August 16, 2010

Rehan Nazir
Torrance Police Department
3300 Civic Center Drive
Torrance, CA 90503

Dear Officer Nazir:

You are hereby notified that on this date a recommendation to terminate you from your position with the Torrance Police Department ("Department") for just cause has been filed with the City Manager for his consideration. This recommendation is being made pursuant to my authority under Section 14.5.4 (See Att. No. 1) and Section 14.47.1 (See Att. No. 2) of the Torrance Municipal Code.

I.    **Rules, Regulations, and/or Orders Upon Which Proposed Dismissal is Based**

Any one of the following provisions, standing alone, is adequate support for my proposal to terminate your employment.

1)    Torrance Municipal Code, Section 14.47.1:

"A department head, with the approval of the City Manager, for . . . incompetence, inefficiency, failure to perform duties . . . c) May discharge any such employee." (See Att. No. 2)

2)    Torrance Police Department Manual, General Order 2.01, Volume 2.01.1:

EMPLOYEE RULES AND REGULATIONS.  A.  EMPLOYEE RESPONSIBILITY.

"5. Perform their duties in a manner that will not reasonably result in the impairment or disruption of public service or Department business . . ." (See Att. No. 3).

3)    Torrance Police Department Manual, General Order 2.01, Volume 2.01.1:

CONDUCT – GENERAL.

"Employees shall not conduct themselves in a manner detrimental to the Department."
(See Att. No. 3).

4)    Torrance Police Department Job Description for Police Officer, EXAMPLES OF DUTIES

"Enforces laws and ordinances; investigates and detects crimes; patrols assigned areas; answers calls for protection of life and property and the enforcement of City, County and State laws; conducts preliminary investigations of robberies, burglaries, thefts, holdups, accidents, deaths and similar incidents; directs traffic, stops drivers who are operating vehicles in violation of law, warns drivers against unlawful practices and issues citations and warnings and makes arrests as the situation requires; testifies in court in connection with prosecutions; serves warrants and subpoenas; prepares reports of arrests made, investigations conducted and illegal incidents observed; gives information and directions to the public; searches prisoners; supervises trustees in cleaning and maintaining stations; operates telephonic and radio transmitting and receiving equipment; completes complaint forms when arrests are made; takes pictures and measurements of physical factors at scenes of crimes and accidents; conducts special surveys and investigations; serves as a juvenile officer and counselor; drives automobiles, motorcycles and similar equipment in the performance of duties."
(See Att. No. 4).

II.    **Factual Basis for Proposed Dismissal**

In a letter dated June 10, 2010, the Los Angeles County District Attorney's Office ("D.A.'s Office") informed me that its *Brady*[1] Compliance Unit had reviewed allegations that you made false statements in two probable cause declarations and a police report that you prepared in connection with the arrests of Michael Baker and Latera Odom. The DA's Office has determined that your conduct involved moral turpitude. Therefore, it considers the information to be *Brady* material. (See Att. No. 5).

According the D.A.'s June 10, 2010, letter to me, the D.A.'s Office reached its determination in accordance with that office's *Brady* Protocol as described in Special Directive 02-08. (See Att. No. 6) Thus, preliminary notification of the D.A.'s determination was sent to you first. You appealed the determination to the

---

[1] The reference to "*Brady*" relates to the United States Supreme Court case, *Brady v. State of Maryland* (1963) 373 U.S. 83, discussed in more detail below.

**165**

**Exhibit J - 2**

RN0036

D.A.'s Special Designee, a neutral third party.  On June 3, 2010, the Special Designee found that there was substantial evidence to support the *Brady* Compliance Unit's determination that *Brady* material exists.  According to Special Directive 02-08, the Special Designee's finding is final and your name, along with a brief description of the conduct involved, has been placed in the D.A.'s Office's "*Brady* Alert System," a computerized database accessible to Los Angeles County deputy district attorneys.

On June 21, 2010, in order to determine the impact, if any, of the D.A.'s June 10, 2010 letter, Deputy Chief Mike Browne and I met with Head Deputy D.A., Diane Vezzani, and the Assistant Head Deputy D.A., Shawn Randolph.  Ms. Vezzani stated that she read the D.A.'s letter pertaining to your *Brady* investigation and had concluded that she would never approve a criminal filing of any case in which you were a material witness nor allow you to testify in any such matter.  Ms. Vezzani stated that "on a scale of 1 to 10," with 10 being the most serious, your actions described in the D.A.'s letter were "at the top of the scale" because they impact your credibility as a witness.

III.   **Analysis**

    A.   **The D.A.'s Determination that You Are Culpable of Moral Turpitude in Including False Statements in Probable Cause Declarations and a Police Report Will be Disclosed to Defendants in Criminal Proceedings Filed by the D.A.'s Office Under *Brady v. State of Maryland***

        1.   *Brady v. State of Maryland*

In *Brady v. State of Maryland* (1963) 373 U.S. 83, the United States Supreme Court held that, in criminal cases, the prosecution owes a duty to a criminal defendant to disclose evidence which is favorable to the defendant and which is material to the guilt and/or punishment of the defendant.  Under that ruling, evidence is considered "favorable" to a criminal defendant if the evidence either helps the defendant or hurts the prosecution.  (*In re Sassounian* (1995) 9 Cal.4[th] 535, 543-544).  A violation of the duty of disclosure described in *Brady v. State of Maryland* is a violation of the defendant's Constitutional rights to due process and a fair trial.

Subsequent courts have explained that records which could be used to impeach a peace officer may constitute *Brady* material.  (See, e.g., *U.S. v. Cadet* (9th Cir. 1984) 727 F.2d 1453, 1467 ("the prosecutor's oath of office, not the command of a Federal Court, should have compelled the government to produce any favorable evidence in [FBI] personnel records").)

**166**

RN0037

Importantly, the obligation to disclose *Brady* material is an affirmative one. The prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in a case, including the police. (See *Kyles v. Whitley* (1995) 514 U.S. 419; *In re Brown* (1998) 17 Cal.4th 873 [72 Cal.Rptr.2d 698]; *Giglio v. U.S.* (1972) 405 U.S. 150.) Even if a request is not made by the defense for the information, the prosecution still owes a duty to disclose any and all *Brady* material. (*U.S. v. Agurs* (1976) 427 U.S. 97; see also, *Izazaga v. Superior Court* (1991) 54 Cal.3d 356 [285 Cal.Rptr. 231]; *People v. Rutherford* (1975) 14 Cal.3d 399 [122 Cal.Rptr. 261].)

    2.    *Brady* Protocol 02-08

In order to ensure uniformity and consistency in meeting constitutionally required discovery obligations under *Brady v. Maryland*, supra, the D.A.'s Office has established its *Brady* Protocol. (See Att. No. 6).

Under the *Brady* Protocol, "if a deputy is aware or becomes aware of potential *Brady* information, the deputy shall inform his or her Head Deputy or Deputy-in-Charge. If the Head Deputy or Deputy-in-Charge concurs with the deputy that the information is potential *Brady* material, a memorandum shall be written summarizing the material and setting forth why the supervisor and the deputy believe that *Brady* material exists."

Thereafter, "the *Brady* Compliance Division will decide whether to include information concerning a peace officer or governmentally employed expert witness in the *Brady* Alert System."

According to the *Brady* Protocol, "the decision to include such information in the alert system will be made using a standard of clear and convincing evidence which is higher than a preponderance of evidence but less than beyond a reasonable doubt. In other words, without clear and convincing evidence that the potential impeachment evidence is reliable and credible, it will not be included in the alert system."

Then, "if the *Brady* Compliance Division determines that *Brady* material exists, it shall notify the Head Deputy or Deputy-in-Charge and place the information into the alert system. The *Brady* Compliance Division will advise Head Deputies and Deputies-in-Charge regarding the manner in which notification is made to the defense . . . The *Brady* Compliance Division will also notify the employee's agency in writing of this decision and action."

Here, pursuant to the *Brady* Protocol, the D.A.'s Office has made an independent determination that it owes an obligation under *Brady* to disclose the fact of your dishonesty in connection with the Michael Baker and Latera Odom arrests and related reports.

**167**

**B.**   **Your Inclusion in the D.A.'s *Brady* Alert System Results in Detriment to the Department and Harm to the Public Service, Thereby Making Your Continued Employment with the Department Untenable**

In *Hankla v. Long Beach Civil Service Commission* (1995) 34 Cal.App.4th 1216, 1222-1233 [40 Cal.Rptr.2d 583], the Court of Appeal confirmed the long-standing principle that discipline involving public employees should be based on "the extent to which the employee's conduct resulted in, or if repeated is likely to result in, harm to the public service." In this case, unfortunately, your inclusion in the D.A.'s *Brady* Alert System will result in harm to the public service in at least two ways: 1) cases in which you are the arresting officer or otherwise a material witness  may not be filed, and 2) even if a case is filed, your credibility will be subject to challenge and any such prosecution is reasonably likely to be undermined.

The job description for your position as police officer for the Department is defined as follows: "under supervision, [a police officer is] to enforce laws and ordinances; to investigate and detect crimes; to apprehend criminals; and to do related work as required." (See Att. No. 4). Examples of police officer duties include the duty to "enforce. . . laws and ordinances, ...testif[y] in court in connection with prosecutions, serve . . . warrants and subpoenas, prepare . . . reports of arrests made, investigations conducted and illegal incidents observed." Your inclusion on the *Brady* List is a glaring illustration of your inability to perform the essential functions of the job and your fundamental duties as a law enforcement officer.

On June 21, 2010, D.A. Vezzani indicated to me that her office would not file any cases in which you are the arresting officer or otherwise are a material witness.  She also stated that her office would not call you as a witness due to your inclusion in the D.A.'s *Brady* System.

Recognizing that D.A. Vezzani will not always be the Head D.A. and/or might decide under the right circumstances to file a case in which you are either the arresting officer or a material witness, I am not in the business of taking unreasonable risks. It is my expectation that cases presented to the D.A. for filing by members of this Department will stand or fall on their own merit. I cannot reasonably ask the taxpayers of the City of Torrance to pay full salary and benefits to a police officer whose cases may or may not get filed, not based on the D.A.'s evaluation of the facts and circumstances of the cases, but based on the D.A.'s formal determination that the officer is not credible. That would be akin to maintaining a 911 call center which only took some but not all calls, or buying police cars that started some but not all of the time, or asking police officers to carry service weapons that work only some of the time. The Department may not be responsible for the problem, but the reality is that the problem exists and must be addressed. In this case, the problem is that you are

**168**

RN0039

now included in the D.A.'s *Brady* Alert System.  Whether that decision is right or wrong is not the issue.  The issue is how to justify continued employment of a police officer that cannot effectively perform the essential functions of his job.  After careful contemplation, I cannot justify it.

As a police officer, you are trained  and highly compensated to, among other things, apprehend criminals, write accurate reports, and submit your cases to the D.A.'s Office for the filing of criminal charges.  Your efforts *culminate* in the prosecution of criminals.  Being included in the D.A.'s *Brady* Alert system undermines all the time and resources that you, your colleagues, and the Department would expend on the investigation and apprehension of criminals.  In every case, we would be left to wonder, first, whether the D.A. would reject your case for filing simply because it is your case, and, second, whether any case that might be filed is nevertheless hampered by issues regarding your credibility.  I cannot accept such risks.

## IV.    Conclusion

For the foregoing reasons, I have no reasonable option but to propose termination of your employment.  I simply cannot overlook the fact of your inclusion in the *Brady* Alert System and the impacts it has on this Department.

## V.    Appeal Rights

Per the City of Torrance Disciplinary Action Policy #39, an Administrative Conference on this matter will be held on Tuesday, August 24, 2010, at 2:00 p.m. in the 3rd floor assembly room of City Hall in front of Assistant City Manager Mary Giordano. You have the right to present your view of your matter and have an attorney and/or other representative present to represent you. If you cannot be present on this date and time, please contact Lieutenant Thomas Stark as soon as possible.  In the alternative, you can also respond in writing to the charges against you. Any written response by you should be submitted to Lieutenant Stark no later than August 18, 2010.

## VI.    Work History

You have been employed as a police officer since July 30, 2000.  Your personnel file showed that in your last three Performance Evaluations you received a Meets Standards rating.  In the two Performance Evaluations prior to that you received an Outstanding rating.

## VII.    Prior Discipline

A review of your personnel file showed that you have the following disciplinary actions:

**169**

**Exhibit J - 6**

April 2007 – An eight (8) day suspension without pay for Insubordination.

July 2008 – A four (4) day suspension without pay for Neglect of Duty.

## VIII.   Documents in Support of Recommendation

The following is a list of the documents I considered in making my recommendation to terminate your employment. The documents are being provided to you with this letter.

1.   Torrance Municipal Code, Section 14.5.4;
2.   Torrance Municipal Code, Section 14.47.1;
3.   Torrance Police Department Manual, General Order 2.01, Volume 2.01.1;
4.   Torrance Police Department Job Description for Police Officer;
5.   Letter from D.A.'s Office to John J. Neu, Chief, dated June 10, 2010;
6.   Special Directive 02-08;
7.   Torrance Municipal Code, Section 14.47.7.

Sincerely,

John J. Neu
Chief of Police

My signature below acknowledges receipt of this document and all attachments listed herein.

Acknowledged:

8/16/10
Date


Refused to Sign @ 1123

Rehan Nazir

Witnessed:

8/16/10
Date

Lieutenant Thomas C. Stark

**170**

RN0041

## SECTION 14.5.4. - POWERS AND DUTIES OF CHIEF GENERALLY.

*(Added by O-249)*

The Chief of the Police Department shall, subject to the approval of the City Manager, have control, management and direction of all members of the Police Department and all buildings, apparatus and equipment of such department as may be necessary in the lawful exercise of the functions of his office. He shall have full power to detail any officer or member of the Police Department to such public service as may be necessary. He shall recommend to the City Manager, members of the Police Department for demotion or dismissal, and may suspend from duty, and prefer charges against any officer or member of the Department.

**171**

RN0042

## SECTION 14.47.1. - POWERS OF DEPARTMENT HEADS.

*(Amended by O-3020; O-3100)*

A department head, with the approval of the City Manager, for misconduct, incompetency, inefficiency, failure to perform duties or to observe the rules and regulations of his department or of the City:

a)  May suspend any employee in his department without pay for a period not to exceed thirty (30) consecutive days; or

b)  May demote any such employee to a classification which he is qualified to fill; or

c)  May discharge any such employee.

**172**

**Exhibit  J - 9**

RN0043



JOHN J. NEU
CHIEF OF POLICE

# TORRANCE POLICE DEPARTMENT

## GENERAL ORDER 2.01  EMPLOYEE RULES AND REGULATIONS

DATE ISSUED:  April 6, 2009

### PURPOSE

Department personnel are expected to conduct themselves in a manner that reflects the Mission, Vision, and Core Values of our Department. This General Order establishes rules and regulations governing employee conduct.

### 2.01.1  EMPLOYEE RULES AND REGULATIONS

A. EMPLOYEE RESPONSIBILITY. It is the duty of all employees to familiarize themselves with and abide by Department rules and regulations. Employees who fail to comply are subject to disciplinary action up to and including termination. Department employees shall:

1. Obey all local, state, and federal laws.

2. Render service to the community with pride, integrity, compassion, and excellence.

3. Enforce the law equitably and without regard to race, color, religion, sex, marital status, sexual orientation, national origin, age, disability, or veteran status. Laws and regulations issued by the United States and the State of California require equal treatment of all persons.

4. Conduct themselves in a manner that does not create a conflict of interest with or is detrimental to the Department.

5. Perform their duties in a manner that will not reasonably result in the impairment or disruption of public service or Department business. This includes the knowing and willful failure to perform a required duty or task.

6. Maintain in good working order the equipment and supplies issued to them, taking all reasonable care to prevent loss or damage.

B. FALSE REPORT PROHIBITED. No employee shall make false official reports, or knowingly enter, or cause to be entered, in any Department book, record, report, or log, any inaccurate, false, or improper information, evidence or material.

### 2.01.2  WORKPLACE CONDUCT

A. DEPARTMENT IDENTIFICATION CARD.  The primary, official means of identifying Department members is the Torrance Police Department Identification card. The issuance of an identification card is only authorized by the Chief of Police, or a designee, and is intended to be used only for official authorized purposes. Department members shall relinquish their identification card upon the direction of the Chief of Police or designee.

1. WEARING IDENTIFICATION. All personnel not in uniform are required to wear identification while inside the Police facility. Police Officers and Services Officers shall wear badges or Department identification cards. All other employees and volunteers shall wear Department identification cards. Identification shall be conspicuously worn on the employee's person, using a clip or lanyard.

2. POSSESSION OR USE. All personnel are required to have their identification card in their possession when they are on duty and displayed when there is a need to identify themselves as a Department member. The Identification Card is to be worn, displayed and/or offered only for Department business.

**173**

**Exhibit  J - 10**

RN0044

B. EFFICIENCY. Employees shall direct and coordinate their efforts in such a manner as will tend to establish and maintain the highest standard of efficiency.

C. PUNCTUALITY. Employees shall be punctual in reporting for duty, and shall work their complete tour of duty, unless relieved by a supervisor.

D. SMOKE-FREE ENVIRONMENT. Smoking is prohibited in the Police station. Outside the Police station, smoking is prohibited within 25 feet of the building. Smoking in City Vehicles is prohibited. Any disputes or grievances on the no-smoking policy shall go first to the Administrative Bureau Commander for resolution. In any dispute arising under this no-smoking policy, the rights of the non-smoker shall be given precedence.

E. ALCOHOL CONSUMPTION. Alcoholic beverages shall not be consumed by on-duty personnel. Exceptions can be authorized only by the Chief of Police or his designee.

F. EMPLOYEE PARKING. Employees shall park their personal vehicles only in designated spaces. Personal vehicles shall not be parked in spaces reserved for City vehicles. Long-term storage of personal vehicles on City property is prohibited.

G. KEYS. Upon transfer or reassignment, employees shall submit their programmable keys to the Services Division for reprogramming. All regular keys for offices or work areas shall be relinquished to the Commander of the concerned Division upon reassignment. Missing or damaged keys be reported to the Services Division on a TPD 41. Upon separation of employment, employees shall return all keys to the Personnel Division.

## 2.01.3  RESPECT FOR COMMAND

A. ADDRESSING RANKING OFFICER. When in the presence of the public, employees of the Department shall address supervisors by their proper titles.

B. OBEDIENCE TO ORDERS. Employees shall obey the lawful orders of any Department supervisor.

C. INSUBORDINATION. Insubordination is the refusal to follow a lawful work order, or a challenge to authority. Additionally, insubordination includes the use by any employee of coarse, profane, or insolent language or behavior toward any supervisor, or willfully lying to any supervisor in any matter having to do with the course and scope of employment.

## 2.01.4  DEPARTMENT SENIORITY

A. SWORN. Seniority of officers is determined by Classified Service rating and further by the length of continuous service in the Classified Service Rate, according to Departmental service. If date of appointment is the same for two or more officers, the one occupying the higher position on the Classified Service eligible list is considered the senior officer.

B. CIVILIAN. Seniority of civilian employees is according to the Classified Service rating whereby one position is classified as being higher in grade than another, and the length of continuous service in that class.

## 2.01.5  TAKING CHARGE OF A SCENE

A. OFFICER IN CHARGE. The officer assigned to an incident shall take charge. In routine performance of duties, or at the scene of a police incident, officers shall recognize and respect the position of the officer-in-charge by effectively and efficiently carrying out lawful orders issued by that authority.

B. SENIOR OFFICER ASSUMING COMMAND. A senior officer may take command of a situation by informing the officer in charge and others involved in the incident of his intent. Such assumption of command shall be undertaken whenever the situation appears to the senior officer to be beyond the control of the officer in charge, or when both officers are involved in the same duty.

**174**

**Exhibit  J - 11**

RN0045

C. JUNIOR OFFICER ASSUMING COMMAND. An officer of equal or junior rank may take command by informing the officer then in charge of his intent. Such assumption of command shall be undertaken only when the officer in command is unable to perform his duties because of physical or mental inability. An officer, regardless of rank, shall assume command of a situation when so instructed by an officer of superior rank. An officer in command of an operation shall maintain that responsibility until relieved by competent authority.

## 2.01.6 CIVILIAN PERSONNEL

A. PERFORMING POLICE DUTIES. A civilian employee shall not be assigned to duties of police nature, except for Services Officers assigned to specific duties. This section does not restrict any employee from assisting, defending, or protecting other employees who are in need of emergency assistance in the performance of their duties. If an emergency exists and a female officer is not immediately available, a female civilian employee may:

1. Temporarily act as an observer during the care or detention of a female.

2. Act as a witness during the photographing of a female crime victim.

## 2.01.7 EMPLOYEE ORGANIZATION

A. EMPLOYER-EMPLOYEE RELATIONS. Employees have the right to form, join, and participate in activities of employee organizations for the purpose of representation on all matters of employer-employee relations. No employee shall be interfered with, intimidated, restrained, coerced, or discriminated against because of his exercise of these rights.

B. MOU PROVISIONS. Wages, hours, and working conditions are governed by the existing Memorandum of Understanding provisions for each of the various employee organizations.

## 2.01.8 SWORN MEAL AND BREAK PERIODS

A. Uniformed officers may take a thirty-minute meal, exclusive of transportation, during the course of the employee's normal working hours.

1. Meals shall be taken only after receiving clearance to do so from Communications.

2. Meals and breaks shall be taken in such a manner that the officer can respond in a timely manner.

3. Meals and breaks shall be taken within their assigned beat. Any exceptions will be with the express approval of a field supervisor, on a day-to-day basis.

4. No more than two marked units or four uniformed officers, excluding supervisors, may be out at any one location. Motors paired after dark will be considered to be one unit.

## 2.01.9 WEIGHT ROOM

A. EMPLOYEES ONLY. The physical training room is for the use of current Department employees only.

B. USE AT OWN RISK. Employees using the physical training room do so at their own risk. Personnel using these facilities must recognize that an injury incurred on- or off-duty is not automatically considered a work-related injury.

C. RULES FOR USE. Unsafe conditions or acts that may cause damage or injury will not be tolerated. Employees shall use the physical training room in a safe manner.

## 2.01.10 PROPERTY DAMAGE

A. DEPARTMENT PROPERTY. An employee shall report promptly, through channels, to his Division Commander or other responsible person, the loss or unserviceable condition of, or damage to, any Department property issued or assigned to him.

B. OTHER PROPERTY. Whenever possible, employees should request supervisory approval prior to taking actions that may result in property damage. If there is an incident where property damage occurs, the employee shall notify a supervisor of the incident and any actions taken, and write a TPD 41 documenting how the property was damaged, the extent of the damage, any notifications made, and efforts to secure the property.

C. SUPERVISORY RESPONSIBILITY. When notified of property damage, supervisors shall make a notation in their log of the damage, any approvals given, and any action taken, including completion of the Notification Card. The Supervisor shall make note of the employee's TPD 41 and forward it to the Personnel Division Commander. Photographs should be taken whenever practical.

### 2.01.11 MISUSE OF PUBLIC RESOURCES

A. Department employees may not use or permit others to use public resources for personal purposes or campaign activity. "Public resources" means any property or asset owned by the City of Torrance, including, but not limited to, land, buildings, facilities, funds, equipment, supplies, telephones, computers, vehicles, travel, and on-duty time.

### 2.01.12 MEMBERSHIPS AND SUBSCRIPTIONS

A. The Department will fund memberships and subscriptions in those professional organizations that contribute to the exchange of related information in the furtherance of the mission and goals of the Department. Involvement in organizations such as L.A. County Peace Officers Association, California Peace Officers Association, International Association of Chiefs of Police, California Narcotics Officers Association, California Juvenile Officers Association, California State Division of International Association for Identification, Fraternal Order of Police, and California Sexual Assault Investigators Association, are strongly supported and encouraged, regardless of whether their cost is covered by the Department.

B. Whenever possible, subscriptions should be listed by rank/position rather than by named individuals. Memberships in professional associations shall be limited to necessary personnel actually assigned to related specialized duties.

C. Memberships in and attendance at annual training conferences of International Association of Chiefs of Police are limited to captains and above; and Federal Bureau of Investigation National Academy Associates is limited to those who have completed the FBI National Academy program.

**JOHN J. NEU**
**CHIEF OF POLICE**

**176**

Exhibit  J - 13                                                                                RN0047

# Police Officer

**Definition**
Under supervision, to enforce laws and ordinances; to investigate and detect crimes; to apprehend criminals; and to do related work as required.

**Distinguishing Characteristics**
Distinguished from Police Sergeant in that an incumbent is not responsible for the supervision of other police officers. Distinguished from Services Officer in that incumbents in the Police officer class are sworn personnel.
Lateral-entry Officer is distinguished from entry-level Officer in that an entry-level Officer is not required to have: Twelve months of peace officer experience; possession of a P.O.S.T. Basic Certificate; and graduated from an approved training academy.

**Examples Of Duties**
- Enforces laws and ordinances;
- investigates and detects crimes;
- patrols assigned areas;
- answers calls for protection of life and property and the enforcement of City, County and State laws;
- conducts preliminary investigations of robberies, burglaries, thefts, holdups, accidents, deaths and similar incidents;
- directs traffic, stops drivers who are operating vehicles in violation of law, warns drivers against unlawful practices and issues citations and warnings and makes arrests as the situation requires;
- testifies in court in connection with prosecutions;
- serves warrants and subpoenas;
- prepares reports of arrests made, investigations conducted and illegal incidents observed;
- gives information and directions to the public;
- searches prisoners;
- supervises trustees in cleaning and maintaining stations;
- operates telephonic and radio transmitting and receiving equipment;
- completes complaint forms when arrests are made;
- takes pictures and measurements of physical factors at scenes of crimes and accidents;
- conducts special surveys and investigations;
- serves as a juvenile officer and counselor;
- drives automobiles, motorcycles and similar equipment in the performance of duties.

**Minimum Qualifications**
<u>Knowledge of</u>:
- The laws of arrest and the legal rights of citizens; State and City traffic laws.
<u>Ability to</u>:
- Use and maintain firearms;

**177**

**Exhibit J - 14**

RN0048

- Use accurate powers of observation and memory for names, faces, numbers, incidents and places;
- Analyze situations quickly and accurately, and to determine proper course of action;
- Understand and carry out oral and written directions;
- Write clear and comprehensive reports;
- Cope with situations firmly, courteously, tactfully and with respect for the rights of others.

**License/Certificate Required**

All incumbents must possess a valid California Motor Vehicle Class 3 Operator's License. In addition, all lateral-entry incumbents must possess a P.O.S.T. Basic Certificate.

**Experience**

Entry-level, none required. Lateral-entry, twelve months of continuous employment as a Peace Officer within the State of California.

**Education**

All incumbents must be high school graduates. In addition, lateral entry incumbents must be graduates from an academy approved by the Torrance Police Department.

**178**



**LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE**
BUREAU OF PROSECUTION SUPPORT OPERATIONS
BRADY COMPLIANCE UNIT

STEVE COOLEY • District Attorney                                    LAEL R. RUBIN • Director
JOHN K. SPILLANE • Chief Deputy District Attorney
SHARON J. MATSUMOTO • Assistant District Attorney

June 10, 2010

**CONFIDENTIAL**

John J. Neu, Chief
Torrance Police Department
3300 Civic Center Drive
Torrance, California 90503

Dear Chief Neu:

OFFICER REHAN (RAY) NAZIR, #16279

The Los Angeles County District Attorney's Office has reviewed information regarding Officer Rehan (Ray) Nazir, #16279, an employee of your department, and has determined that *Brady* impeachment material which relates to Officer Nazir exists. The review was conducted in accordance with the District Attorney's Brady Protocol as set forth in Special Directive 02-08.

The Brady Compliance Unit reviewed allegations that Officer Nazir authored two probable cause declarations and a police report for the arrests of Michael Baker and Latera Odom which contained false information and determined that his conduct involved moral turpitude and is, therefore, *Brady* material. Officer Nazir objected to the Brady Compliance Unit's determination and submitted an appeal to the District Attorney's Special Designee, a neutral third party. On June 3, 2010, the Special Designee found that there was substantial evidence to support the Brady Compliance Unit's determination that *Brady* material exists. The Special Designee's finding is final and Officer Nazir's name, along with a brief description of the conduct involved, has been placed in our office's Brady Alert System, a secure computerized database accessible only to Los Angeles County deputy district attorneys.

The placement of Officer Nazir's name and accompanying information in the Brady Alert System should not be used as a basis for a personnel action against him.

Hall of Records
320 West Temple Street, Suite 540
Los Angeles, CA 90012
(213) 974-5060
Fax (213) 229-2801

**179**

**Exhibit J - 16**

RN0050

Chief John J. Neu
Page Two
June 10, 2010

Should you have any questions, please contact Imogene M.N. Katayama, Deputy District Attorney, Brady Compliance Unit, at (213) 974-5060.

Very truly yours,

STEVE COOLEY
District Attorney

By

IRENE WAKABAYASHI
Head Deputy, Appellate Division

imnk

**180**

## SPECIAL DIRECTIVE 02-08

### BRADY PROTOCOL

December 7, 2002

---

### THIS SPECIAL DIRECTIVE SUPERSEDES SD 02-05

On May 13, 2002, this office issued a comprehensive Brady policy set forth in Special Directive 02-04 and Special Directive 02-05. At that time, the Brady Alert System was being developed. In the intervening time, the U.S. Supreme Court and California Supreme Court have given us additional guidance through their decisions.

In order to ensure uniformity and consistency in meeting constitutionally required discovery obligations under *Brady v. Maryland* (1963) 373 U.S. 83, the Brady Compliance Division will coordinate and make available to deputy district attorneys known Brady information on peace officers and governmentally employed expert witnesses who are part of the "prosecution team."[1] The Brady Compliance Division will be the central repository of such known Brady information and is charged with answering any Brady questions that might arise. Subject to any future changes in the law, this Special Directive sets forth the office policy for handling these discovery obligations. This policy was carefully drafted to protect the statutory and privacy rights of police officers while fulfilling prosecutorial obligations.

### I. WHAT IS REQUIRED UNDER *BRADY*

Prosecutors are required to disclose to the defense evidence <u>favorable to a defendant</u> which is either <u>exculpatory</u> or <u>impeaching</u> and is <u>material</u> to either <u>guilt</u> or <u>punishment</u>. Evidence is "favorable" to the defendant if it either helps the defendant or hurts the prosecution. (*In re Sassounian* (1995) 9 Cal.4th 535, 543-544.) In *Strickler v. Greene* (1999) 527 U.S. 203, 280-281, the United States Supreme Court stated:

In *Brady* this Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* supra, 373 U.S. at 87. We have since held that the duty to disclose such evidence is applicable even though there has been no request by the accused, [*United States v. Agurs* (1976) 427 U.S. 97, 107], and that the duty encompasses impeachment evidence as well as exculpatory evidence, [*United States v. Bagley,* (1985) 473 U.S. 667, 676]. Such evidence is material "if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id at 682; see also [*Kyles v. Whitley* (1995) 514 U.S. 419, 433-434].

In order to ensure compliance with these rules, the United States Supreme Court on more than one occasion has urged the "careful prosecutor" to err on the side of disclosure. (*Kyles v. Whitley,* supra, 514 U.S. 419, 440; *United States. v. Agurs, supra,* 427 U.S. 97, 110.)

**181**

**Exhibit J - 18**

RN0052

## A. Material Evidence

The definition of "material evidence" is generally provided in the context of an appeal from a conviction. Evidence is material if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed. A reasonable probability of a different outcome is shown where suppression undermines confidence in the outcome. Such evidence must have a specific, plausible connection to the case, and must demonstrate more than minor inaccuracies. (*Kyles v. Whitley*, supra; *U.S. v. Bagley*, supra; *People v. Padilla* (1995) 11 Cal. 4th 891, 929-32; *People v. Clark* (1992) 3 Cal. 4th 41, 133-34.)

However, as prosecutors we must determine what Brady evidence there may be *before* trial. In making this assessment, the deputy shall utilize the above guidelines.

## B. Exculpatory Evidence

Exculpatory evidence is evidence favorable to the defendant and material to the issue of guilt or punishment.

## C. Impeachment Evidence

Evidence Code section 780 states in part that:

Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing including, but not limited to, any of the following:

* * *

(e) His character for honesty or veracity or their opposites.

(f) The existence or nonexistence of a bias, interest or other motive.

(h) A statement made by him that is inconsistent with any part of his testimony at the hearing. (Emphasis added.)

CALJIC No. 2.20 (2000 rev.) incorporates the above listed factors and adds conviction of a felony and past criminal conduct of a witness amounting to a misdemeanor as well as several other considerations. If impeachment evidence is based upon the prior commission of a crime, the crime must involve moral turpitude to be admissible. (*People v. Castro* (1985) 38 Cal.3d 301, 314 [felonies]; *People v. Wheeler (1992)* 4 Cal.4th 284, 295-297 [misdemeanor conduct].)

Further examples of possible impeachment evidence of a material witness include:

1. False reports by a prosecution witness (*People v. Hayes* (1992) 3 Cal. App. 4th 1238, 1244);

2. Pending criminal charges against a prosecution witness (*People v. Coyer* (1983) 142 Cal.App.3d 839, 842);

**182**

**Exhibit  J - 19**

RN0053

3. Parole or probation status of the witness (*Davis v. Alaska* (1974) 415 U.S. 308, 319; *People v. Price* (1991) 1 Cal.4th 324, 486);

4. Evidence contradicting a prosecution witness' statements or reports (*People v. Boyd* (1990) 222 Cal.App.3d 541, 568-569);

5. Evidence undermining a prosecution witness' expertise (e.g., inaccurate statements) (*People v. Garcia* (1993) 17 Cal.App.4th 1169, 1179);

6. A finding of misconduct by a Board of Rights or Civil Service Commission, that reflects on the witness' truthfulness, bias or moral turpitude (cf. *People v. Wheeler, supra,* 4 Cal.4th at p. 293) (Note that the burden of proof in an administrative hearing is preponderance of the evidence);

7. Evidence that a witness has a reputation for untruthfulness (3 Witkin Cal. Evid., 4th Ed., § 288-290);

8. Evidence that a witness has a racial, religious or personal bias against the defendant individually or as a member of a group (*In re Anthony P.* (1985) 167 Cal.App.3d 502, 507-510); or

9. Promises, offers or inducements to the witnesses, including a grant of immunity (*United States v. Bagley, supra,* 473 U.S. 667, 676-677; *Giglio v. United States* (1972) 405 U.S. 150, 153-155).

A thorough review of all other types of information must be made before a determination is reached that evidence concerning the credibility of a material prosecution witness is impeachment evidence.

### D. What is *not* Brady material

Allegations that cannot be substantiated, are not credible, or have been determined to be unfounded are not considered impeachment material and therefore will not be included in the Brady Alert System. (Please refer to section III below.) The prosecution has no obligation to communicate preliminary, challenged or speculative information. (*United States v. Agurs, supra,* 427 U.S. 97, 109, fn. 16.) Pending criminal or administrative investigations are considered preliminary in nature.

If a deputy has any question whether information falls within Brady, the Brady Compliance Division will be available for consultation.

### II. PROCEDURES FOR NOTIFYING THE BRADY COMPLIANCE DIVISION OF POTENTIAL BRADY INFORMATION

If a deputy is aware or becomes aware of potential Brady information, the deputy shall inform his or her Head Deputy or Deputy-in-Charge. If the Head Deputy or Deputy-in-Charge concurs with the deputy that the information is potential Brady material, a memorandum shall be written summarizing the material and setting forth why the supervisor and the deputy believe that Brady material exists. (If the Head Deputy or Deputy-in-Charge does not agree with the deputy, please refer to section IV D below.)

**183**

**Exhibit J - 20**

RN0054

If it is believed that the conduct amounts to a crime, the memorandum and copies of all supporting evidence and relevant documentation (such as transcripts, disposition reports, police reports or expert reports) shall be forwarded to both the Brady Compliance Division and the Justice System Integrity Division (JSID). (See Special Directive 01-10.) JSID will either conduct an independent investigation or refer the matter to the employee's agency for investigation. JSID shall be responsible for monitoring the status of such investigation and encouraging a timely response from the agency.

If the discovered information is other than a potential crime, the memorandum and copies of all supporting evidence and relevant documentation shall be sent directly to the Brady Compliance Division. The Brady Compliance Division will refer the matter to the employee's agency for investigation.

## III. BRADY ALERT SYSTEM

The Brady Compliance Division will maintain a computer-based "Brady Alert System." The system includes both known historical and current Brady information. This system will *not* create secondary personnel files on police officers or governmentally employed experts. The only information from an employee's personnel file to be included in the system is that which is received pursuant to a *Pitchess* motion, where a court has released information without a protective order prohibiting dissemination of the material, or pursuant to an investigation resulting in a criminal charge filed against the employee.

### A. Access to the Brady Alert System

Every deputy can access the Brady Alert System to determine whether information on a particular witness exists. The alert system will confirm if information exists as well as provide a brief summary of the Brady information. Deputies will then need to contact the Brady Compliance Division for further details if necessary.

At arraignment on an Information, deputies shall access the system to determine whether impeachment information exists for any witness. Calendar or trial deputies shall also check the system at least 30 days before trial. Any information learned from accessing the Brady Alert System shall be noted in the DA file. The deputy appearing in court on a case shall have the responsibility of notifying the defense of any information learned from the system. A notation shall be made in the DA file indicating the date, what information was provided and in what manner notification to the defense was made (i.e., in writing, on the record, etc.) Any information learned from the system shall be conveyed to the defense only on the particular case. Misuse of this system will subject an employee to disciplinary action up to, and including, discharge.

### B. Security Log

A security log has been built into the system and is maintained by our Systems Division. This log will track every Brady Alert System inquiry made by a member of this office.

### IV. STANDARD OF REVIEW BY THE BRADY COMPLIANCE DIVISION

**184**

RN0055

## A. Post Investigation

The Brady Compliance Division will decide whether to include information concerning a peace officer or governmentally employed expert witness in the Brady Alert System. Such decision will be made after an investigation of the allegations by the employee's agency, another law enforcement agency or by JSID.

The decision to include such information in the alert system will be made using a standard of *clear and convincing evidence* which is higher than a preponderance of evidence but less than beyond a reasonable doubt. In other words, without clear and convincing evidence that the potential impeachment evidence is reliable and credible, it will not be included in the alert system.

Using the above standard, if the Brady Compliance Division determines that Brady material exists, it shall notify the Head Deputy or Deputy-in-Charge and place the information into the alert system. The Brady Compliance Division will advise Head Deputies and Deputies-in-Charge regarding the manner in which notification is made to the defense. (Please refer to section VI below.) The Brady Compliance Division will also notify the employee's agency in writing of this decision and action.

Only Brady Compliance Division deputies will input or delete information from the Brady Alert System.

## B. Pending Investigations

If, while a matter is under investigation, the Brady Compliance Division determines that there is sufficient credible information that the potential evidence is reliable and credible and it is necessary to present such evidence to a court (such as where a trial has commenced), it will advise the Head Deputy or Deputy-in-Charge to notify the employee that the trial deputy will be requesting an *ex parte, in camera* hearing to present all relevant, material evidence to the court and ask the judge to make a decision whether the evidence should be revealed to the defense. If the judge rules that there is Brady material, a protective order shall be requested before the material is turned over to the defense. The trial deputy shall send a memorandum to the Brady Compliance Division setting forth the judge's reasoning.

## C. Insufficient Time for an Investigation

In those unusual instances where alleged Brady material is discovered shortly before or during trial and there is insufficient time for an investigation, the trial deputy shall consult with his or her supervisor and the Brady Compliance Division. Upon a determination by the Brady Compliance Division that there appears to be sufficient credible information that the potential evidence is reliable and credible, the Head Deputy or Deputy-in-Charge shall notify the employee that the trial deputy will be requesting an *ex parte, in camera* hearing to present all relevant, material evidence to the court and ask the judge to make a decision whether the evidence should be revealed to the defense. If the judge rules that there is Brady material, a protective order shall be requested before the material is turned over to the defense. The trial deputy shall send a memorandum to the Brady Compliance Division setting forth the judge's reasoning.

**185**

RN0056

In either situation described in section B or C above, if a court issues a protective order, the alleged Brady material will not be included in the Brady Alert System. If no protective order is issued, the Brady Compliance Division will wait for a full investigation of the alleged Brady material before making a decision to include such information in the Brady Alert System.

### D. Individual Responsibility

Complying with Brady is the individual responsibility of each deputy. The decision whether to use a witness whose name appears on the alert system will be left to the discretion of the individual trial deputy after appropriate consultation with his or her Head Deputy or Deputy-in-Charge and the Brady Compliance Division. If the situation should ever arise in which a witness' name does not appear on the alert system and an individual trial deputy learns of information that he or she believes triggers his or her Brady obligation, the trial deputy shall review this information with his or her Head Deputy or Deputy-in-Charge and the Brady Compliance Division. If neither the deputy's Head Deputy or Deputy-in-Charge nor the Brady Compliance Division agree, upon request by the deputy, the Brady Compliance Division will refer the matter to the employee's agency for investigation.

## V. JUSTICE SYSTEM INTEGRITY DIVISION, OFFICEWIDE DECLINATIONS AND NEWLY DISCOVERED BRADY MATERIAL

### A. Justice System Integrity Division/Officewide Declinations

Because the Brady Alert System will include both known historical and current Brady information, JSID will share information with the Brady Compliance Division on current as well as past filed cases involving peace officers and governmentally employed experts.

A copy of every JSID declination involving a member of the prosecution team will be sent to the Brady Compliance Division. The latter will review the declination and make a preliminary determination if potential Brady information exists. If there has not been an investigation concerning the potential Brady material, it will be the responsibility of the Brady Compliance Division to ensure such an investigation is completed before making any determination. Following this investigation, if the information is determined to be Brady material, it will be included in the alert system and the notification process will be initiated.

In all other divisions, if a case is rejected but a deputy believes that potential impeachment information concerning a peace officer or governmentally employed expert witness is included, it shall be brought to the attention of the Head Deputy or Deputy-in-Charge. If the Head Deputy or Deputy-in-Charge agrees that Brady material exists, then the Head Deputy or Deputy-in-Charge shall send a memorandum summarizing and analyzing the Brady material to the Brady Compliance Division. The same procedures discussed above shall be followed.

### B. Newly Discovered Brady Material

**186**

RN0057

If a deputy learns of "new" Brady material concerning any member of the prosecution team already identified in the alert system, the procedure described above shall be followed.

## VI. NOTIFICATION OF DEFENSE ATTORNEYS/PRO PER DEFENDANTS

Because obligations under *Brady* continue even after a case is concluded (*People v. Gonzalez* (1990) 51 Cal. 3rd 1179, 1260-1261), once the Brady Compliance Division determines that Brady material exists for a particular witness, the division shall obtain a computer run of all cases for that witness. The computer run will include all cases from the date of the alleged misconduct to the present. Head deputies in the offices where cases are located will be notified to send letters to all defense attorneys of record or pro per defendants, alerting them to the existence of potential Brady material. Head deputies shall not send notification letters in closed cases where the defendant has pled guilty or no contest. (See *U.S. v. Ruiz*, (2002) 536 U.S. , 153 L. Ed 2nd 586, 597, 122 S. Ct )

## VII. PRIMARY RESPONSIBILITIES OF THE BRADY COMPLIANCE DIVISION

1. Maintain the Brady alert system;

2. Collect and maintain Brady material;

3. Assist deputies in determining whether Brady material exists in a particular case, or against a particular witness;

4. Consult with individual deputies as to when it is appropriate to disclose potential impeachment information to the defense;

5. Advise deputies on issues relating to the Brady Protocol and on relevant case law;

6. Consult with deputies as to when it is appropriate to seek *ex parte, in camera* review by the court of potential Brady material; develop and maintain pleadings for this purpose; and

7. Coordinate responses to Public Records Act requests for Brady material within the office.

Compliance with this Directive will help fulfill our primary mission of fairly prosecuting those who violate criminal laws in Los Angeles County.

dtg

---

[1] The policy regarding possible Brady material in the possession of law enforcement is set forth in SD 02 – 07.

**187**

## SECTION 14.47.7. - WRITTEN CHARGES AND ADMINISTRATIVE REVIEW.

*(Amended by O-3100)*

a)  Prior to the imposition of a suspension, demotion or discharge under the provisions of this Article, an employee shall receive a written statement of charges and notice of the recommended discipline.

b)  Any employee recommended for such discipline shall be afforded an opportunity to respond to the charges before the City Manager or his designee in accordance with procedures established by the City Manager. The decision of the City Manager or his designee shall be given to the employee in writing.

**188**

RN0059

**189**

Exhibit K



# CITY OF TORRANCE

## OFFICE OF THE CITY MANAGER

LeRoy J. Jackson
City Manager

Mary K. Giordano
Assistant City Manager
310/618-5849
mgiordano@torrnet.com

September 9, 2010

Rehan Nazir
22306 Marjorie Avenue
Torrance, CA 90505

Dear Officer Nazir:

Pursuant to City of Torrance Policy, Procedure and Protocol Manual Chapter 139, "Disciplinary Action Procedure," an administrative conference was held on September 7, 2010 at 2:00 p.m. before the designee of the City Manager, Mary Giordano, Assistant City Manager. The administrative conference was scheduled based upon the recommendation of the Police Chief that you be terminated due to violation of certain rules, regulations, orders and/or laws as set forth in the letter of charges dated August 16, 2010.

Participating in the conference were Mary Giordano, Hearing Officer; Captain Mark Matsuda, Torrance Police Department; and, J. Scott Tiedemann, Esq., Liebert Cassidy Whitmore. As scheduled, the conference began at 2:05 p.m.; however, neither you nor a representative appeared at the conference. The conference was closed at 2:15 p.m. Per Chapter 139, a response from the employee is not required.

Prior to the scheduled administrative conference, the Hearing Officer reviewed the letter of charges and the accompanying documentation in its entirety. The purpose of the administrative hearing was to provide you with an opportunity to present facts or documentation relevant to the proposed discipline persuasive to the Hearing Officer to refute or mitigate the charges against you.

Hearing Officer Findings

The Hearing Officer has weighed the evidence presented by the Department in the letter of charges to arrive at a determination of whether there are reasonable grounds to believe that the charges against you are true and support the recommended disciplinary action of termination.

---

3031 Torrance Boulevard • Torrance, California 90503 • Telephone 310/618-5880 • Fax 310/618-5891
Visit Torrance's home page: http://www.torrnet.com

**190**

**Exhibit K - 1**

RN0024

Rehan Nazir
September 9, 2010
Page 2

Based on a comprehensive review of the facts, the Hearing Officer finds that the preponderance of evidence supports the Department's recommended disciplinary action. The recommendation for termination is upheld, effective September 9, 2010.

You have certain rights to appeal this decision to the Civil Service Commission pursuant to Section 14.47.8 of the Torrance Municipal Code.  A request to have this matter reviewed must be submitted to Ms. Laura Lohnes, Civil Service Manager, within (10) calendar days of the date of this letter.

Sincerely,

Mary K. Giordano
Assistant City Manager

cc: Andrew M. Dawson, Esq.
J. Scott Tiedemann, Esq.
John Neu, Police Chief
Lohnes Laura, Civil Service Manager
Elaine Winer, Human Resources Director
Personnel file

**Exhibit  K - 2**

RN0025